**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION**

| | |
|---|---|
| **LUXPRO CORPORATION, a Taiwanese corporation,** )<br>)<br>) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 4:08-CV-04092-HFB** |
| **vs.** ) | |
| ) | |
| **APPLE, INC. f/k/a Apple Computer, Inc.,** )<br>) | |
| ) | |
| **Defendant.** ) | |

---

## PLAINTIFF'S FIRST AMENDED COMPLAINT

---

**NOW COMES** Plaintiff Luxpro Corporation, a Taiwanese corporation, and for its Original Complaint against Apple, Inc. f/k/a Apple Computer, Inc. states:

### I.     PARTIES

1.     Luxpro Corporation ("Luxpro") is a Taiwanese corporation, with its principal place of business in Taiwan. It develops, manufactures, distributes and sells MP3 players throughout the world, including in the United States.  Luxpro is a citizen of and is domiciled in Taiwan, a foreign state.

2.     Apple, Inc. ("Apple") is a California corporation that manufactures, distributes and sells MP3 players under the brand name iPod throughout the world. Apple's principal place of business and corporate headquarters are located at 1 Infinite Loop, Cupertino, Santa Clara County, California 95014.  Apple is a citizen of and is domiciled in California.

## II.    JURISDICTION AND VENUE

3.      This Court has original jurisdiction over this case under 28 U.S.C. § 1332(a)(2).  The matter in controversy exceeds the sum or value of $75,000, exclusive of costs and interest.  Luxpro is a citizen of Taiwan, a foreign state.  Apple is a citizen of California.  Therefore, the Court has subject-matter jurisdiction over this case based on diversity of citizenship.

4.      This Court has personal jurisdiction over Apple because Apple regularly conducts business in this state.  At all relevant times, Apple was engaged in the business of marketing, distributing and/or selling its consumer electronics products, including iPods, in Arkansas and throughout the United States.

5.      Venue in the Western District of Arkansas is proper for this case under 28 USC § 1391(a)(1)-(2) and (c).  Apple conducts business in this judicial district and is subject to personal jurisdiction at all times relevant herein.  Apple maintains a substantial presence in this District as it has numerous retail sales locations throughout this District.  Further, Apple promotes, uses, sales, engages in marketing and/or distributes its iPods and related services throughout this District.

## III.    FACTUAL BACKGROUND

6.      Through a scheme designed to interfere with Luxpro's existing and prospective business relations, Apple unlawfully attempted, and partially succeeded, in squashing the success Luxpro had achieved through lawful efforts to compete in the worldwide MP3 player market.  Luxpro's MP3 players were independently researched, developed, manufactured, distributed, licensed and sold.  However, Apple furthered its

unending aspiration to monopolize the worldwide MP3 player market by preventing fair competition from smaller MP3 player manufacturers like Luxpro.

**A.    The History of Apple's Ipod Products**

7.    On January 8, 2001, Apple introduced iTunes at the Macworld Expo. iTunes is a digital media player application that plays and organizes digital music and video files.   On October 23, 2001, Apple introduced the iPod which interfaces with iTunes to play music files.  By February 2005, Apple had released several generations of the iPod Classic, the first generation of the iPod mini and the iPod Shuffle.  On April 23, 2003, Apple introduced its online media store, the iTunes Store.

8.    Soon after the iTunes Store launch, Apple announced the iTunes Store had over one million songs available for download in the United States.  Through the iTunes Stores, Apple has gained control over 80% of the music downloaded in the U.S. However, Apple deliberately makes digital music purchased at the iTunes Store inoperable with its competitor's MP3 players.  Thus, in order to play music from Apple's iTunes Store, the dominant online music retailer, the consumer's only option in the digital music player market is Apple's iPods.   Apple also makes the iPod in such a manner that it is unable to play music sold at rival online music stores, leaving consumers with no choice but to purchase music from iTunes.

9.    Unlike most internet sites, iTunes Store is accessed with proprietary Apple software rather than with a web browser.  The iTunes Store sells individual songs that can only be played by the iPod.  Individual songs can be downloaded from the iTunes Store for $.99.   Apple receives funds from iTunes purchases that it then funnels to the recording industry.  Apple does not turn a profit on the sale from iTunes.  Instead, Apple

relies on sales of its MP3 players to secure significant profits. Because of the importance of the worldwide MP3 player market to Apple's bottom line, Apple has sought to monopolize the worldwide MP3 player market and crush legitimate, smaller competitors.

