# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### TEXARKANA DIVISION

| | | |
|---|---|---|
| **LUXPRO CORPORATION, a** | § | |
| **Taiwanese Corporation,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **Case Number: 4:08-cv-4092** |
| | § | |
| **APPLE, INC. f/k/a Apple Computer,** | § | |
| **Inc.,** | § | |
| | § | |
| **Defendant** | § | |

---

## PLAINTIFF LUXPRO CORPORATION'S RESPONSE TO DEFENDANT APPLE INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Dockets.Justia.com

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES……………………………………………………...……ii

I.      INTRODUCTION……………………………………………...………………1

II.     LEGAL STANDARD…………………………………………...………….....2

        A.     Luxpro's Factual Allegations Must be Taken as True……………………2

        B.     Luxpro's FAC Meets the Notice Pleading Standards
               of the Federal Rules of Civil Procedure………………………………..3

III.    THE PARTIES AND BACKGROUND OF THE LAWSUIT………………….5

        A.     Luxpro's MP3 Products Find Early Success in the Global Market……….6

        B.     In an Effort to Obtain a Monopoly, Apple Targets Luxpro
               and Attempts to Destroy Its MP3 Business………………………………7

               1.     Apple Resorts to a Pattern of Abusive Litigation
                      Against Luxpro and Other Small Competitors……………………8

               2.     Apple Intimidates and Tortiously Interferes with
                      Luxpro Customers and Prospective Customers…………..……..10

IV.     A CHOICE OF LAW ANALYSIS IS PREMATURE…..………………..…..12

V.      LUXPRO'S CLAIMS AND APPLE'S AFFIRMATIVE DEFENSES...……….13

        A.     Tortious Interference with Contract and Tortious
               Interference with Prospective Economic Advantage……………………13

               1.     Luxpro's Tortious Interference Claims are Sufficient
                      to State a Claim Upon Which Relief May Be Granted…………..13

               2.     Luxpro's Tortious Interference Claims are not Barred
                      by the Statute of Limitations………………………………….…18

        B.     Common Law Monopolization………………………………………..20

               1.     Luxpro's FAC Alleges Facts Showing Apple's Specific
                      Intent to Monopolize the MP3 Player Market…………………...20

2.      Arkansas Recognizes a Claim for Common Law
Attempt to Monopolize…………………………………………..24

3.      California Courts Have Also Recognized Attempted
Monopolization Claims Based in Common Law……………….....24

C.      Apple's Attempts to Drive Luxpro Out of Business Violated
Section 17200 of the California Business and Professional Code………..26

1.      Luxpro Has Alleged Facts Constituting "Unfair"
Conduct Under Section 17200………………………………...27

2.      Luxpro Need Not Satisfy the Pleading Requirements of the
Federal Antitrust Laws to State a Claim Pursuant to Section
17200…………………………………………………………..28

3.      Luxpro's FAC Also Alleges "Deceptive" Conduct…………...30

4.      Luxpro's Claim for Restitution Damages is Supported by
Section 17200………………………………………………………30

D.      Apple's Attempts to Dismiss Luxpro's Claims Related to
Commercial Disparagement Must Also Fail…………………………..31

E.      Apple is Not Entitled to Exonerate its Unlawful Conduct Under
the *Noerr-Pennington* Doctrine……………………………....……..33

VI.      CONCLUSION…………………………………………………………..35

# TABLE OF AUTHORITIES

**Pages**

## CASES

*Ace American Ins. Co. v. Huntsman Corp.*
\_\_\_\_ F.R.D. \_\_\_\_, 2008 WL 4453108, *4 (S.D. Tex. 2008)…………………………..………3

*Alarmax Distributors, Inc. v. Tyco Safety Products Canada Ltd.*
2008 WL 2622899, *4 (W.D. Pa. June 27, 2008)……………………………………….……26

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*
486 U.S. 492, 499-500 (1988)……………………………………………………………33, 35

*American Philatelic Soc. v. Claibourne*
3 Cal.2d 689, 698 (1935)……………………………………………………………..………28

*Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*
144 F.3d 732 (11th Cir. 1998)…………………………………………..………………………..5

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)…………………………………………3

*Burdell v. Grandi*
152 Cal. 376, 92 P. 1022 (1907)………………………………………………………………..24

*Cardtoons v. Major League Baseball Players Ass'n*
208 F.3d 885, 889 (10th Cir. 2000). ……………………………………………………33, 34

*California v. ARC America Corp.*
490 U.S. 93, 101 (U.S. 1989) ……………………………………………………………..…26

*Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*
20 Cal.4th 163, 187, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). …………………………..27, 28, 29

*Chavez v. Whirlpool*
93 Cal.App.4th 363, 375 (Cal. App. 2001) …………………………………………………..…29

*Coker v. Purdue Pharma Co.*
No. W2005-02525-COA-R3-CV, 2006 WL 3438082 (Tenn. Ct. App, Nov. 30, 2006)………..26

*Cook v. Winfrey*
141 F.3d 322 (7th Cir. 1998)……………………………………………………………………12

*Conley v. Gibson*
355 U.S. 41, 47, 78 S.Ct. 99 (1957)……………………………………………………………3

*Cormack v. Settle-Beshears*
474 F.3d 528, 531 (8th Cir. 2007)……………………………………………………………..5

*Cortez v. Purolator Air Filtration Products*
23 Cal.4th 163 (2000)………………………………………………………………………31

*County of Santa Clara v. Astra USA, Inc.*
401 F. Supp.2d 1022, 1026 (N.D. Cal. 2005)………………………………………………28

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*
11 Cal.4th 376, 392-393, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995)………………………15

*Diebold, Inc. v. Continental Casualty Co.*
2008 WL 1372948, *3 n.7 (D. N.J., April 10, 2008)………………………………………..12, 13

*Doe ex rel. Doe v. School Dist. of City of Norfolk*
340 F.3d 605, 614 (8th Cir. 2003)…………………………………………………………..4
*E.&J. Gallo Winery v. Encana Energy Services, Inc.*
388 F. Supp. 2d 1148 (E.D. Cal. 2005)……………………………………………………25

*Eckert v. Titan Tire Corp.*
514 F.3d 801, 806 (8th Cir. 2008) …………………………………………………………..3

*Exxon Corp. v. Superior Court*
51 Cal.App.4th 1672, 1687-88, 60 Cal.Rptr.2d 195 (Cal. Ct. App. 1997)…………………25

*Great American Indemnity Company v. Brown*
307, F.2d 306, 308 (5th Cir. 1962)…………………………………………………………....32

*Gregory v. Albertson's, Inc.*
104 Cal. App. 4th 845, 851 (Cal. App. 2002)……………………………………….……….28

*Hammond Packing Co. v. State*
81 Ark. 519, 100 S.W. 407 (1907)…………………………………………………………24

*Harmelin v. Man Financial Inc.*
2007 WL 2739579, *2 n.2 (E.D. Pa., September 20, 2007)………………………………..12, 13
*Hopkins v. De Beers Centenary AG*
2005 WL 1020868, *1 (Cal. Superior, April 15, 2005)……………………………………25

*In re Apple iPod iTunes Antitrust Litigation*
No. C 05-00037 JW, 2008 WL 5574487, *8-9 (N.D. Cal. Dec. 22, 2008)………………..…26

*In re Cipro Cases I and II*
121 Cal. App. 4th 402, 406, 17 Cal.Rptr.3d 1, 2 (Cal. Ct. App. 4 Dist. 2004)……………..25

*In re Circular Thermostat,*
No. MDL C05-01673WHA, 2005 WL 2043022, *2 (N.D.Cal. Aug. 24, 2005) ………………..25

*Korea Supply Co. v. Lockheed Martin Corp.*
29 Cal.4th 1134, 1153-1154, 1164-1165, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003)……………..15

*Kraus v. Trinity Management Services*
23 Cal.4th 116 (2000)…………………………………………………………………...…30, 31

*Laitram Mach v. Carnitech A/S*
 901 F.Supp. 1155, 1161 (E.D. La. 1995)…………………………………………………….34

*Mahoney v. Roberts*
86 Ark. 130, 110 S.W. 225 (1908)………………………………………………………….…...13

*Mamot Feed Lot and Trucking v. Hobson*
539 F.3d 898, 901-2 (8th Cir. 2008)……………………………………………….…….…...2, 3, 5

*Mid-South Beverages, Inc. v. Forrest City Grocery Co., Inc.*
300 Ark. 204, 778 S.W.2d 218  (Ark.1989)……………………………………….……………14

*Motors, Inc. v. Times Mirror Co.*
102 Cal.App.3d 735, 740 (Cal. App. 1980)……………………………………………….……27

*Natural Gas Anti-trust Cases I, II, III, & IV*
2002 WL 31570296, *2-3 (Cal. Superior, October 16, 2002)…………………………..………25

*Nelson v. Berry Petroleum Co.*
242 Ark. 273, 279, 413 S.W.2d 46, 50 n.2 (1967) ……………………………………………24