**B.     How Apple Monopolized the Worldwide Market**

10.     Since the introduction of the iPod, Apple spurred the creation of the MP3 market and dominated it. Apple has sold over 22 million iPods since its introduction. In the United States alone, Apple has obtained a dominant 90% market share of the hard drive based MP3 player market and 70% share of the MP3 player general market.

11.     Apple dominates the worldwide market today. In 2005, Apple's iPod increased its market share to 26% from 21% in the prior year. Mid-range competitors such as Creative Technologies which created the Ltd.'s ZEN series, Reigncom which created the Ltd.'s Iriver series, Samsung and SanDisk's combined market share dropped from the previous year to a combined 14% market share, perhaps due to legitimate competition from smaller-range manufacturers of other digital music players. These smaller ranged manufacturers increased their combined market share of the digital music player market by eight percent in one year, which was greater than Apple's 5% gain from 2004 through 2005. It is no wonder then, once Apple realized its strongest threat in the MP3 player market included mid-range and small-range manufacturers, that Apple intentionally targeted Luxpro, a small-range MP3 player manufacturer in Taiwan. Apple sought to conquer smaller competitors such as Luxpro to prevent an increased market share among the smaller-ranged manufacturers.

**C.  Apple's Conduct as to the Worldwide MP3 Player Market**

12.  Since the introduction of the iPod, Apple has sought to stamp out the competition using various schemes.  In the last few years, Apple's competitors have attempted to fight back with multiple suits having been filed alleging, among other things, that Apple engages in illegal anti-trust tying schemes (between the iPod and iTunes), unfair competition, and monopolizing behavior by placing unneeded and unjustifiable technological restrictions on its most popular products in an effort to restrict consumer choice and restrain competition in the digital music markets.

13.  Apple developed a confidential, internal strategy to stop competition through strategically filed litigation and has repeatedly used other unfair tactics against other small manufacturers.  As an example, although Creative Technology, a Singapore based company, beat Apple to the patent punch on iPod's interface, Apple sued Creative Technology in a Wisconsin District Court alleging that Creative Technologies infringed on four of Apple's patents. Ultimately, the case was settled when Apple forked over one hundred million dollars to Creative Technologies in 2006.  Ironically, the settlement allowed Apple to use Creative's patent on the interface in Apple products, another tactic designed to promote growth of the Apple monopoly and to deter other lawful efforts to compete by smaller manufacturers.  .

**D.  The Luxpro Corporation's History and Product Development**

14.  The Luxpro Corporation was founded in December of 2002.  Luxpro owns an outstanding research and development team which has a first-rate reputation in the worldwide MP3 player market for high quality design.  Among others products, Luxpro developed and marketed a variety of cutting edge MP3 players such as the Luxpro EZ

Share MX-125D ("EZ Share"), EZ Season MX-110D ("EZ Season"), EZ Listen MX-265E ("EZ Listen"), Top Tangent MX-585D ("Top Tangent"), EZ Tangent MX-595D ("EZ Tangent") and  Super Tangent MX-575D/1075D ("Super Tangent").

15.     Luxpro's products are progressive and unique. Luxpro spent several million dollars in research and development.  Ultimately, Luxpro launched the EZ Share in January 2004 boasting features Apple products fail to contain.  For example, the EZ Share entered the market with the capability to listen to FM radio, record music, and move, receive and set up music files.  Similarly, the EZ Season (product design launched in July 2004), EZ Listen (product design launched in August 2004), Top Tangent (product design launched in April 2005), EZ Tangent (product design launched in April 2005) and Super Tangent (formally in volume production by May 2005) all contained these extra features.  Additionally, Luxpro developed the EZ Listen, Top Tangent, and EZ Tangent with a seven language learning function and tri-color OLED display monitors.  Moreover, the Top Tangent and EZ Tangent were the first MP3 players with a Voice Positioning System. The development of these advanced products led to increased recognition of Luxpro's products in the worldwide MP3 player market and allowed Luxpro to rapidly expand its business and operations.