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*
41 Cal.3d 118, 1126, 270 Cal.Rptr.1, 791 P.2d 587 (1990)………………………….……………14

*Peck v. Hoff*
660 F.2d 371, 374 (8th Cir. 1981)…………………………………………………….…...……4

*People's Choice Wireless, Inc. v. Verizon, Inc.*
131 Cal.4[th] 656, 668 (Cal. App. 2005)……………………………………………………...…29

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*
508 U.S. 49 (1993)……………………………………………………………………….33, 35

*Razorback Ready Mix Concrete Co. v. Weaver*
761 F.2d 484 (8th Cir. 1985)……………………………………………………………………33

*Rodime PLC v. Seagate Technology, Inc.*
174 F.3d 1294, 1307 (Fed. Cir. 1999)……………………………………………………..34

*Schmedding v. Tnemec Co., Inc.*
187 F.3d 862 (8th Cir. 1999)…………………………………………………………………..5

*Slattery v. Apple Computer, Inc.*
No. C 05-00037 JW, 2005 WL 2204981, *4 (N.D. Cal. Sept. 09, 2005)……………………25, 26

*Smith v. Ouachita Technical College*
337 F.3d 1079, 1080 (8th Cir. 2003) (per curiam)…………………………………………..……4

*Swierkiewicz v. Sorema, N.A.*
534 U.S. 506, 512-3, 122 S.Ct. 992, 997 (2002)…………………………………….…………....4

*Tucker v. Apple Computer, Inc.*
493 F.Supp.2d 1090, 1102 (N.D. Cal. 2006)……………………………………….…………25

*United Bilt Homes v. Sampson*
310 Ark. 47, 832 S.W.2d 502 (1992)……………………………………………………………14

*Venetian Casino Resort, L.L.C. v. N.L.R.B.*
484 F.3d 601, 612 (C.A.D.C. 2007)……………………………………………………….…35

*Walker v. Unum Life Ins. Co. of America*
530 F.Supp.2d 351, 354 (D. Maine 2008)……………………………………………….12, 13

## STATUTES

FEDERAL RULES OF CIVIL PROCEDURE………………………………………………...………23

FED. R. CIV. P. 8…………………………………………………………...……………2, 3, 4

Rule 12(b)(6) of the FEDERAL RULES OF CIVIL PROCEDURE………………………1, 3, 4, 5, 35, 36

*Noerr-Pennington* Doctrine………………………… …………………………………………..34

Section 17200 of California Business and Professions Code…………………………  27, 28, 30

## TREATISES

5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER
FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1215, p. 174, 190 (3d 2004……………...…..…4

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **LUXPRO CORPORATION, a** | § | |
| **Taiwanese Corporation,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **Case Number: 4:08-cv-4092** |
| | § | |
| **APPLE, INC. f/k/a Apple Computer,** | § | |
| **Inc.,** | § | |
| | § | |
| **Defendant** | § | |

**PLAINTIFF LUXPRO CORPORATION'S RESPONSE TO DEFENDANT APPLE INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Luxpro Corporation ("Luxpro") files its Response to Defendant Apple Inc. f/k/a Apple Computer, Inc.'s ("Apple's") Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6) of the FEDERAL RULES OF CIVIL PROCEDURE. For the reasons stated below, Luxpro respectfully requests that the Court deny Apple's motion in its entirety.

## I.      INTRODUCTION

Apple's motion intentionally attempts to confuse, and grossly mischaracterize, the real issues of this suit as stated by Luxpro in its detailed allegations of fact set forth in the First Amended Complaint ("FAC"). In doing so, Apple attempts to avoid litigating its illegal scheme to destroy Luxpro's business and knows that, if evidence of its acts is allowed to be presented, its unlawful conduct will be revealed. Apple does not even challenge many of Luxpro's factual allegations. Instead, Apple makes an elaborate, but

vain, attempt to justify its actions as an effort to protect its intellectual property rights in the iPod products.  However, conspicuously absent from Apple's mischaracterization of Luxpro's claims is any specific description of the alleged intellectual property rights Apple says it attempted to protect.  Apple's refusal to define or describe those "intellectual property rights" forces Luxpro and the Court to speculate as to the legitimacy of Apple's perceived threat and the merits of Luxpro's claims.

Accordingly, Luxpro respectfully submits it is much too early for the Court to pass final judgment on its claims, and requests that the Court deny Apple's Motion to Dismiss in its entirety and asks this Court to allow the parties to proceed with discovery. This is especially true where, as here, Luxpro's FAC is subject to the notice pleading standard of FED. R. CIV. P. 8; Rule 8's requirements are easily satisfied by the FAC, and Apple's Motion to Dismiss should be denied.  Furthermore, to the extent that Apple has raised relevant affirmative defenses, those defenses require the Court address factual issues that have not yet been tested through the discovery process, and dismissal, at this juncture, would be improper.  In sum, Apple's motion is based on nothing more than broad mischaracterizations, an affidavit of a single corporate officer, and a handful of pleadings from prior litigation between the parties that fail to address Luxpro's claims.

## II.     LEGAL STANDARD

### A.     Luxpro's Factual Allegations Must be Taken as True.

Apple's motion grossly mischaracterizes a number of the facts pled by Luxpro. Even more important to this analysis, Apple's motion wholly fails to address the majority of the factual allegations in Luxpro's FAC.  As discussed below, the Court must take Luxpro's factual allegations as true. *See Mamot Feed Lot and Trucking v. Hobson,* 539

F.3d 898, 901-2 (8th Cir. 2008). When the Court views Luxpro's factual allegations as true and applies the notice pleading standard to those facts, the Court is left with no choice but to deny Apple's motion in its entirety.

**B.      Luxpro's FAC Meets the Notice Pleading Standards of the Federal Rules of Civil Procedure.**

Because Luxpro's FAC meets the pleading standards of Fed. R. Civ. P. 8(a) and 12(b)(6), the Court should deny Apple's Motion to Dismiss in its entirety and allow Luxpro to litigate its claims. "In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ace American Ins. Co. v. Huntsman Corp.*, ____ F.R.D. ____, 2008 WL 4453108, *4 (S.D. Tex. 2008) (quoting Fed. R. Civ. P. 8(a)(2)). The short and plain statement contemplated by Fed. R. Civ. P. 8(a) must only provide a defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99 (1957)). The United States Supreme Court recently reaffirmed the federal pleading standard by emphasizing that no requirement for a heightened pleading standard exists and only enough facts to "state a claim for relief that is plausible on its face" must be present. *See Twombly*, 550 U.S. at _____, 127 S.Ct at 1974. The Supreme Court clarified the Rule 8 standard: "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.,* 550 U.S. at _____, 127 S.Ct. 1969.

---

The simplified notice pleading standard expressed in Rule 8(a) and by the United States Supreme Court is reinforced by the instruction of FED. R. CIV. P. 8(f) that "all pleadings shall be construed to do substantial justice."  Indeed, a complaint cannot be dismissed, nor a claim pled ignored, merely because the complaint does not state with precision all elements giving rise to a legal basis for recovery.  *Smith v. Ouachita Technical College*, 337 F.3d 1079, 1080 (8th Cir. 2003) (per curiam).  The Eighth Circuit Court of Appeals recognizes the practical reality that a plaintiff "may not be privy to the facts necessary to accurately describe or identify" the harm inflicted by a defendant and that holding a plaintiff to such a high standard disregards the liberality of Rule 8.  *Doe ex rel. Doe v. School Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003).  The Eighth Circuit view is consistent with the United States Supreme Court position that the simple notice pleading standard applicable under the Federal Rules of Civil Procedure relies on liberal discovery rules and summary judgment motions to define disputed facts and to dispose of flawed claims.  *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512-3, 122 S.Ct. 992, 997 (2002).  The Federal Rules of Civil Procedure were designed so that "the discovery procedures should give the parties an opportunity for securing an elaboration of the allegations and that process and *not the pleadings* bears the burden of filling in the details of the dispute for the parties and the court." 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1215, p. 174, 190 (3d 2004) (emphasis added).

While a motion to dismiss filed under FED. R. CIV. P. 12(b)(6) properly tests the legal sufficiency of the complaint, such a motion *cannot be used to test facts to support the claims* found in the complaint.  *Peck v. Hoff*, 660 F.2d 371, 374 (8th Cir. 1981).

---

When deciding a Rule 12(b)(6) motion, courts must (1) accept all factual allegations in the complaint as true, (2) view those facts in the light most favorable to the nonmoving party, and construe the complaint liberally, and (3) make all reasonable inferences in favor of the nonmoving party. *See Mamot Feed*, 539 at 901-2; *Cormack v. Settle-Beshears*, 474 F.3d 528, 531 (8th Cir. 2007).