**E**.     **Luxpro's MP3 Products Gain Momentum in the Global Consumer Electronics Market.**

16.     The success of Luxpro's MP3 players allowed it to enter into a number of distributorships agreements that should have allowed Luxpro to compete with Apple in the global MP3 marketplace throughout Asia and the United States.

17.     For example, in April 2005, Luxpro entered into an agreement with Beijing Huaqi Informational Digital Technology Co., Ltd. ("Beijing Huaqi").  Under this

agreement, Luxpro agreed to supply Beijing Huaqi with 630,000 sets of its Super Tangent, Top Tangents, EZ Tangents and EZ Listens MP3 players. Also under this agreement, Beijing Huaqi was licensed to distribute Luxpro's MP3 players in China for one year.

18.     Also in April 2005, Luxpro entered into another agreement with Beijing Qian Kun Time Digital Technology Co., Ltd. ("Beijing Qian Kun"). Under this agreement, Luxpro agreed to supply Beijing Qian Kun with over 600,000 sets of its Super Tangents, Top Tangents, EZ Tangents and EZ Listens MP3 players for two years. Also under this agreement, Beijing Qian Kun could distribute Luxpro's MP3 players in China for two years.

19.     In June 2005, officers of InterTAN Canada, Ltd. ("InterTAN") traveled to Taiwan to meet with Luxpro about selling Luxpro's MP3 players in InterTAN's retail stores. InterTAN is a Canadian consumer electronics retailer that operates under "The Source by Circuit City" banner and is a wholly owned subsidiary of Circuit City Stores, Inc. InterTAN showed great interest in Luxpro's MP3 players. InterTAN's interest in Luxpro's MP3 players was, in part, based on Luxpro's MP3 players' screens functioning as an FM radio and their ability to record sound. InterTAN placed orders for Luxpro's Top Tangent under the brand name "Centrios." In August 2005, Luxpro shipped over seven thousand of its Top Tangent MP3 players under the brand name "Centrios" to InterTAN for a two-week trial sell in InterTAN's retail stores. Luxpro's Top Tangents were popular with InterTAN's customers and flew off of the retailer's shelves. In response to this popularity, InterTAN began to actively promote the Top Tangent.

20.    In June 2005, Luxpro entered into another agreement with TC Digital Electronic SBU of Shenzen City, China ("TC").  Under this agreement, Luxpro agreed to supply TC with more than one million sets of Super Tangents, Top Tangents, EZ Tangents and EZ Listens for two years.  Under the agreement, TC could distribute Luxpro's MP3 players for two years.

21.    By August 2005, Luxpro had obtained orders for its MP3 players from all over the world and had attracted the interest of venture capital firms in the United States, Japan, and other countries.  Specifically, Luxpro received substantial interest and orders for its MP3 players from retailers, distributers, suppliers, and consumers in the United States, and around the globe, during this time frame.

22.    In September 2005, Luxpro sent MP3 players valued at $NTD 2.8 Million to Kaga Electronics Co., Ltd., an electronics supplier in Japan.

**F.    Luxpro's Evolution and the Market Interest in Its Products Provides the Foundation for a Public Offering of Luxpro Securities.**

23.    Luxpro's world-wide growth allowed it, in 2005, to begin the process of publicly trading company shares on the GreTai Securities Market ("GreTai"), a non-profit organization which took over the business of public stock trading from the Taipei Securities Dealer's Association.  A listing on the Taiwanese GreTai Securities Market would have been a great advantage to Luxpro's enterprise, shareholders and employees. The opportunity to be traded on GreTai would have made raising long-term capital for growth easier, bettered Luxpro's already outstanding reputation and promoted business growth, improved Luxpro's interior management system and operations and increased Luxpro's support from domestic industries.  Moreover, a GreTai listing would have allowed Luxpro to establish a stock option system for employees designed to increase

loyalty to the company, increase the social status of Luxpro's employees and allow employees to share in the accomplishments of the company.

24.     Being traded on GreTai would have benefited Luxpro's shareholders by increasing the marketability of Luxpro's stock, made Luxpro's stock easier to circulate and liquidate, and would have allowed Luxpro's stock to be used as collateral of loans from financial institutions.