In seeking dismissal for failure to state a claim, a defendant bears the very high burden of showing that the plaintiff cannot conceivably prove any set of facts that would entitle her to relief. *Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.,* 144 F.3d 732 (11th Cir. 1998). As a practical matter, a court should grant a motion for failure to state a claim under Fed. R. Civ. P. 12(b)(6) only in the unusual case in which a plaintiff has presented allegations that show on the face of the complaint that there is an insuperable bar to relief. *Schmedding v. Tnemec Co., Inc.*, 187 F.3d 862 (8th Cir. 1999). With these pleading standards in mind, together with the Supreme Court's reminder that the Court must accept all factual allegations in the complaint as true,[1] Luxpro turns to a substantive response to Apple's motion to dismiss.

### III.    THE PARTIES AND BACKGROUND OF THE LAWSUIT

While Apple's motion mischaracterizes a number of facts pled by Luxpro, many other facts detailed in Luxpro's FAC are not even addressed by Apple. For example, Apple fails to discuss the following: (1) the complex history of Apple's development of the iPod product (FAC at ¶¶ 7-9); (2) Apple's monopolization of the worldwide MP3 player market (FAC at ¶¶ 10-11); (3) Apple's conduct in the worldwide MP3 player market (FAC at ¶¶ 12-13); (4) Luxpro's history and product development (FAC at ¶¶ 14-

---

[1] Luxpro's First Amended Complaint contains a Factual Background at ¶¶ 6- 35. Those facts must be taken as true by the Court.

15); (5) Luxpro's products gaining momentum in the global electronics market (FAC at ¶¶ 16-22); and (6) Luxpro's opportunity for a public offering on the GreTai Securities Market in Taiwan. (FAC at ¶¶ 23-24).  Apple only glosses over and mischaracterizes the remaining factual allegations addressing Luxpro's efforts to develop and market its own unique MP3 players and Apple's plans to crush Luxpro as a competitor.  FAC at ¶¶ 25-36.

A.    **Luxpro's MP3 Products Find Early Success in the Global Marketplace.**

Luxpro is a privately-held Taiwanese consumer electronics corporation.  In addition to producing and selling other products such as television and radio receivers, Luxpro engages in developing, manufacturing, distributing, and selling functionally superior MP3 players throughout world, including in the United States.  FAC at ¶ 1. Luxpro's research and development team has a first-rate reputation in the worldwide MP3 player market for high-quality design.  FAC at ¶ 14.  Notwithstanding Apple's belittling (and incorrect) claim that Luxpro simply developed "knock-offs" of the Apple products, Luxpro is often called upon by consumers, retailers and other third parties to design and develop custom MP3 products.  Luxpro has independently developed and marketed a variety of cutting-edge MP3 players, such as the Luxpro "EZ Share," "EZ Season," "EZ Listen," "Top Tangent," "EZ Tangent," "Super Tangent," "iOta Flash," "Pico" (and "iPico") and the "Top Square."  FAC at ¶ 14.

As Luxpro's FAC demonstrates, due to the quality and popularity of its MP3 products, Luxpro gained momentum in the global MP3 marketplace including, notably: (1) executing agreements with two Chinese companies (Beijing Huaqi Informational Digital Technology Co., Ltd. and Beijing Qian Kun Time Digital Technology Co., Ltd.)

to supply over one million MP3 players for sale to consumers; (2) arranging discussions with executives from Circuit City Stores, Inc. ("Circuit City"), and Circuit's City's Canadian subsidiary, InterTAN Canada, Ltd. ("InterTAN"), and then executing an agreement with InterTAN to ship over 7,000 of its Top Tangent MP3 players to InterTAN for sale in retail stores; (3) executing an agreement with a third Chinese company (TC Digital Electronic SBU) to supply more than one million sets of MP3 players; (4) receiving substantial interest and orders for its MP3 players from retailers, distributers, suppliers, and consumers in the United States, and around the globe; (5) executing an agreement with Kaga Electronics Co., Ltd., an electronics supplier in Japan, for the sale of $NTD 2.8 million worth of Luxpro MP3 players; (6) receiving interest from other consumer electronics retailers, including Best Buy and Radio Shack; (7) agreeing with the Starbucks Corporation to initiate a proposal that would place Luxpro's MP3 players in Starbucks' Japanese stores; and (8) entering into agreements with a number of other companies to sell Luxpro MP3 products around the world, including, but not limited to, Compu Import Co. in  Mexico and Taiwanese Luxpro distributers Carrefour, EUPA, 3C, and ET Mall.  FAC at ¶¶ 16-22, 32-34.

**B.     In an Effort to Obtain a Monopoly, Apple Targets Luxpro and Attempts to Destroy Its MP3 Business.**

Apple is a publicly-traded multinational corporation that manufactures, distributes and sells consumer electronics and computers.  FAC at ¶ 2.  Apple's MP3 players, marketed under the brand name iPod, are sold throughout the world, including in the Western District of Arkansas.  FAC at ¶¶ 2, 4-5; Apple, Inc.'s Transfer Brief at 3.  In conjunction with the development of its proprietary iTunes product—a digital media player application that plays and organizes digital music and video files—Apple has

achieved a monopoly in both the hard-drive based MP3 market (90% market share)  as well as the more general MP3 market (70% market share).  FAC at ¶ 10.

As further demonstrated in Luxpro's FAC, Apple's focused, intentional strategy designed to destroy Luxpro's MP3 business was widespread and involved various illicit and illegal activities throughout the world, including Canada, China, Germany, Japan, Poland, Singapore, Taiwan, and the United States.  FAC at ¶¶ 6, 10-13, 25-36.  Not coincidentally, these illegal activities were directed toward Luxpro when its products were first gaining momentum in the marketplace, and Apple was attempting to achieve a monopoly in the global MP3 industry.

### 1. Apple Resorts to a Pattern of Abusive Litigation Against Luxpro and Other Small Competitors.

During the time when Apple was attempting to achieve a monopoly in the marketplace for its iPod products, it targeted certain small and medium sized competitors by filing lawsuits against them.  For example, in 2006, Apple sued Creative Technology ("Creative") for infringement of several of Apple's patents related to technology allegedly embodied in Creative's MP3 players.  FAC at ¶ 13.  Creative, a Singapore company who competes with Apple in manufacturing and selling MP3 players, was also asserting claims for patent infringement against Apple related to Apple's iPod products.  On August 23, 2006, Apple announced that it was paying Creative $100 million to settle the lawsuit; Creative made no payments to Apple as part of the settlement.[2]

Similar to its strategy with Creative, Luxpro's FAC explains that Apple targeted Luxpro, another small competitor in the MP3 market.  By March of 2005, Luxpro had developed a couple of prototypes of an MP3 player it called the "Super Shuffle" to

---

[2] *Id*; http://www.apple.com/pr/library/2006/aug/23settlement.html

display at the CeBit Tradeshow in Hanover, Germany.  Those prototypes were to demonstrate the superior functionality of Luxpro's products in a package that did not exceed the size of other available players.  Without notice to Luxpro, Apple sought and obtained *ex parte* injunctive relief from a German court precluding Luxpro from using the name "Super Shuffle" on its products at the tradeshow.  FAC at ¶ 26.  Even though Apple had no registered intellectual property rights (*i.e.*, no patent, copyright, or trademark) that related to Luxpro's Super Shuffle, Luxpro decided to make a few changes to the product and change its name to the "Super Tangent" in order to (1) eliminate any possible legal claim of product confusion, and (2) efficiently resolve the dispute (because Luxpro is a small company and only a few samples of the Super Shuffle had been made). *Id.*

Even so, after refusing Apple's baseless demand that Luxpro cease the manufacturing and selling of **all** of its MP3 products (not just the player originally described as a Super Shuffle), Apple sued Luxpro in Taiwan alleging that the appearance of Luxpro's other MP3 players too closely resembled Apple's iPod Shuffle product. Again, it must be noted that Apple did not claim that Luxpro had infringed any "intellectual property right," such as a patent, trademark, or copyright.  Nevertheless, in the early stages of the lawsuit, Apple was able to temporarily convince the Taiwanese court through a one-sided presentation to enjoin Luxpro from manufacturing any of its MP3 players.  This injunction lasted until November of 2005 when the Taiwanese court ruled in Luxpro's favor and lifted the injunction.  Apple appealed that ruling.  The Taiwan Supreme Court agreed with the lower court's decision and dismissed Apple's appeal, although not until March of 2008.  FAC at ¶¶ 27-28.  Notwithstanding Luxpro's

victory in court, Apple's litigation had its intended effect: The litigation cost Luxpro substantial resources, the injunction stalled the momentum Luxpro had achieved with its MP3 products and resulted in strained relationships and lost consumer and manufacturing partners.

Apple was not finished.  Undeterred by its failure, Apple then filed a motion with the Fair Trade Commission alleging that Luxpro violated Taiwan's Fair Trade Act.  Not unlike the result in the Taiwanese civil courts, the Fair Trade Commission issued a ruling stating that Apple's complaints lacked merit and that Luxpro's MP3 products did not violate the Fair Trade Act.  FAC at ¶ 29.  Again, however, Apple's litigation had its intended effect: The delays stemming from Apple's Fair Trade Act complaints, coupled with the previous lawsuits, created a cloud over Luxpro that resulted in the loss of valuable market opportunities, product orders and business relationships.