## G.     Luxpro's MP3 players and Apple's Plans to Squash a Competitor

25.     However, as Luxpro MP3 players began to leave their footprint on the MP3 player market, and Apple continued its unfair trade practices designed to bring down their competition, Apple also initiated a well-planned, and previously undisclosed strategy specifically targeted at Luxpro and all of its current and future products.

26.     In February 2005, Luxpro conducted a trial run of its Super Shuffle MP3 player and showed it off in March 2005 at the CeBit Tradeshow in Hanover, Germany. Contemporaneously with the tradeshow, Apple applied for and received injunctive relief against Luxpro from a German court asking Luxpro to abandon the use of the word "Shuffle" in the product name of one of its competing products, even though no trademark for that name was registered by Apple.  Nevertheless, in the face of this challenge, Luxpro renamed its Super Shuffle the "Super Tangent" and added the word "LUXPRO" to the product to eliminate any possible legal claim of product confusion. Luxpro then began to remarket its MP3 player products under the "Tangent" label.

27.     In spite of these efforts by Luxpro, in April 2005, Apple did not give up the attack and engaged a third party to purchase a Super Tangent from Luxpro.  In addition, in furtherance of its scheme to steal rightfully earned market share from Luxpro,

Apple also surreptitiously obtained two of Luxpro's proprietary price lists. Then, on April 8 and 26, 2005, without any apparent reason other than to intimidate its competition, Apple sent threatening letters to Luxpro demanding that Luxpro immediately stop marketing, manufacturing and selling **all** of its competing MP3 products – the Super Tangent, the Top Tangent *and* the EZ Tangent. Besides noting the obvious differences in the Apple and Luxpro MP3 players, Luxpro responded by reminding Apple that it had changed the name of one of its MP3 players the Super Tangent to avoid confusion and differentiate it with Apple's iPod Shuffle. Since Apple had no legal right to demand that a competitor simply withdraw its independently developed products from the market, Luxpro continued to manufacture, market, distribute, license, and sell its MP3 players.

28. Nevertheless, Apple, as part of its privately developed scheme to ambush and eliminate one of its most serious smaller competitors, Apple sued Luxpro in Taiwan alleging that the appearance of the Super Tangent, EZ Tangent, **and** Top Tangent closely resembled the iPod Shuffle. Through a clearly one-sided submission by Apple when the lawsuit was filed, Apple was able to convince a Taiwanese court to enter a preliminary injunction that prohibited Luxpro from manufacturing, distributing and marketing **any** of its MP3 players. Eventually, Luxpro won the lawsuit on appeal, and the injunction was lifted as to all of Luxpro's products, except any using the name "Shuffle." However, in spite of this favorable ruling, the injunction had forced Luxpro to stop manufacturing, advertising and marketing its MP3 players for a significant period of time. The improperly obtained broad-form injunction had stopped all of Luxpro's MP3 production and had forced Luxpro to cease performance of existing contracts and orders. Luxpro

attempted to negotiate with material suppliers to terminate or hold orders of raw materials. Some of these raw material orders could not be cancelled. As a result, Luxpro's relationship with its raw material suppliers significantly worsened and deteriorated. Additionally, even though Luxpro had spent significant resources to undertake listing its stock on the GraTei securities market, Apple's litigation forced Luxpro to halt these efforts, as well. Apple's litigation was calculated to stomp out the competition, caused Luxpro great economic damage, and ruined the company's reputation with the public and with its business contacts and partners. Apple knew that Luxpro would not be able to clear its name and compete effectively in the global and U.S. markets until the litigation had concluded and the injunction was lifted. It was not until November 2005, that the Taiwanese courts agreed with Luxpro and revoked the preliminary injunction issued against the Top Tangent and EZ Tangent MP3 players. But Apple wouldn't stop its efforts and appealed that ruling in Luxpro's favor. Finally, in March of 2008, the Taiwan Supreme Court dismissed Apple's appeal of the Taiwan High Court's ruling. Despite the enormous damage intentionally and wrongfully inflicted on Luxpro due to the injunction and continued, frivolous, legal proceedings, Apple was not finished.