> **2.     Apple Intimidates and Tortiously Interferes with Luxpro Customers and Prospective Customers.**

Apple's attempt to destroy Luxpro's MP3 business was not limited to filing meritless and abusive litigation.  In conjunction with the frivolous legal proceedings it initiated against Luxpro, Apple also began an illegitimate business campaign against Luxpro by threatening and sending intimidating letters to Luxpro's customers, business partners and others.  While the breadth and scope of Apple's illegal acts will not be completely exposed without thorough discovery, Luxpro is aware of several non-parties with which Apple has illegally interfered.  For example, as articulated in Luxpro's FAC, Apple placed significant pressure on InterTAN to drop from its retail shelves the MP3 players it had already purchased from Luxpro.  FAC at ¶¶ 30-31.  InterTAN was one of Luxpro's North American customers and had been working with Luxpro to develop MP3

players for InterTAN's retail stores. InterTAN, along with its parent company, Circuit City, had discovered Luxpro's products at a tradeshow in Las Vegas, Nevada and expressed interest in Luxpro's MP3 products. Circuit City was also interested in selling Luxpro's MP3 products in the United States. However, as a result of Apple's actions and threats, InterTAN stopped offering Luxpro's products for sale and destroyed several thousand Luxpro MP3 players; this, despite the popularity of the Luxpro MP3 players in InterTAN retail stores. Further, Circuit City's interest in discussing the sale of Luxpro MP3 players in the United States ceased.

InterTAN was not the only customer or business partner of Luxpro that Apple targeted, however. News of Apple's lawsuits and intimidation of InterTAN spread throughout the MP3 player marketplace, resulting in (1) other business partners terminating contracts with Luxpro, and (2) other large U.S.-based retailers (such as Best Buy and RadioShack) refusing to do business with Luxpro. Another Luxpro partner— U.S.-based Starbucks Corporation—backed out of an agreement with Luxpro to sell MP3 players in its Japanese stores because of pressure from Apple. FAC at ¶ 32. In addition, Apple threatened the following companies to force an end to all business relationships with Luxpro: Orchard Company, a Singapore company, Kaga Electronics Co. Ltd., a Japanese company, and Web Worker, a German Luxpro client. FAC at ¶ 33.

Further, Apple successfully encouraged some of its own suppliers to begin to pressure Luxpro's business partners to end their relationships with Luxpro. For example, Apple's supplier ASUS Tek Computer Co. threatened Compu Import Co., a Luxpro client in Mexico. Apple's supplier Synnex Technology International Corp. also threatened a number of Luxpro's distributors in Taiwan. FAC at ¶ 34. In sum, similar to

---

its abusive litigation strategy, Apple's illegal interference and intimidation of Luxpro's business partners, customers (including prospective customers), and suppliers had its intended affect: Luxpro's MP3 business was crippled at the most critical stage of market development.

## IV.    A CHOICE OF LAW ANALYSIS IS PREMATURE.

Because no discovery has been conducted by the parties, a sufficient record for a proper choice of law analysis is not before the Court.  If, at the Rule 12(b)(6) stage of litigation, a district court lacks sufficient facts on which to conduct a choice of law analysis, the court need not do so.  *See Walker v. Unum Life Ins. Co. of America,* 530 F.Supp.2d 351, 354 (D. Maine 2008); s*ee also Diebold, Inc. v. Continental Casualty Co.*, 2008 WL 1372948, *3 n.7 (D. N.J., April 10, 2008); *Harmelin v. Man Financial Inc.,* 2007 WL 2739579, *2 n.2 (E.D. Pa., September 20, 2007).  The delay of a choice of law analysis during the Rule 12(b)(6) stage of litigation is further warranted if a district court is convinced that the plaintiff has alleged "a plausible entitlement to relief."  *Walker,* 530 F.Supp.2d at 354.  Apple's short and incomplete choice of law analysis shows the need for further development of facts and issues through discovery before the Court performs a choice of law analysis.

First, Luxpro's cause of action under Section 17200 of California's Business and Professions Code does not mean California law applies to its common law claims.  *See e.g. Cook v. Winfrey,* 141 F.3d 322 (7th Cir. 1998) (applying Illinois law to tortious interference claims and Ohio law to defamation claims).   Although Apple is headquartered in California, Apple sells iPods throughout the United States and the world.  At the time of Apple's unlawful and wrongful actions, Luxpro was attempting to

---

introduce its own unique MP3 players into the same market.  For Apple to flatly assert that California is the only state with any relationship to either the parties or issues in this litigation glosses over other significant factors to be considered in making a choice of law analysis.

Similarly, Apple's conclusion that California law must apply to Luxpro's claims merely because that is where Apple's headquarters is located is perfunctory, at best. Apple is not a small, local California company.  Apple's products are sold throughout the United States and the world.  Therefore, the need to apply California law to advance governmental interests is ameliorated as a factor in the choice of law analysis.

At this stage of these proceedings, the parties are not in a position to fully and competently address the choice of law analysis, and the Court is well within its discretion to delay a decision on the issue.  *See Walker,* 530 F.Supp.2d at 354; *Diebold, Inc.,* 2008 WL 1372948 at *3 n.7; *Harmelin,* 2007 WL 2739579 at *2 n.2.  In any event, Luxpro believes that its claims withstand scrutiny under either California or Arkansas law. Further, California and Arkansas law do not differ substantially with respect to Luxpro's claims.

## V.   LUXPRO'S CLAIMS AND APPLE'S AFFRIMATIVE DEFENSES.

### A.   Tortious Interference with Contract and Tortious Interference with Prospective Economic Advantage

#### 1.   Luxpro's Tortious Interference Claims are Sufficient to State a Claim Upon Which Relief May Be Granted.

Arkansas has recognized wrongful interference with a contract as an actionable tort for nearly a century.  *See Mahoney v. Roberts,* 86 Ark. 130, 110 S.W. 225 (1908). The underlying premise of this cause of action is that a person has a right to pursue valid

contractual and business expectancies unmolested by the wrongful and officious intermeddling of a third party, so that a third party who intentionally and with malice interferes with the contractual relations of another incurs liability for his action in tort. *United Bilt Homes v. Sampson,* 310 Ark. 47, 832 S.W.2d 502 (1992).

In Arkansas, the elements of tortious interference with contract or prospective economic advantage that must be alleged are: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference; (4) inducing or causing a breach or termination of the relationship or expectancy; and (5) resultant damage to the party whose relationship or expectancy has been disrupted. *Id.* In Arkansas, a cause of action for the tort of interference with contractual relationship or business expectancy does not require a contractual relationship between a plaintiff and defendant. *Mid-South Beverages, Inc. v. Forrest City Grocery Co., Inc.*, 300 Ark. 204, 778 S.W.2d 218 (Ark.1989).

In California, a plaintiff establishes a prima facie case of intentional interference with contractual relations by showing "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendants' intentional acts designed to induce breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 41 Cal.3d 118, 1126, 270 Cal.Rptr.1, 791 P.2d 587 (1990).

In addition, in order to plead a claim for interference with prospective economic advantage, a plaintiff in California must allege an economic relationship between it and a

third party that carries a probability of future economic benefit to the plaintiff, defendant's knowledge of the relationship, intentional acts by the defendant designed to disrupt the relationship, actual disruption of the relationship, and economic harm to the plaintiff proximately caused by the defendant's acts. *Korea Supply Co. v. Lockheed Martin Corp.* 29 Cal.4th 1134, 1153-1154, 1164-1165, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). The plaintiff must allege that the defendant's conduct was "wrongful 'by some measure beyond the fact of the interference itself.'" *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 392-393, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995).

As is the case in Arkansas, California courts do not require a plaintiff pleading intentional interference with prospective economic advantage to prove an existing *contractual* relationship, but he must prove that the defendant's act of interference was wrongful apart from the fact of the interference itself. *Id.* Moreover, it is not necessary to prove that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's prospective economic advantage. *Korea Supply Co.*, 29 Cal.4th at 1155-1157. Instead, "it is sufficient for the plaintiff to plead that the defendant '[knew] that the interference is certain or substantially certain to occur as a result of his action.'" *Id.* at 1156-1157, quoting Rest.2d Torts, § 766B, com. d, p. 22. In this context, "an act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply,* 29 Cal.4th at 1159 (fn. omitted).

Arkansas and California law do not substantially differ regarding tortious interference claims. Thus, whether the Court applies California law or Arkansas law, Apple's contention that Luxpro's FAC fails to state a cause of action for tortious

interference is wholly without merit.  As seen below, Luxpro's FAC adequately alleges that Apple disrupted Luxpro's relationships with a variety of businesses through a host of individualized illegal acts including, but not limited to, abusive litigation and even direct contact with Luxpro's business partners and prospective business relationships.