29.     However, Apple would not give up on its improper litigation strategy. The Taiwan Supreme Court's ruling notwithstanding, Apple filed a motion with the Fair Trade Commission alleging that Luxpro violated Taiwan's Fair Trade Act. The Fair Trade Commission ultimately issued a letter opinion stating that Luxpro's Tangent product line was not in contravention of the act. However, the delays caused by Apple's unlawful legal strategy caused Luxpro to lose valuable market opportunities and a

considerable amount of product orders. These secretly and carefully planned actions gravely impeded Luxpro's efforts to market its MP3 players. In fact, to this day, Apple continues to pursue its litigation strategy through endless appeals, in hopes that the litigation, coupled with pressure exerted against Luxpro's business partners, will completely squash Luxpro or severely hamper Luxpro's ability to increase market share in the worldwide MP3 player market. The Taiwanese civil court dismissed Apple's latest appeal in February 2008, but the resulting damage fostered by this litigation strategy had already crippled Luxpro's business efforts in the MP3 market.

30.     Abusive litigation was not the only tactic Apple utilized to attempt to stunt Luxpro's growth in the worldwide MP3 player market. While Apple's over-reaching injunctions were on appeal, unbeknownst to Luxpro, Apple compounded their illegal acts by sending warning letters to other companies who were doing business with Luxpro demanding that those companies cease business relations with Luxpro. For example, Apple placed significant pressure on InterTAN, a subsidiary of U.S. based consumer electronics giant, Circuit City, to drop Luxpro's MP3 players from its retail shelves. In September 2005, under pressure from Apple, InterTAN yanked 4,500 Luxpro MP3 players off its shelves and destroyed these products, directly costing Luxpro significant revenue, to say nothing of the damage to Luxpro's brand, marketing efforts, and related issues. Despite the popularity of the Luxpro MP3 players in its retail stores that are owned and operated by Circuit City, InterTAN stopped placing orders with Luxpro. News of the incident spread throughout the MP3 player market and, combined with the undisclosed threatening letters to Luxpro's business partners, resulted in other entities terminating contracts with Luxpro, causing further economic damage to Luxpro.

Notably, other U.S.-based consumer electronics companies, such as Best Buy and Radio Shack, consequently refused to do business with Luxpro.

31.     By April 2006, while Apple was still appealing the Taiwanese district court ruling, Luxpro managed to persuade InterTAN's officers and company product buyers to travel to Taiwan to meet.  At that meeting, InterTAN's officers disclosed to Luxpro that Apple had placed exceptionally strong pressure on InterTAN to yank the Centrios brand from InterTAN's retail shelves and discontinue all business dealings with Luxpro.  Luxpro showed InterTAN many MP3 players that Luxpro had improved since InterTAN's first order in 2005.  Over Luxpro's vigorous insistence that Apple's actions were designed to improperly stop the production of better products, InterTAN ultimately refused to order more of Luxpro's MP3 players.  Upon receipt of this devastating news, Luxpro inquired why InterTAN would carry other MP3 players, like those produced by Samsung, but not Luxpro's.  InterTAN explained it could not afford to annoy Apple over a small company like Luxpro.  InterTAN apologized to Luxpro, but left Taiwan without placing orders for Luxpro's MP3 players.

32.     This pattern of tortiously interfering in Luxpro's business did not end with InterTAN.  In September 2006, Apple increased its pressure on Luxpro's business partners, including a number of U.S.-based partners and retailers located in the United States.  For example, Starbucks Corporation had agreed to initiate a proposal that would place Luxpro's MP3 players in Starbucks' Japanese stores.  Luxpro prepared samples for Starbucks to approve for sale.  Apple pressured Starbucks to quash its deal with Luxpro and Luxpro's relationship with Starbucks ended.

33.     Also in September 2006, Apple threatened Orchard Company ("Orchard"), a Singapore company, and Kaga Electronics Co. Ltd. ("Kaga"), a Japanese company, to cease all business relations with Luxpro or Apple would either file suit against Orchard and Kaga or end its business relationship with those companies. Apple also threatened Web Worker, a German Luxpro client, to end all business relationships with Luxpro.