Again, Apple incorrectly points to one single incident (i.e., the foreign litigation which occurred between Apple and Luxpro) and argues that because the litigation was brought with probable cause, Luxpro's claims for tortious interference must fail.  Apple's argument is once again misplaced.  As stated above, the litigation Apple continues to refer to was only the backdrop in a myriad of separate actions taken by Apple in an effort to interfere with Luxpro's business partners and prospective business relationships. Contrary to Apple's contention, the German litigation is not the basis of this suit, but rather, is merely one spoke in the wheel of Apple's scheme to destroy Luxpro's MP3 player business.

For example, Luxpro alleges that abusive litigation was not the only tactic Apple utilized in an attempt to stunt Luxpro's growth in the worldwide MP3 player market. Apple placed significant pressure on InterTAN to drop Luxpro's MP3 players from its retail shelves.  Later, under pressure from Apple, InterTAN yanked 4,500 Luxpro MP3 players off its shelves and destroyed these products, directly costing Luxpro significant revenue, to say nothing of Luxpro's brand, marketing efforts, and related issues.  Despite the popularity of the Luxpro MP3 players in its retail stores that are owned and operated by Circuit City, InterTAN stopped placing orders with Luxpro.  News that spread throughout the MP3 player market, combined with undisclosed threatening calls, visits and letters to Luxpro's business partners, resulted in other entities terminating contracts

with Luxpro, causing further economic damages.  FAC at ¶ 30.  At a meeting between Luxpro and InterTAN that took place in April of 2006, InterTAN officers informed Luxpro that Apple had placed exceptionally strong pressure on InterTAN to discontinue its business relationship with Luxpro.  FAC at ¶ 31.  Thereafter, Luxpro showed InterTAN many MP3 players that Luxpro had improved and developed since InterTAN's first order.  Over Luxpro's vigorous insistence that Apple's actions were designed to improperly stop the production of better products, InterTAN ultimately refused to order more of Luxpro's MP3 players.  Upon hearing this devastating news, Luxpro inquired as to why InterTAN would carry other MP3 players, like those produced by Samsung, but not Luxpro's.  InterTAN explained it could not afford to annoy Apple over a small company like Luxpro.  *Id.*

Apple also filed a motion with the Fair Trade Commission alleging that Luxpro violated Taiwan's Fair Trade Act.  The Fair Trade Commission ultimately issued a letter opinion stating that Luxpro's Tangent product line was not in contravention of the act. However, the delays caused Luxpro to lose valuable market opportunities and a considerable amount of product orders.  FAC at ¶  29.

In an attempt to erase its fingerprints from the secretly developed scheme to squash Luxpro's business, Apple successfully encouraged some of its suppliers to pressure Luxpro business partners to end their relationships with Luxpro.  For example, Apple supplier ASUS Tek Computer Co. threatened Compu Import Co., a Luxpro client in Mexico.  ASUS told Compu Import that if it did not stop carrying Luxpro products, ASUS would stop supplying Compu Import with ASUS products.  Apple supplier

Synnex Technology International Corporation threatened a number of Taiwanese Luxpro distributors, including Carrefour, EUPA, 3C, and ET Mall.  FAC at ¶ 34.

To this day, Apple continues to pursue its litigation strategy through endless appeals, in hopes that the litigation, coupled with the pressure exerted against Luxpro's business partners, will completely ruin Luxpro's ability to increase market share in the worldwide MP3 market.  FAC ¶ at 29.  Apple's combined, concerted and illegal efforts to unfairly ruin a viable competitor caused great damage to Luxpro and its consumers, and had a chilling effect on competition.  FAC at ¶ 36.

Luxpro's FAC adequately alleges (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference; (4) inducing or causing a breach or termination of the relationship or expectancy; and (5) resultant damage to the party whose relationship or expectancy has been disrupted.  For Apple to argue otherwise is clearly disingenuous.  Apple's contention that Luxpro's tortious interference causes of action should be dismissed for failure to state a claim is wholly without merit and should be denied.

### 2.    Luxpro's Tortious Interference Claims are not Barred by the Statute of Limitations.

Apple incorrectly argues that the claims asserted accrued over three years before Luxpro filed its complaint on October 14, 2008.  In making its argument, Apple points to the German injunction that was obtained in March of 2005 and the demand letters sent by Apple to Luxpro in April and August of 2005. Apple conveniently ignores the conduct that occurred in 2006 and continued to occur right up to the date this case was filed.  The litigation referred to in Luxpro's FAC is simply the "first shot" of Apple's concentrated

effort to destroy Luxpro.  It is not, however, the sole basis of Luxpro's FAC or its claims against Apple. Many other events related to Apple's illegal efforts, all of which took place much later, form the basis of Luxpro's claims.

For example, by April 2006, Luxpro managed to persuade InterTAN's officers and company product buyers to travel to Taiwan to meet.  At that meeting, InterTAN's officers disclosed to Luxpro that Apple had previously placed exceptionally strong pressure on InterTAN (Circuit City's Canadian subsidiary) to pull its Centrios[3] brand from InterTAN's retail shelves and discontinue all business dealings with Luxpro.  FAC at ¶ 31.

This pattern of tortiously interfering in Luxpro's business did not end with InterTAN.  In September 2006, Apple increased its pressure on Luxpro's other business partners, including a number of U.S. based partners and retailers located in the United States.  For example, Starbucks Corporation had agreed to initiate a proposal that would place Luxpro's MP3 players in Starbuck's Japanese stores.  Following pressure by Apple, Starbucks ended its relationship with Luxpro.   FAC at ¶ 32.

Also, in September 2006, Apple threatened Orchard Company, a Singapore company, and Kaga Electronics Co. Ltd., a Japanese company, to cease all business relations with Luxpro or Apple would file suit against Orchard and Kaga or end its business relationship with those companies.  Luxpro also alleged that Apple threatened Web Worker, a German Luxpro client, to end all business relationships with Luxpro. FAC at ¶ 33.

---

[3] InterTAN placed orders for Luxpro's Top Tangent MP3 player under the brand name "Centrios."

In sum, Apple, again, seeks to re-plead Luxpro's FAC in an attempt to avoid the true facts from coming to light.  The facts alleged in Luxpro's FAC, which is referenced above and must be taken as true at this stage, show that Apple created a plan to destroy Luxpro.  In doing so, Apple carried its plan out with brutal efficiency by engaging in a variety of unlawful schemes in an effort to interfere with Luxpro's business relationships and prospective business relationships. Apple's misconduct occurred well within the established limitations period. Luxpro adequately pled these events in detail.  FAC at ¶¶ 33, 34, 35.

### B.   Common Law Monopolization

#### 1.   Luxpro's FAC Alleges Facts Showing Apple's Specific Intent to Monopolize the MP3 Player Market.

Apple complains Luxpro fails to allege that Apple specifically intended to monopolize the MP3 player market.  Luxpro has alleged many actions that show Apple specifically intended such a monopoly.   Apple deliberately makes digital music purchased at its iTunes Store inoperable with its competitors' MP3 players.  FAC at ¶ 8. In order to play music from Apple's iTunes Store, the dominant online music retailer, the consumer's only option in the digital music player market is Apple's iPods.  *Id.*  Apple makes iPods that are unable to play music sold at rival online music stores, leaving consumers with no choice but to purchase music from the iTunes Store.  *Id.*  The iTunes Store sells individual songs that can only be played by the iPod.  FAC at ¶ 9.  Because of the importance of the worldwide MP3 player market to Apple's bottom line, Apple has sought to monopolize the worldwide MP3 player market and crush legitimate, smaller competitors.  *Id.*

Apple has obtained a dominant 90% market share of the hard drive based MP3 player market and a 70% share of the MP3 player general market.  FAC at ¶ 10.  Apple dominates the worldwide market today, and over time has increased its market share.  FAC at ¶ 11.   At the same time Apple was increasing its market share, smaller-range MP3 manufacturers, like Luxpro, were also increasing their market share.  *Id.*  Once Apple realized its strongest threat in the MP3 player market included small-range manufacturers, Apple intentionally targeted Luxpro, a small-range MP3 player manufacturer in Taiwan.  *Id.*  Apple sought to conquer smaller competitors such as Luxpro to prevent an increased market share among the smaller-ranged manufacturers.  *Id.*

Since the introduction of the iPod, Apple has sought to stamp out the competition using various schemes.  FAC at ¶ 12.  Apple developed a confidential, internal strategy to stop competition through strategically filed litigation and has repeatedly used other unfair tactics against other small manufacturers.  FAC at ¶ 13.  As an example, although Creative Technology, a Singapore based company, beat Apple to the patent punch on iPod's interface, Apple sued Creative Technology in a Wisconsin District Court alleging that Creative Technology infringed on four of Apple's patents.  *Id.*  Ultimately, Apple paid Creative Technology over $100 million to settle the case and obtained the use of Creative Technology's patent on the interface.  *Id.*