34.     In an attempt to erase its fingerprints off the secretly developed scheme to squash Luxpro, Apple successfully encouraged some of its suppliers to begin to pressure Luxpro business partners to end their relationships with Luxpro. For example, Apple supplier ASUS Tek Computer Co. ("ASUS"), threatened Compu Import Co. ("Compu"), a Luxpro client in Poland. ASUS told Compu that if it did not stop carrying Luxpro products, ASUS would stop supplying Compu with ASUS products. Apple supplier Synnex Technology International Corp. ("Synnex") threatened a number of Taiwanese Luxpro distributors, including Carrefour, EUPA, 3C, and ET Mall.

35.     By the time Luxpro had successfully defeated Apple's litigation strategy in the Taiwanese courts, including the 2008 dismissal of the latest appeal, it was too late to get back into the global market, including its efforts to penetrate Apple's vise-grip on the United States MP3 market.

36.     Apple's combined, concerted, and illegal efforts to unfairly ruin Luxpro as a viable competitor, caused great damage to Luxpro. Further, Apple's combined, concerted, and illegal efforts to unfairly ruin Luxpro harmed consumers, including in the United States, for MP3 players. Finally, Apple's actions against Luxpro, and others in the industry, had a chilling effect on competition, and harmed competition (*e.g.*,

consumers paid higher prices for MP3 players and products), in the relevant market, including in the United States, for MP3 players.

## IV.    CAUSES OF ACTION

### A.    Interference with Contractual/Prospective Advantage

36.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

37.    Due to the early success of Luxpro and the existing contracts that were canceled only due to Apple's pressure, Luxpro had a reasonable expectation of economic advantage or benefit.  As set forth above, Luxpro has been in the MP3 players business since 2002 and had a number of business partners with whom it had entered into contracts.  Those contracts call for Luxpro's MP3 players to be distributed, marketed and sold throughout the world in well known stores such as The Source by Circuit City. Luxpro's MP3 players are unique and are designed with features that not all MP3 players have, such as a FM radio tuner.

38.    Apple had knowledge of Luxpro's expectation of economic advantage or benefit.  In fact, without Luxpro's knowledge or consent, Apple sought out information about Luxpro's relationships with its business partners.  Apple implemented a concerted plan to discredit Luxpro and even persuaded other business entities to exert pressure on Luxpro's business partners.

39.    Apple wrongfully, and without justification, interfered with Luxpro's reasonable expectation of an economic advantage or benefit.  No legally sufficient justification for Apple targeting Luxpro exists.  Apple's actions can only be explained by its thirst for complete global dominance in the worldwide MP3 player market.

40.     In the absence of the wrongful acts of Apple, it is reasonably probable that Luxpro would have realized its economic advantage or benefit.  Luxpro is a successful company in the worldwide MP3 player market.  A reasonable probability certainly exists that Luxpro would have realized a significant economic advantage or benefit that it missed out on due to Apple's scheme to quash it.

41.     Luxpro did in fact sustain damages as a result of this wrongful interference by Apple.  Luxpro sustained damage as a result of Apple's wrongful interference because its true market share in the worldwide MP3 player market was never realized.

**B.      Tortious Interference with a Contract**

42.     Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

43.     A valid contractual relationship existed between Luxpro and its retailers, distributors and business partners.  As set forth above, Luxpro has been in the MP3 players business since 2002 and had a number of business partners with whom it had entered into contracts.  Those contracts call for Luxpro's MP3 players to be distributed, marketed and sold throughout the world in well known stores such as The Source by Circuit City.

44.     Apple had knowledge of the relationship between Luxpro and Luxpro's retailers, distributors and business partners.

45.     Apple intentionally and improperly interfered with the relationship between Luxpro and their Retailers which induced or caused a breach or termination of said relationships.  Apple forced entities like InterTAN to drop existing contracts with Luxpro or be without Apple products.  Such conducts is intentional and improper.

Apple's market share of the worldwide MP3 player market at that time was so great, InterTAN had not real choice but to bow to Apple's wishes and terminate its relationship with Luxpro.

46.     As a result of Apple's intentional and improper interference, Luxpro experienced significant economic and other damages.  Luxpro expended substantial sums in developing its MP3 player products prior to Apple's intentional and improper interference.  Luxpro sustained damage as a result of Apple's wrongful interference because its true potential or available market share in the worldwide MP3 player market was never realized.