Apple initiated a well-planned strategy to specifically target Luxpro.  FAC at ¶ 25.  Although Apple had not obtained a trademark for the word "Shuffle," at the CeBit Tradeshow in Germany, Apple initiated litigation to enjoin Luxpro from using the word "Shuffle" in its products.  FAC at ¶ 26.  Luxpro renamed its Super Shuffle the Super

Tangent and added "LUXPRO" to its product, which obviously eliminated any confusion of the products, and began to market this MP3 player under the "Tangent" label.  *Id.*

Despite Luxpro's actions to address Apple's complaints, Apple furthered its scheme to preclude Luxpro, a small-range MP3 manufacturer, from **any** place in the MP3 player market.  *Id.*  Apple engaged a third party to purchase Luxpro's products, surreptitiously obtained two of Luxpro's proprietary price lists, sent threatening letters to Luxpro demanding Luxpro immediately stop marketing, manufacturing and selling ***all*** of its MP3 players (even MP3 players that Luxpro ***never*** branded with the "Shuffle" moniker).  *Id.*

Luxpro responded by reminding Apple that it had changed the name of one its MP3 players to the Super Tangent to avoid any possibility of confusion and to differentiate it from Apple's iPod Shuffle and continued with manufacturing, marketing, distributing, licensing and selling its MP3 players.  *Id.*  Nevertheless, Apple sued Luxpro in Taiwan, and successfully obtained a preliminary injunction (with a one-sided submission) that enjoined Luxpro from manufacturing, distributing or marketing **any** MP3 player.  *Id.*  Eventually, Luxpro overturned the injunction with respect to all of its MP3 players, except that Luxpro could not use the name "Shuffle," which it had already stopped using.  *Id.*

Despite Luxpro's ultimate success in the litigation in Taiwan, the preliminary injunction required Luxpro to halt manufacturing, advertising and marketing its MP3 players and forced Luxpro to cease performing existing contracts and filling existing orders.  *Id.*  Luxpro's relationship with its business partners was ruined, its plans for a public stock offering were unavoidably abandoned, and its chance of garnering market

share was lost.  *Id.*  Apple continued with litigation with the hopes that it, coupled with pressure on Luxpro's business competitors, would completely destroy Luxpro or severely hamper its ability to increase market share in the MP3 player market.  *Id.*

Apple compounded the effects of the litigation by sending warning letters to Luxpro's business partners demanding those business partners cease relations with Luxpro, including InterTAN, a subsidiary of U.S. based Circuit City.  FAC at ¶ 30.  Even though Luxpro had successfully placed its MP3 players on the retail shelves of InterTAN, Apple successfully pressured InterTAN to yank over 4,000 of Luxpro's MP3 players, costing Luxpro significant lost revenue and damage to its brand and marketing efforts.  *Id.*  InterTAN also stopped placing orders with Luxpro and any opportunities Luxpro had with other major U.S. based retailers was lost.  *Id.*  Examples of Apple approaching other Luxpro business partners are listed in Luxpro's FAC.  FAC at ¶¶ 32-34.

These potent facts indicated Apple's thirst for a monopoly on the MP3 player market and show Apple's specific intent to create a monopoly.  During this time frame, Apple was gaining market share, but so were small-range companies like Luxpro.  Apple had essentially defeated more medium-size MP3 player manufacturers, like Creative Technology's ZEN series, Reigncom's Iriver series, Samsung and ScanDisk and was gaining market share as a result.  However, the cumulative market share of small-range companies like Luxpro was growing as well, and Apple saw those small-range companies as its next threat in the marketplace.  Luxpro's FAC alleges a number of facts showing Apple's specific intent to monopolize and is sufficient to meet the pleading requirements of the FEDERAL RULES OF CIVIL PROCEDURE on this issue.

2.    **Arkansas Recognizes a Claim for Common Law Attempt to Monopolize.**

As discussed above, the Court is not required to conduct a choice of law analysis at this early stage of the case.  After discovery has been completed, a choice of law analysis may show that Arkansas, California, or another state's common law, may be more appropriately applied to Luxpro's attempted monopolization claim.  Apple is the driving force behind creating and possibly monopolizing a worldwide MP3 player market.  It makes little sense to decide at the infant stages of this litigation which state's law should be applied to a claim addressing the attempted monopolization of the worldwide MP3 player market.

However, to the extent the Court deems it appropriate to examine the issue now, Arkansas law recognizes that, aside from any statutory authority, an attempted monopoly or an agreement in restraint of trade, amounts to the equivalent of a criminal conspiracy at common law.  *See Nelson v. Berry Petroleum Co.*, 242 Ark. 273, 279, 413 S.W.2d 46, 50 n.2 (1967) (citing *Hammond Packing Co. v. State*, 81 Ark. 519, 100 S.W. 407 (1907)).  Therefore, Arkansas clearly recognizes the viability of an attempted monopoly claim based in common law.  Luxpro's FAC, as discussed above, addresses Apple's specific intent to attempt a monopoly.

3.    **California Courts Have Also Recognized Attempted Monopolization Claims Based in Common Law.**

For many years, California appellate courts have recognized that monopolization and attempted monopolization are against public policy and prohibited at common law.  *See Burdell v. Grandi,* 152 Cal. 376, 92 P. 1022 (1907).  Despite Apple's contentions to the contrary, California does recognize the existence of the common law "business tort"

of monopolization. *See Exxon Corp. v. Superior Court,* 51 Cal.App.4th 1672, 1687-88, 60 Cal.Rptr.2d 195 (Cal. Ct. App. 1997); *Natural Gas Anti-trust Cases I, II, III, & IV,* 2002 WL 31570296, *2-3 (Cal. Superior, October 16, 2002).   In fact, in 2004, a California appellate court affirmed a trial court's decision to grant class certification status to litigation alleging, *inter alia*, claims asserting the common law tort of monopolization by the manufacturers of the pharmaceutical know as Cipro.  *See In re Cipro Cases I and II,* 121 Cal. App. 4th 402, 406, 17 Cal.Rptr.3d 1, 2 (Cal. Ct. App. 4 Dist. 2004); *see also Hopkins v. De Beers Centenary AG*, 2005 WL 1020868, *1 (Cal. Superior, April 15, 2005).  Not unlike California state courts, federal courts in California too have recognized the claim.  *See In re Circular Thermostat,* No. MDL C05-01673WHA, 2005 WL 2043022, *2 (N.D.Cal. Aug. 24, 2005) (noting claim for common law monopolization); *E.&J. Gallo Winery v. Encana Energy Services, Inc.*, 388 F. Supp. 2d 1148 (E.D. Cal. 2005) (denying motion to dismiss common law claims of monopolization and attempted monopolization).

The availability of the common law claim of monopolization under California law is not news to Apple.  In the "The Apple iPod iTunes Anti-Trust Litigation"[4] presently pending in the Federal District Court, Northern District of California, Apple's attempts to dismiss the plaintiff's claims of common law monopolization as a matter of law have been denied in two separate cases.  *See Tucker v. Apple Computer, Inc.*, 493 F.Supp.2d 1090, 1102 (N.D. Cal. 2006) (denying Apple's motion to dismiss claim of common law monopolization); *Slattery v. Apple Computer, Inc.* No. C 05-00037 JW, 2005 WL

---

[4] Apparently the *Tucker* and *Slattery* cases cited herein have been consolidated with a number of other cases into the class action now styled *In re Apple iPod iTunes Antitrust Litigation* pending in the Northern District of California and also cited herein.

2204981, *4 (N.D. Cal. Sept. 09, 2005) (same).  Indeed, the court now presiding over the consolidated "The Apple iPod iTunes Anti-Trust Litigation" recently _granted_ class certification as to several counts in the plaintiff's amended complaint, _including the claim for common law monopolization_.  *See In re Apple iPod iTunes Antitrust Litigation*, No. C 05-00037 JW, 2008 WL 5574487, *8-9 (N.D. Cal. Dec. 22, 2008).

As discussed previously, given the inadequate record before the Court on the choice of law issues at this juncture, the Court should allow the parties to conduct discovery before deciding which state's law to apply to the attempted monopoly claim. This is true especially where, as here, the application of *several* jurisdictions' laws may be applicable (particularly given the scope and breadth of Apple's illegal scheme) and the claim of common law monopolization is widely recognized in multiple jurisdictions.  *See. e.g., California v. ARC America Corp.*, 490 U.S. 93, 101 (U.S. 1989) (acknowledging the "long history of state common-law and statutory remedies against monopolies and unfair business practices"); *Alarmax Distributors, Inc. v. Tyco Safety Products Canada Ltd.*, 2008 WL 2622899, *4 (W.D. Pa. June 27, 2008) (acknowledging common law claim for restraint of trade seeking injunctive relief); *Coker v. Purdue Pharma Co.,* No. W2005-02525-COA-R3-CV, 2006 WL 3438082 (Tenn. Ct. App, Nov. 30, 2006) (noting availability of claim).  For now, the FAC provides adequate notice to Apple and alleges ample facts to support the monopolization claim, which is all that is required at the pleading stage of litigation.