**C.     Attempted Common Law Monopolization**

47.     Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

48.     Luxpro was a growing and active member of the MP3 player market. Luxpro's MP3 players were attracting a lot of attention and posed a significant risk to Apple's dominant share of the market.

49.     Apple had specific intent to monopolize the MP3 player market.

50.     One or more of Apple's acts claimed by Luxpro in this Complaint was done, was wrongful, and was done in furtherance of this intent.

51.     Apple intended to monopolize the MP3 players market and acted in furtherance of that intent so as to create a reasonable probability that monopolization of the market would sooner or later occur.

52. The attempted monopolization so established was the proximate cause of damage to the business or property of Luxpro, by causing Luxpro to lose sales on which Luxpro would have made a profit.

**D.     Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.***

53. Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

54. The conduct alleged in this complaint constitutes unfair competition and unlawful, unfair, and fraudulent business acts and practices within the meaning of the California Unfair Competition Law, § 17200, *et seq.* of the California Business and Professions Code. Luxpro has suffered injury in fact and lost money and/or property as a result of Apple's violations of law and wrongful conduct.

55. Apple's actions are unlawful and unfair because, in an attempt to monopolize the worldwide MP3 player market, it has attempted to squash a smaller competitor, Luxpro. Apple has interfered with Luxpro's business, economic advantages and contracts and has disparaged Luxpro's name in the worldwide MP3 player market in violation of common law.

56. Accordingly, Apple has violated the Unfair Competition law proscription against engaging in unlawful, unfair, and fraudulent business practices.

57. As a result of Apple's unlawful, unfair and fraudulent conduct, Apple has been unjustly enriched at the expense of Luxpro.

**E.     Commercial Disparagement**

58. Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

59.     Apple published false statements concerning Luxpro's business and products.

60.     Apple intended the publication of its false statements to cause a pecuniary loss to Luxpro or Apple should have reasonably known that the publication of its false statements would result in a pecuniary loss to Luxpro's business and products.

61.     Apple knew the statements it made were false or Apple acted in reckless disregard of the statements truth or falsity.

62.     Apple's disparagement caused harm to Luxpro's reputation and caused Luxpro economic losses and pecuniary damages.

## DAMAGES

63.     As a direct and proximate result of Defendant's actions Plaintiff has been damaged in an amount to be determined by a jury at a trial of this matter and an award of attorney's fees.

64.     That in addition to the aforementioned damages and as a result of the conduct on the part of the Defendant, punitive damages should be imposed to punish the conduct of the Defendant and to deter others from similar conduct.

## JURY DEMAND

65.  The Plaintiff demands a jury trial on all issues of this complaint.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff prays for judgment against the Defendant and respectfully requests that this Court enter its Order granting judgment against Defendant for actual and consequential damages, attorney fees, punitive damages and for all other relief which Plaintiff is entitled.

Respectfully Submitted,

/s/ Richard A. Adams
Richard A. Adams
Ark. Bar No. 97036
Phillip N. Cockrell
Ark. Bar No. 79154
Corey D. McGaha
Ark. Bar No. 2003047
**PATTON ROBERTS PLLC**
Century Bank Plaza, Suite 400
P.O. Box 6128
Texarkana, Texas 75505-6128
Phone: (903) 334-7000
Fax: (903) 334-7007

Jeremy Y. Hutchinson
Ark. Bar No. 2006145
**PATTON ROBERTS PLLC**
111 Center St., Suite 1315
Little Rock, AR 72201
Telephone: (501) 372-3480
Facsimile: (501) 372-3488

Patrick J. Conroy
*Pro Hac Vice*
Glenn E. Janik
*Pro Hac Vice*
**SHORE CHAN BRAGALONE
LLP**
Bank of America Plaza
901 Main Street, Suite 3300
Dallas, Texas 75202
Telephone: (214) 593-9110
Facsimile: (214) 593-9111

**ATTORNEYS FOR
PLAINTIFF LUXPRO
CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was served upon C T Corporation System, 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201, Registered Agent in Arkansas for Apple, Inc., by U. S. Certified Mail, Return Receipt Requested, this 20th day of October, 2008.

/s/ Richard A. Adams\
Richard A. Adams