## C.    Apple's Attempts to Drive Luxpro Out of Business Violated Section 17200 of the California Business and Professions Code

Based on Luxpro's well-pled complaint and the numerous examples of Apple's illegal actions that caused harm to Luxpro, harm to other competitors of Apple, and harm

to the consumer, Apple's challenge to the claim asserted under Section 17200 of the California Business and Professions Code must also be denied.  Luxpro has alleged an elaborate scheme by Apple to utilize fraudulent business practices to drive Luxpro out of business.  Those allegations clearly state a prima facie case of harm caused by patently unfair business practices.  *See Motors, Inc. v. Times Mirror Co.,* 102 Cal.App.3d 735, 740 (Cal. App. 1980) ("… if [the] pleading states a prima facie case of harm, having its genesis in an apparently unfair business practice, the defendant should be made to present its side of the story.").

       **1.**       **Luxpro Has Alleged Facts Constituting "Unfair" Conduct Under Section 17200.**

Business and Professions Code section 17200 states: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."   A claim under Section 17200 is far broader than a federal antitrust claim, and thus, Apple's conduct may constitute a violation of Section 17200 even if it does not arise from a technical antitrust violation.  *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4[th] 163, 187, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). The California Supreme Court has consistently recognized the sweeping nature of Section 17200, stating: "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes Section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law." *Cel-Tech Comms,* 20 Cal.4[th] at 187.

2.      **Luxpro Need Not Satisfy the Pleading Requirements of the Federal Antitrust Laws to State a Claim Pursuant to Section 17200.**

Apple argues that, where the same conduct is alleged to be an antitrust violation and an unfair business act or practice, the plaintiff must adequately plead an antitrust claim for its unfair competition claim to survive a motion to dismiss.  Apple's argument is meritless.   Apple's assertion that a claim under Section 17200 carries with it a heightened pleading requirement ignores that this statute was intended to have very broad coverage, not limited to only violations of antitrust laws.  Section 17200 was enacted to cover all anti-competitive conduct:

> It governs 'anti-competitive business practices' as well as injuries to consumers, and has a major purpose 'the preservation of fair business competition.' [internal citations omitted].

*Gregory v. Albertson's, Inc.* 104 Cal. App. 4th 845, 851 (Cal. App. 2002) (citing *Cel-Tech* 20 Cal.4[th] at 180.   The *Cel-Tech* court went on to explain:

> [t]he Legislature … intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed, the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes' which the fertility of man's invention would contrive.

*Cel-Tech*, 20 Cal. 4th at 181 (citing *American Philatelic Soc. v. Claibourne*, 3 Cal.2d 689, 698 (1935).

Unlike the unlawful prong of Section 17200, the prohibition of "unfair" conduct does not require a showing of a violation of a separate law.  *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp.2d 1022, 1026 (N.D. Cal. 2005).  For instance, the "unfair" prong does not require a violation of the antitrust laws.  *See Cel-Tech*, 20 Cal.4[th] at 185-87.  If an antitrust violation was required to satisfy the part of 17200 prohibiting unfair

_____

**PLAINTIFF LUXPRO CORPORATION'S RESPONSE TO DEFENDANT APPLE INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**                    28

conduct, there would be no need for that separate and distinct prong, and the language of *Cel-Tech* regarding *incipient* antitrust violations, violations of the *spirit* of the anti-trust laws and those comparable laws would be rendered meaningless.  *See also Chavez v. Whirlpool*, 93 Cal.App.4[th] 363, 375 (Cal. App. 2001) (an "unfair practice need not violate an antitrust law to be actionable under Section 17200); *People's Choice Wireless, Inc. v. Verizon, Inc.,* 131 Cal.4[th] 656, 668 (Cal. App. 2005) (*Cel-Tech* does not require an antitrust violation in order to state a Section 17200 claim.").

In support of this unfair competition claim, Luxpro outlines numerous acts that constitute "unfairness" in Apple's business practices, but has not relied on the statutes banning antitrust activity.  These claims seek injunctive relief against Apple's conduct that has harmed or threatened to harm fair competition in the MP3 player market.  Since the introduction of the iPod, Apple has sought to stamp out the competition using various schemes.  In the last few years, Apple's competitors have attempted to fight back with multiple suits having been filed alleging, among other things, that Apple engages in illegal anti-trust tying schemes (between iPod and iTunes), unfair competition, and monopolizing behavior by placing unneeded and unjustifiable technological restrictions on its most popular products in an effort to restrict consumer choice and restrain competition in the digital music market.  FAC at ¶ 12.

Apple developed a confidential, internal strategy to stop competition through strategically filed litigation and has repeatedly used other unfair tactics against other small manufacturers.  FAC at ¶ 13.  The list is endless.  FAC at ¶¶ 25-35.

### 3. Luxpro's FAC Also Alleges "Deceptive" Conduct.

Apple argues that Luxpro failed to adequately allege deceptive conduct.  Apple's argument is completely baseless.  The FAC clearly demonstrates that Apple resorted to deceptive acts by sending warning letters, without notice to Luxpro, to other companies who were doing business with Luxpro demanding that those companies cease business relations with Luxpro.  FAC at ¶ 30.  Unbeknownst to Luxpro, Apple placed significant pressure on InterTAN, a subsidiary of the U.S. based consumer electronics giant, Circuit City, to drop Luxpro's MP3 players from its retail shelves.  Under pressure from Apple, InterTAN removed 4,500 Luxpro MP3 players off its shelves.  *Id.*  This particular act, as well as the myriad of others set forth in Luxpro's FAC, demonstrates the deceptive nature of Apple's actions, when they occurred, and how they occurred. Apple's argument to the contrary is meritless.  Of course, it goes without saying, that the FAC also details only those illegal, anticompetitive acts that are publicly known and of which Luxpro is aware. There is no telling what discovery in this case will reveal.

### 4. Luxpro's Claim for Restitution Damages is Supported by Section 17200.

Apple incorrectly argues that Luxpro's prayer for damages should be dismissed. In making its argument, Apple states that damages are not available under Section 17200. However, injunctive relief and/or damages in the form of restitution *are available* under Section 17200.  As the Court stated in *Kraus v. Trinity Management Services,* 23 Cal.4th 116 (2000):

_____

**PLAINTIFF LUXPRO CORPORATION'S RESPONSE TO DEFENDANT**
**APPLE INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**                30

> An order that a defendant disgorge money obtained through an unfair business practice may include a restitutionary element, *but is not so limited.* As in this case, such orders may compel a defendant to surrender all money obtained through an unfair business practice even though not all is to be restored to the persons from whom it was obtained or those claiming under those persons. It has also been used to refer to surrender of all profits earned as a result of an unfair business practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice.

*See also Cortez v. Purolator Air Filtration Products*, 23 Cal.4th 163 (2000). As a result of Apple's unlawful, unfair and fraudulent conduct, Apple has been unjustly enriched at the expense of Luxpro. FAC at ¶ 57. Luxpro has not asked for money damages as compensation for its Section 17200 claim. And, as evidenced by the Court's holding set forth above, Luxpro may properly ask that Apple surrender any profits it obtained through its unfair business practices. Again, Apple's argument to the contrary is disingenuous and misleading.

**D.    Apple's Attempts to Dismiss Luxpro's Claims Related to Commercial Disparagement Must Also Fail.**

Apple is seeking to dismiss Luxpro's commercial disparagement claim on two grounds. First, Apple argues that Luxpro's FAC fails to specifically identify the false statements which are the basis for the disparagement claim. Second, Apple incorrectly asserts that Luxpro's FAC fails to meet the requirements of FED. R. CIV. P. 9(g) regarding special damages. These arguments simply ignore Luxpro's detailed description of the unlawful campaign Apple undertook to discredit Luxpro's products and to undermine its reputation in the MP3 market.

Apple contends that Luxpro's FAC is deficient as to the time and place of publication of the disparaging statements and that the FAC fails to identify the recipients and substance of the statements. Contrary to these assertions, the FAC clearly explains

that all of the statements forming the basis of Luxpro's claims originated with either Apple or its suppliers.  FAC at ¶¶ 30, 32-34.  The pleadings further explain that the recipients of the statements include, but are not limited to, InterTAN, Starbucks, Orchard Company, Kaga Electronics Co. and Compu Import Co. FAC at ¶¶ 30-34.  The substance of the statements concerned the manner in which Luxpro designed, produced and marketed its products. FAC at ¶¶ 30-34.  Apple published false statements concerning quality and development of Luxpro's business and products.

Luxpro's FAC complies with FED. R. CIV. P. 9(g) in its description of the special damages to which the plaintiff is entitled.  Rule 9(g) does not require that the exact amount of special damages be plead, only that the *kind of special damages* be specified.  *Great American Indemnity Company v. Brown*, 307, F.2d 306, 308 (5th Cir. 1962) (emphasis added).  Luxpro easily meets this standard.  Apple unlawfully interfered with Luxpro's existing and prospective business relations including InterTAN, Kaga Electronics Co., and Orchard Company among others.  This interference resulted in a loss of business including:  (1) lost orders for its product line from InterTAN; (2) the end of business relationships with Starbucks; (3) the end of business relationships with U.S. based consumer electronics relaters Best Buy and Radio Shack; (4) depriving Luxpro of economic benefits; and (5) halting Luxpro's efforts to raise additional capital by listing its stock shares on the Taiwanese GraTei Securities Market.  FAC at ¶¶ 30-31.

Apple also contends it is unclear whether Luxpro's 'commercial disparagement' claim is a claim for defamation or trade libel.  To the extent that the court determines these are two separate causes of action, Luxpro is entitled to relief under both, as Apple disparaged or defamed both Luxpro and the products it was marketing to the public.

**E.     Apple is Not Entitled to Exonerate its Unlawful Conduct Under the *Noerr-Pennington* Doctrine.**

Apple's monopolistic conduct is not afforded protection under the *Noerr-Pennington* doctrine as articulated by the United States Supreme Court.  *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49 (1993); s*ee also Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484 (8th Cir. 1985).   The essence of the doctrine is that "[t]hose who petition government for redress are generally immune from antitrust liability."  *Professional Real Estate Investors,* 508 U.S. at 56.

Apple's strategic plan to ruin a competitor is not protected by *Noerr-Pennington*.  Neither its private actions nor its concerted strategy to isolate a smaller competitor deserve immunization as they do not involve strictly petitioning conduct.  To the extent that the *Noerr-Pennington* doctrine can be extended outside of the antitrust context, it is applied solely on the basis of the right to petition.  *Cardtoons v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889 (10th Cir. 2000).  Specifically, the Petition Clause of the First Amendment mentions only the right to petition the Government for a redress of grievances.  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988).

The right to petition also does not grant Apple absolute immunity from suit just because it sought relief, unsuccessfully, from a court or administrative body.  Luxpro's FAC clearly takes issue with the validity and the abusive nature of Apple's litigation.  FAC at ¶¶ 25-36.  At best, Apple's actions and motives are clearly issues that will need further examination through discovery.  Luxpro's claims arise from damages caused by Apple's wholly separate strategy of intimidating Luxpro's customers, retailers, suppliers, and manufacturers.  The plain language of the First Amendment protects only those

petitions which are made to "the Government."  Therefore, it is patently frivolous for Apple to argue that the *Noerr-Pennington* doctrine applies to purely private communications between Apple and Luxpro's business partners, customers and contacts, and should be wholly rejected.

Indeed, a letter from one private party to another private party simply does not implicate the right to petition, regardless of what the letter threatens.  *Cardtoons*, 208 F.3d at 892; s*ee, also, Rodime PLC v. Seagate Technology, Inc.,* 174 F.3d 1294, 1307 (Fed. Cir. 1999) (recognizing that contacts with patentee's potential licensees are not entitled to immunity because the contacts "had nothing to do with petitioning the government").  Furthermore, Apple's actions to deter potential customers from doing business with Luxpro by threats of boycott or litigation are not protected by the *Noerr-Pennington* doctrine.  *See e.g. Laitram Mach v. Carnitech A/S,* 901 F.Supp. 1155, 1161 (E.D. La. 1995) (holding that "[t]he *Noerr-Pennington* doctrine does not extend to sending letters to a competitor's customers alleging violation of trade secrets and infringement of patents.").

In the instant case, Apple contacted numerous existing and potential distributors, including InterTAN, Orchard Company, Kaga Electronics, and Compu Import Co. demanding that each company cease its relationship with Luxpro or risk losing Apple's business. FAC at ¶¶ 30, 31-34.  Those contacts were a part of Apple's over-arching scheme designed to interfere with Luxpro's existing and prospective business partners, and clearly are not protected by the *Noerr-Pennington* doctrine.  In determining its application to civil litigation, the proper inquiry is whether the conduct can be characterized as "typical" litigation activity, or is "more aptly characterized as

commercial activity" that happens to also involve litigation.  *Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 484 F.3d 601, 612 (C.A.D.C. 2007) (citing *Allied Tube*, 486 U.S. at 507).

Specifically, Apple's conduct cannot, for immunity purposes, be viewed as "conduct incidental to the prosecution of the suit."  *Professional Real Estate Investors,* 944 F.2d at 1528.  As explained in *Allied*, "incidental activity" is not protected by *Noerr-Pennington* if its "context and nature . . . make it the type of commercial activity that has traditionally had its validity determined by the antitrust laws themselves."  *Allied,* 486 U.S. at 505.  In the civil litigation context, *Noerr-Pennington* immunity does not extend to activities that are "neither common features of litigation nor statutorily protected litigation privileges."  *Venetian Casino*, 484 F.3d at 613.

Here, Apple's strategy of forcing retailers to remove Luxpro products from its shelves is neither a common feature of litigation, nor is it a statutorily protected litigation privilege.  FAC at ¶ 30.  Similarly, Apple's other tortious conduct toward Luxpro's business and partners is not a common feature of litigation, nor is it a statutorily protected litigation privilege.  FAC at ¶¶ 32-34.  Apple's illegal conduct can only be described as unprotected "commercial activity."  Apple's assertion that it is entitled to the benefits of *Noerr-Pennington* must be denied.

## **CONCLUSION**

Apple's arguments that Luxpro's claims are "based entirely on Apple's attempts to enforce its intellectual property rights with respect to Luxpro's digital music players" is inappropriate in the context of a 12(b)(6) motions because Apple raises factual issues outside the pleadings that should not be examined pursuant to a motion to dismiss.

Luxpro reminds the Court that Apple has not been completely forthcoming by failing to explain to the Court whether Apple's intellectual property rights are based on trademark, patent, copyright, or on a statute or common law.  It is impossible for the Court to determine what effect, if any, Apple's alleged intellectual property rights have on Luxpro's claims and Apple's potential affirmative defenses without permitting discovery to explore the scope of Apple's asserted intellectual property rights.

Moreover, Apple's contentions are merely an attempt by Apple to re-write Luxpro's FAC and to misdirect the Court from the real issues.  Apple attempted to directly persuade retailers to drop Luxpro's products, clearly leveraging its monopoly status in so doing.  FAC at ¶¶ 30, 32.  Apple's conduct unnecessarily impeded Luxpro's ability to compete, thereby unlawfully reinforcing Apple's monopolistic scheme.  It is this scheme of private actions that is the crux of Luxpro's FAC, and it is totally distinct from the litigation Apple prosecuted against Luxpro – litigation that was ultimately found to be without merit.

Because Luxpro's FAC meets all the pleading requirements under Rule 9 of the FEDERAL RULES OF CIVIL PROCEDURE, Apple's Motion to Dismiss should be denied.  To the extent the Court deems that any portion of Luxpro's FAC requires more definition pursuant to FED. R. CIV. P. 12(b)(6), Luxpro respectfully requests the Court grant it leave to re-plead its First Amended Complaint.  Luxpro, confident that the Court will agree its FAC satisfies all pleading requirements of the FEDERAL RULES OF CIVIL PROCEDURE, requests the Court deny Apple's Motion to Dismiss and grant it all other relief to which it is entitled.

Respectfully Submitted,

/s/ Richard A. Adams_____
Richard A. Adams
Ark. Bar No.  97036
Phillip N. Cockrell
Ark. Bar No.  79154
Corey D. McGaha
Ark. Bar No.  2003047
Leisa Beaty Pearlman
Ark. Bar No. 92070
Reid Miller
Ark. Bar No. 2008264
**PATTON ROBERTS PLLC**
2900 St. Michael Drive, Suite 400
Texarkana, Texas 75505-6128
Phone:  (903) 334-7000
Fax:  (903) 334-7007

Jeremy Y. Hutchinson
Ark. Bar No.  2006145
**PATTON ROBERTS PLLC**
111 Center St., Suite 1315
Little Rock, AR 72201
Telephone: (501) 372-3480
Facsimile: (501) 372-3488

Patrick J. Conroy
*Pro Hac Vice*
Glenn E. Janik
*Pro Hac Vice*
**SHORE CHAN BRAGALONE LLP**
Bank of America Plaza
901 Main Street, Suite 3300
Dallas, Texas 75202
Telephone:  (214) 593-9110
Facsimile:  (214) 593-9111

Nicholas H. Patton
Arkansas State Bar No. 63035
**PATTON TIDWELL & SCHROEDER, LLP**
4605 Texas Boulevard, P. O. Box 5398
Texarkana, Texas 75505-5398
Telephone: (903) 792-7080
Facsimile: (903) 792-8233

Patricia L. Peden
**LAW OFFICES OF PATRICIA L. PEDEN**
5901 Christie Avenue, Suite 201
Emeryville, California 94608
Telephone:  (510) 268-8033
Facsimile:  (510) 547-2446


**ATTORNEYS FOR
PLAINTIFF LUXPRO CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV5(a)(3), this 2nd day of March, 2009.


/s/ Richard A. Adams_____
 Richard A. Adams