IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


LUXPRO CORPORATION,                  ]
a Taiwanese corporation,             ]      No. 08-CV-4092
                                     ]
                   Plaintiff,        ]      September 1, 2009
vs.                                  ]
                                     ]
APPLE, INC., f/k/a Apple             ]      Texarkana, AR
Computer, Inc.,                      ]
                                     ]
                   Defendant.        ]


TRANSCRIPT OF ARGUMENT ON MOTIONS
BEFORE THE HONORABLE HARRY F. BARNES,
UNITED STATES DISTRICT JUDGE.


Appearances:

For Plaintiff:                  PATTON ROBERTS, PLLC
                                By:  Phillip N. Cockrell, Esquire
                                Richard A. Adams, Esquire
                                Cory Darnell McGaha, Esquire
                                Reid D. Miller, Esquire
                                P O Box 6128
                                Texarkana, TX  75505

                                SHORE CHAN BRAGALONE LLP
                                By:  Patrick J. Conroy, Esquire
                                Bank of America Plaza
                                900 Main Street, Suite 3300
                                Dallas, TX  75202

For Defendant:                  FRIDAY ELDREDGE & CLARK
                                By:  Kevin A. Crass, Esquire
                                2000 Regions Center
                                400 West Capitol Ave.
                                Little Rock, AR  72201-3493

```
                              MORRISON FOERSTER LLP
                              By:  Stuart C. Plunkett, Esquire
                              425 Market Street
                              San Francisco, CA  94105

                              JAMES M. PRATT, JR., PA
                              By:  James M. Pratt, Jr., Esquire
                              144 Washington NW
                              Camden, AR  71701

Court Reporter:               Donna S. McKinney, CCR-CVR
                              U.S. District Court
                              101 South Jackson
                              El Dorado, AR  71730
```

*PROCEEDINGS RECORDED BY STENOMASK; TRANSCRIBED FROM DICTATION.*

# I N D E X

Court's Remarks                                         4

Argument on Behalf of Parties:

For Defendant, Mr. Crass                                9
Response, Mr. Cockrell                                 20
Rebuttal, Mr. Crass                                    38
Reply, Mr. Cockrell                                    41


Reporter's Certificate                                 45

Luxpro Corporation v. Apple, Inc.                                        4
No. 08-4092

1                        September 1, 2009

2                   [Commencing at 9:47 a.m.]

3          **THE COURT:** All right, ladies and gentlemen, the United

4    States District Court for the Western District of Arkansas,

5    Texarkana Division is now in session.

6          I want to welcome all of you that are here, my old friends,

7    certainly, but folks that are from out-of-state and I want to

8    welcome you to this court.  We enjoy it.  This is a good bar

9    down here.  We enjoy the bar, we enjoy trying good lawsuits.  We

10   enjoy having good lawyers here to try them.  So welcome, all of

11   you that are here from out-of-state, and then of course, our

12   dear friends from in-state.

13         Today we're going to deal with Case No. 08-CIV-4092, Luxpro

14   Corporation, a Taiwanese corporation, versus Apple, Inc.,

15   formerly known as Apple Computer, Inc.

16         Now I talked with you briefly and I think just to kind of

17   give an overview of what we know and what we want to know from

18   you is to kind of hone your arguments and give me some help.

19         We have pending motions, both by Apple and they're going to

20   be the Motion to Dismiss and the Motion to Transfer Venue.

21         Now plaintiff's claims - plaintiff claims tortious

22   interference of perspective economic advantage, tortious

23   interference with contract, attempted common law monopolization,

24   violation of California Business and Professional Code 17200 and

25   commercial disparagement.  Those are the allegations as set

1  forth in the First Amended Complaint.

2       Background, I know a little bit about the background.

3  We've studied and hopefully, are ready for you.

4       Luxpro is a small Taiwanese corporation manufacturing many

5  different MP3 players on its Tangent line.

6       Apple is a California company and also manufactures MP3

7  players.  Apple calls their player the iPod.  Apple has, in

8  effect, dominated the market.  Apple players are called iPod

9  Shuffle.

10      April, June and September of 2005, Luxpro entered into

11  several agreements with Chinese companies and a Canadian company

12  to distribute its MP3 players.  Luxpro showed that as a Super

13  Shuffle and the CeBit Trade Show in Germany in March 2005.  And

14  these dates are important because they're going to deal with

15  your statute of limitations argument.

16      Apple received an injunction from the German court

17  enjoining Luxpro from using the word "shuffle" on its MP3 player

18  even though Apple really didn't have a trademark, as I read, for

19  shuffle registered.  Luxpro renamed Super Shuffle Super Tangent

20  adding the word Luxpro underneath their MP3 players.

21      November 2005, a Taiwanese injunction against Top Tangent

22  and EZ Tangent MP3 - well, let me go back.

23      In August of 2005, Apple received an injunction from the

24  Taiwanese court enjoining Luxpro from manufacturing,

25  distributing and marketing any of its MP3 players.

1      Then in November 2005, the Taiwanese injunction against Top

2   Tangent and EZ Tangent MP3 players was revoked except for the

3   name Shuffle.

4      March 2008, the Taiwan Supreme Court dismissed Apple's

5   appeal of this revocation.  Apple then filed a motion with the

6   Fair Trade Commission alleging Luxpro violated Taiwan's Fair

7   Trade Act.  The commission held that Luxpro's Tangent MP3 player

8   produced was not in violation of that act.

9      April 2006, Luxpro became aware that in September 2005

10  Apple sent letters and exerted pressure or alleged exerted

11  pressure on InterTan, a Canadian distributor for Luxpro causing

12  them to pull Luxpro's MP3 player off their shelves and end their

13  business relationship.

14     April 2006,  Starbucks of Japan, and other companies ended

15  their relationship.

16     So those are the allegations that have been set forth in

17  the Complaint, the Response and the Motions to Dismiss and

18  Motions to Transfer.

19     We have read and note that Apple's Motion to Dismiss

20  12(b)(6).  I understand Apple's arguments.  Basically, one that

21  *Noerr-Pennington* doctrine immunizes Apple from claims in this

22  suit and under that precedent if it's a valid, non-sham

23  litigation then that would so stand.  Luxpro has responded.

24  Apple did breach their choice of law arguments.  I thought well.

25  Luxpro has not so briefed those yet, however says that analysis

**Luxpro Corporation v. Apple, Inc.**                                    7
**No. 08-4092**

1   is premature.

2        Our research, court's research, particularly on *Noerr-*

3   *Pennington*, we had to study that some time.  It's not the

4   easiest issue or theory of the law.

5        But basically, initially from anti-trust laws for action

6   intended to influence legislative, executive, administrative or

7   judicial decision making, provided that such action was not a

8   sham to cover what was actually nothing more than a baseless

9   interference with a competitor's ability to compete.

10       *Noerr-Pennington* immunity is available outside the anti-

11  trust realm, or has so been held, and tortious interference with

12  business expectancy claims have been tried under that.  Sham

13  litigation exception is only if the court finds the challenged

14  litigation is objectively meritless, may the court examine then

15  Apple's subjective motivation.

16       I think the question that I'd sure like to talk about is

17  whether seeking the injunction in Germany and Taiwan was

18  objectively meritless.  If not, then I think, my research tells

19  me, that *Noerr-Pennington* would apply.  If objectively

20  meritless, then Apple's subjective modification in filing the

21  injunction is dealt with and if it were a sham, then *Noerr-*

22  *Pennington* would not apply.

23       Now I think I'm having some trouble with the letters sent

24  out which are alleged as anti-competition.  I know in *Noerr-*

25  *Pennington* are the - in that case post trial letters were sent

1  which were covered under the umbrella of immunity of *Noerr-*

2  *Pennington*.  Now how about subsequent letters?  Are they under

3  the same umbrella, or are they not?

4       Statute of limitations, the 2005 and 2006 may well be out

5  of the statute of limitations.  I mean, they may be barred by

6  the statute of limitations.  However, how about the letters that

7  went out to competitors thereafter?  That's why I think it is

8  very important to determine the umbrella of *Noerr-Pennington* as

9  it relates to that.

10      I'm going to be listening for again, and it may be

11  premature for Luxpro, but choice of law, pre-suit and post-suit

12  demand letters.

13      Now I think probably the Motion to Transfer would come

14  after we deal with the Motion to Dismiss.  So I'm not going to

15  listen a lot about that.  You can argue it is you want to, but

16  it may determine that the crux of this case could be handled

17  right here in this court on the Motion to Dismiss.  Then if I do

18  not dismiss the case and we start discovery, then we might deal

19  with the Motion to Transfer.  That seems logical to me.  So you

20  can argue it if you want to, touch briefly on it, anything that

21  you can do to help me to understand this better will be of great

22  assistance to me.

23      I was talking about my law clerks and bragging on them.  We

24  have had many, many discussions on this case.  It's going to be

25  interesting to hear what you say about it.  So, with that having

1  been done, I'm betting you that you can make all the arguments

2  you want to and we'll be out of here before noon, and even

3  earlier if you want to.  Cory ought to know that and Jamie would

4  know it, too.

5      So, what that, I'm ready to listen to you.  Why don't we

6  hear from Apple as to their Motion to Transfer, and Mr. Crass,

7  if you'd like to do that, you may proceed.

8          **MR. CRASS:**  Your Honor--

9          **THE COURT:** Is that an acceptable procedure this

10  morning?

11          **MR. CRASS:**  --let me make sure I understand.  You said

12  Motion to Transfer, did you mean Motion to Dismiss?

13          **THE COURT:** Motion to Dismiss, you're correct.

14          **MR. CRASS:**  Okay.

15          **THE COURT:** Is everybody okay with that?  Why don't you

16  make your motion to dismiss, we'll hear a response, then if you

17  want to talk about transfer, I don't want to listen too long

18  about it, but you can tell me what your high points are.  I have

19  pretty well a pretty good high point here and then you all can

20  likewise respond.

21          **MR. CRASS:**  Thank you, Your Honor.  It's a pleasure to

22  be before Your Honor and again, for the record, we have Jamie

23  Pratt, co-counsel with us, Stuart Plunkett from Morrison &

24  Foerster and Elise Bigelow from Apple.

25      With the court's opening discussion, I think I will

1    dispense with a lot of the prepared remarks that provided some

2    of the background.  I do want to highlight a couple of things in

3    the background for emphasis, Your Honor.

4        It's Apple's view of this case that we have a plaintiff, a

5    Taiwanese company, that was selling knock-offs of a product that

6    Apple had designed, engineered, built, and marketed.  Some might

7    not like the word "knock off" so I'll use the word that the

8    Taiwanese court used which was "a look-alike."  We're not

9    talking about a trademark product, per se, as much as we're

10   talking about trade dress.  I don't think Luxpro disputes that

11   we have intellectual properties at stake here that are legally

12   protectable.

13       Once we discovered those look-alikes or knock-offs were

14   being shown at the German Trade show and then sold in Taiwan, we

15   took action.  And Your Honor, this may go to the second prong of

16   the *Noerr-Pennington* and that is the subjective intent which I

17   submit you shouldn't get to, but I think the court understands

18   that in this global economy it is critical for American

19   industry, American commerce, to be able to protect its

20   international or intellectual property against misappropriation,

21   whether in this country or abroad.  It's the subject of trade

22   discussions between foreign countries.

23       I was interested to note that the Taiwanese court talked

24   about how important it was to Taiwan that companies like Apple

25   take steps to protect their intellectual property.  He says that

1   "To allow Luxpro to confuse customers and damage the fair

2   competition rights of Apple would also lead to negative

3   consequences for Taiwan and the international community, as many

4   will see our country as fostering dishonest activities."

5       So this is not about targeting a particular competitor.

6   It's about protecting our markets and so did Apple have a right

7   to go to Taiwan and to go to Germany and seek protection,

8   indeed, they do.

9       My analysis may be too simple, Judge, but you know I

10  haven't dealt a lot with Taiwanese cases and things of this

11  sort.  But the question is, was this objectively baseless?  We

12  have a German court and a Taiwanese court saying that not only

13  was it not baseless, from a merit standpoint, it had merits

14  enough to warrant the issuance of injunctions.

15      In the Taiwanese situation it gets a little bit complicated

16  in that there were initially an injunction against three

17  products that was later modified to apply to only one of the

18  three products.  The way it's been described to me, Judge, is

19  two of the three had screens, one of them didn't.  The one

20  without the screen is the one that looks most like - or looks

21  most like our product.  So that injunction was not only issued

22  initially by the court, but has been affirmed all the way up to

23  the Taiwanese appellate system.

24      I don't see how one could argue with a straight face that

25  where a court of law–

1          **THE COURT:** Well now they altered their Shuffle

2    product, did they not?

3          **MR. CRASS:**  Only after the original–

4          **THE COURT:**  And called it Tangent, and then wrote on

5    the bottom of it Luxpro.

6          **MR. CRASS:**  Correct.  As I understand, only after the

7    original injunction was issued by the Taiwanese court.  So it

8    was a - I stand to be corrected if my timing is off on that, but

9    I believe that was in reaction to our demands and our legal

10   action.

11         **THE COURT:** I think that is probably so, yes.

12         **MR. CRASS:**  So I really don't understand how one could

13   argue, although these are good lawyers and I have a high regard

14   for them, they know that and I want the court to know that.  I

15   don't know how one could argue that if a Taiwanese court, a

16   German court granted our injunction, that it was baseless.

17       I think what they try to do is broaden this beyond the

18   court action and say this was an overall scheme to, and that's

19   such a vague and nebulous concept, I have a hard time getting my

20   hands on it.  We submit their pleading of it doesn't comply with

21   *Twombly* and the Federal Rules.  But they say there is this

22   overall scheme where you took action to harm Luxpro.

23       I think that leads me to the court's question, what about

24   these letters.  And I want to make sure that I'm clear on the

25   record and the court hears me on it, it is my understanding

1   there were letters sent after the litigation was instituted

2   against Luxpro.  Their allegations, and we have to rely upon

3   their allegations at this point in the stage, that their

4   allegations are that we sent letters, cease and desist letters,

5   to people other than Luxpro.

6       I submit that letters to somebody other than Luxpro have

7   nothing to do with this litigation.  Those folks have not

8   complained and alleged that we've attempted to monopolize.

9       So I think the question for the court is, is it just

10  litigation that falls within *Noerr-Pennington*, or is it

11  additional communication?

12          THE COURT: Let me ask a question.  Did Apple send out

13  letters before initiating the first German injunction and

14  thereafter the Taiwanese injunction?

15          MR. CRASS:  Let me ask for some help on that, Your

16  Honor. [Confers with co-counsel.]  I'm told and I submit that

17  there would have been letters sent before the Taiwanese action.

18          THE COURT: Yes.  I thought so.

19          MR. CRASS:  And, Your Honor, having been involved in

20  the protection of intellectual property on a much smaller scale,

21  you would always send a letter before–

22          THE COURT: Yes.  I would say that if *Noerr-Pennington*

23  pertained and immunized Apple, that those letters would be

24  covered within that umbrella of immunity.

25          MR. CRASS:  right.

Luxpro Corporation v. Apple, Inc.                                    **14**
No. 08-4092

1    **THE COURT:**  Now the second is after the Taiwanese

2  letter, or after the Taiwanese injunction and then letters sent

3  to say the Canadian company, the Chinese company, are they

4  within the umbrella of that protection and immunity?

5    **MR. CRASS:**  I would submit they have to be, Your

6  Honor, because they're the first.  If the letter to Luxpro

7  before litigation falls within *Noerr-Pennington*, then the letter

8  to the Canadian company is the same first step in that process.

9  And it may be that the Canadian company said, we're not going to

10  fight you.  We agree.  We'll pull it off the market so we didn't

11  have to go to court.  I'm speaking somewhat hypothetically

12  there, but I would submit that if the first letters to *Noerr-*

13  *Pennington* - to Luxpro fall within *Noerr-Pennington*, even though

14  they ultimately had to file a lawsuit, that pre-litigation

15  letters to the Canadian company - same protection.

16    **THE COURT:** Now initially, I agree with you.  I came in

17  and we began to talk about it.  And then a response was that if

18  the injunction was to petition properly under *Noerr-Pennington*

19  and that injunction caused Luxpro to change, drop Shuffle, put

20  in Tangent, then they've complied with what the injunction said.

21    Now the second group of letters, that's what I'm concerned

22  about.  That second group of letters that caused apparently this

23  - the Canadian company, the Starbucks Company over in Japan, and

24  the Chinese companies.  Letters went out to them.  Now would

25  those letters still have the immunity that was initially covered

**Luxpro Corporation v. Apple, Inc.**                                    **15**
**No. 08-4092**

1  those initial letters that were sent out?  Maybe I may be

2  looking at it in too complicated–

3         **MR. CRASS:**  No, Your Honor, I appreciate the point and

4  the question.  I think it has to do with what, at least the

5  courts have said is covered.  We cited the court the Eighth

6  Circuit case, the *IBP*–

7         **THE COURT:** I've read that and I understand that.

8         **MR. CRASS:**  It seems to me to say it's a fairly broad,

9  it's defined as activities reasonably and normally attendant to

10 effective petition.

11        **THE COURT:** That's one of the real keys that I think

12 we're looking at in this lawsuit right now.

13        **MR. CRASS:**  Correct.  And so if we have an order from

14 Taiwan and an order from Germany and we can't communicate it to

15 people in Canada it is somewhat ineffective.  I mean it's not

16 like something--

17        **THE COURT:** My question was that from that order,

18 Luxpro did comply and they changed the name.  They dropped

19 Shuffle, they put in Tangent and wrote Luxpro on the bottom of

20 their MP3, that's what I understand.  Now if I'm incorrect, then

21 alert me to that.

22        **MR. CRASS:**  I'll try to get to the bottom of that,

23 Your Honor.  I'm a little unclear on that, as well.

24        **THE COURT:** Okay.  I didn't mean to interrupt.

25        **MR. CRASS:**  No, sir, I appreciate it.

Luxpro Corporation v. Apple, Inc.                                    **16**
No. 08-4092

1          **THE COURT:** There are some things that we've really

2     been concerned about as to this.  Go ahead, excuse me.

3          **MR. CRASS:**  That's all right, Your Honor.  Maybe I can

4     get this answered now. [Conferring with co-counsel]

5       Your Honor, two points I think with regard to the post-

6     injunction letters.  They still have to show that those are

7     baseless in terms of the merits.  And it may be that someone

8     says well, the injunction caused them to change.  We still

9     believe it violated our trade dress and we've not, I don't think

10    we've been in litigation with the Canadian company, but the

11    bottom line is, we do believe it is protected by *Noerr-*

12    *Pennington.*

13         **THE COURT:** Okay.

14         **MR. CRASS:**  Let me look at my notes on your other

15    question.  Your Honor, you mentioned that you wanted them to

16    address the choice of law and I would just say, I don't believe

17    one has to wait until the end of discovery or really the

18    commencement of discovery to address the choice of law provision

19    as you said, we briefed it.  We appreciate the compliment. They

20    chose-

21         **THE COURT:** You briefed it well.  I understand it.

22    Thank you.

23         **MR. CRASS:**  Thank you.  I can take credit because

24    somebody else wrote it.

25       Your Honor, they've not briefed it.  I would just say it

1  seemed somewhat inconsistent to me for a plaintiff to say we're

2  going to sue you under a California statute and then argue that

3  California law doesn't apply.  That would just be the point of

4  emphasis I would make.

5      I think you covered the fact that *Noerr-Pennington* covers

6  things outside of anti-trust, including the rights to protect

7  intellectual property.

8      The next point you raised, Your Honor, was the statute of

9  limitations.  We believe that the cause of action accrued more

10  than three years before the filing of this lawsuit.  Arkansas,

11  at least to the extent it would apply here, and we think

12  California, as well, would not allow some sort of continuing

13  tort theory.

14          **THE COURT:** I understand.

15          **MR. CRASS:**  They can't just wait until - once they're

16  on notice that there's action and they know, or they believe

17  that damage has been incurred, the cause of action accrues and

18  absent some tolling theory, which they've not alleged, we do

19  believe all of the--

20          **THE COURT:** I'm thinking with Apple on the statute of

21  limitations on both - talking about the lawsuits in Germany and

22  Taiwan, certainly three years has gone after that.  However

23  these post letters are within the three year statute if they are

24  not covered by the umbrella of *Noerr-Pennington*.

25          **MR. CRASS:**  Correct.

Luxpro Corporation v. Apple, Inc.                                    **18**
No. 08-4092

1          THE COURT: That may be where your lawsuit is, or your

2    Motion to Dismiss is.

3          MR. CRASS:  I guess I'll just wait and see what their

4    argument on that is, Your Honor.  We believe it is all part -

5    they claim it is all part of an overall scheme.  They can't then

6    divide it up and say, well, we're entitled to file a claim on

7    things that occurred within three years of the statute, of the

8    filing of the lawsuit rather.  But, I think the question-

9          THE COURT: I think the letters to Japan, Canada and

10   China were afterwards.  I mean they would come under the statute

11   of limitations.

12         MR. CRASS:  They would be within the three years.

13         THE COURT: If, if they weren't under the cover of

14   *Noerr-Pennington.*

15         MR. CRASS:  That would be one argument we would make,

16   Your Honor.  But we also make the argument that once it is

17   started, they couldn't - I mean, what you're doing basically is

18   splitting the cause of action and saying they can't sue for the

19   injunctive actions but they can sue for letters.  I just

20   submit-

21         THE COURT: They've got to, you know, you've got to tie

22   this in to that subjective intent then.

23         MR. CRASS:  Correct.

24      Your Honor, you didn't address the other arguments we made

25   in the 12(b)(6) motion with regard to attempted common law

1   monopolization.  You know, I'm pretty simple minded, if I can't

2   find it in AMI--

3         **THE COURT:**  I couldn't find it.

4         **MR. CRASS:**  --I wonder if it exists.  I can't see that

5   it exists under Arkansas law and they've briefed the California

6   law.  I won't belabor that.  The California statute, if deemed

7   to apply, has tests in it that we briefed.

8         **THE COURT:**  Generally, I could clean this up.  That's

9   why I mentioned the causes of action with the Motion to Dismiss.

10  It's kind of like a summary judgment, you can kind of knock some

11  things off and let others go in, if you get by that initial

12  hurdle.  That's the linchpin.

13        **MR. CRASS:**  Yes, sir.

14        **THE COURT:**  Because that's going to be tortious

15  interference.  I think that would still be on the board if that

16  one issue that we talked about didn't prevent these subsequent

17  letters, which could certainly be characterized as tortious

18  interference.

19        **MR. CRASS:**  Absent immunity, Your Honor.  I think

20  that's the question.

21        **THE COURT:**  Yeah.

22        **MR. CRASS:**  And the question, I think in terms of how

23  far does *Noerr-Pennington* stretch, you know, what is the policy

24  of *Noerr-Pennington*, that is to allow people to take action, to

25  petition to protect their intellectual property in this case.

1   And if you said, well, because these letters were post-

2   injunction, they fall outside the immunity umbrella, it shields

3   our ability to protect.

4           **THE COURT:** That's why I'm glad we had this hearing

5   today is to deal with that issue.

6           **MR. CRASS:**  Your Honor, I think I'll sit down at this

7   point.

8           **THE COURT:** Okay.  I'm going to say notwithstanding

9   Luxpro saying we don't need a hearing, I sure need one.  Thank

10  you.

11          **MR. COCKRELL:**  Thank you, Your Honor.

12      Phillip Cockrell on behalf of the plaintiff today, Luxpro.

13  And we also appreciate the opportunity to be before you today.

14  And for the record we do have other counsel at the table with

15  us, Rick Adams, Cory McGaha, Reed Miller and Patrick Conroy.

16  Patrick will also be--

17          **THE COURT:** I know some of these folks.

18          **MR. COCKRELL:** All right.  Thank you, Your Honor.

19      I appreciate the court's efforts to clarify the issue that

20  is most important, the issues that are most important to the

21  court.

22      And one thing we want to emphasize at the very beginning,

23  that while the facts may very well be inter-related and while

24  some of the arguments may sound very similar, we believe that

25  the *Noerr-Pennington* doctrine is very distinct and different

1   from the statute of limitations issue.  They are trying to

2   immunize their conduct under both of those doctrines, but they

3   have to be analyzed separately to be able to understand why

4   Luxpro's claims do still exist and are alive and can be

5   discovered and litigated in the courts.

6        The *Noerr-Pennington* doctrine came out of the anti-trust

7   type litigation.  In fact, that *Noerr-Pennington* case dealt with

8   anti-trust cases.  What it was saying was if you have got a

9   federal statute, if you've got an established body of law that

10  allows you to assert certain intellectual property rights, or

11  assert rights that have been established and defined, then you

12  ought to have the right to petition the court to be able to

13  enforce those.

14       We don't question or challenge whether or not *Noerr-*

15  *Pennington* is a valid doctrine.  We do challenge whether or not

16  that doctrine applies at all to this case because of the points

17  the court has already made.

18       We are not complaining in this litigation that the

19  injunction, either in Germany or in Taiwan is the crux of our

20  causes of action.  The crux of our causes of action are the post

21  injunction interference with our contracts with other people.

22  We do not believe that–

23            **THE COURT:** And that would have to be those letters

24  that you're talking about.

25            **MR. COCKRELL:** That's correct, Your Honor.

1          **THE COURT:** All right.  We're on the same sheet of

2     music.

3          **MR. COCKRELL:** All right.  The letters to Luxpro that

4     were asking, demanding, that Luxpro stop producing the one that

5     they claimed violated their trade dress, which we still haven't

6     gotten any definition about what really trade dress means in

7     this context.  We'll talk about that in just a second.  But I

8     want to make the point, the demand letters to Luxpro to stop

9     producing its products is one thing.

10         We actually exceeded, when you're dealing with a company as

11    large as Apple and they make threats of litigation and they have

12    sued you and they can carry that on forever, you have to

13    obviously take that into consideration, and Luxpro did do that.

14    Luxpro changed the name, stopped using the word Shuffle, and

15    actually started making its product look even more different.

16    Even though the functionality of the products were already

17    different, we're trying to make them look different, as well.

18    Luxpro exceeded to those demands in 2005.

19         What Luxpro is complaining about in this lawsuit is what

20    Apple did after that took place and after Luxpro exceeded to

21    those demands and they didn't just make demands to Luxpro and

22    say stop producing.  They then went to the business partners in

23    2006-2007 and even 2008 and told our business partners that you

24    stop doing business with Luxpro or we will either sue you, or

25    we'll boycott your products.  If you want to sell our products,

1   then you'll not sell Luxpro products.

2        That is what we were being told in the 2006-2007 time frame

3   by our business partners.  I'm talking about suppliers, I'm

4   talking about distributors, as well as customers.  You want our

5   products, you don't buy their product.  That's different from

6   trying to protect our intellectual property rights.

7        I think it's very instructive for the court to look and see

8   what were those intellectual property rights.  They don't claim

9   any patent that was being infringed.  They don't claim any

10  registered trademark that was being infringed.  And they don't

11  claim any copyright that was being infringed by the production

12  of these products.

13       As we go through the factual development of the case, the

14  paragraphs where we describe the global domination of the MP3

15  market that Apple was trying to accomplish, and did in fact to

16  some extent accomplish that, they were coming out with their own

17  products, but other people were too.  Not just Luxpro, but there

18  were other companies that were producing products that looked

19  very similar.

20       Now, in this case in 2005, when Apple was rolling out its

21  Shuffle, the iPod Shuffle, Luxpro was also rolling out one of

22  its products that had more functionality than the Shuffle

23  product.  Did some of the same things, as well as other products

24  performed some of the same functions.  They were very similar.

25  All of the products were very similar, not just exactly alike,

1  but very similar.

2       Now in our case, we called ours, because it was a better

3  product, the Super Shuffle.  Apple took umbrage to that, took

4  offense to that, wanted us to stop using the name.  Got an

5  injunction through an ex-parte presentation in the German court.

6  Got an injunction in the CeBit Trade show to say, stop using the

7  word Shuffle.

8       Luxpro said fine, we'll stop doing it.  We don't agree with

9  your argument, don't think you have any rights we're infringing.

10 You haven't given us a patent.  You haven't given us a trademark

11 registration.  You haven't given us a copyright, but you are the

12 800 pound gorilla and we cannot fight that, so we will stop.  We

13 did.  But it was the actions that took place after that.

14      We don't think *Noerr-Pennington, Noerr-Pennington* does

15 recognize that if you're going to go into court and try to

16 enforce recognized rights then you may also need to write demand

17 letters to say stop, cease and desist things that would flow out

18 of that action.  But I don't believe *that Noerr-Pennington* nor

19 the cases that are cited by Apple actually say, but you can take

20 it to another level.  You can go out there and try to make

21 people stop doing business with Luxpro at all, whether it's the

22 Shuffle product that they complained about, or whether it's the

23 subsequent next generation products that are completely

24 different where courts have determined that there is no

25 confusion in those products and they can be produced and the

1   injunction overturned.  What we're saying is the litigation

2   should have stopped in 2005.  The litigation didn't stop there.

3        There were successive appeals, as explained in our

4   pleadings.  Successive appeals of the Taiwanese rulings that

5   really, and this is the key, that litigation put a strangle hold

6   on Luxpro.  It could not sell, not just the Shuffle products,

7   couldn't sell any of its products.

8           **THE COURT:** All right, now back up and say that again,

9   please.

10          **MR. COCKRELL:** All right.  The injunctions that were

11  issued in 2005–

12          **THE COURT:** Yeah.

13          **MR. COCKRELL:** --the first one in Germany applied only

14  to the Shuffle product, that was what the real fuss was about.

15  When they went to Taiwan, after Apple[sic] said we'll stop using

16  the word Shuffle, we'll put our name on our product.  That

17  should have stopped the inquiry.  That should have stopped the

18  problem, but it didn't.  They went to Taiwan and got an

19  injunction that covered not only the iPod Shuffle product, or

20  the Luxpro Super Shuffle, they also got an injunction that

21  stopped Luxpro from producing any of its products.  It's next

22  generation products, the ones that had the screens on them that

23  the Shuffle did not have, that had other functionality that

24  didn't even look like the iPod Shuffle, they stopped Luxpro from

25  producing any of its products.

1    Now that's the strangle hold.  We've got you stopped,

2  Luxpro, you can't produce anything while you're tied up in

3  litigation.  And then they used that strangle hold to go to our

4  business partners and say, you can't do business with those

5  folks.  You can't - it's not just limited to the Shuffle

6  product, it is saying you cannot do business with them at all if

7  you want to do business with us.

8    We do not believe the *Noerr-Pennington* doctrine was ever

9  intended to go to that extent.  Things that are related to the

10  enforcement of a registered established right, then you can also

11  send out demand letters to the party that is infringing on that

12  right.  But when you go to the point of trying to interfere with

13  their business as a total and try to destroy that business,

14  that's not covered by the *Noerr-Pennington* doctrine.

15    We think that's separate and distinct from the statute of

16  limitations issue, but the facts flow along the same line.  We

17  are not basing the lawsuit that has been filed here today on the

18  fact that Apple got an injunction in Germany, or that Apple got

19  an injunction in Taiwan.  Luxpro fought those injunctions in

20  Taiwan and got them overturned.

21    What Apple did after that is continue to appeal, continue

22  to try to keep that in the litigation process.  And it's that

23  pattern of litigation conduct that we believe is the exception,

24  if *Noerr-Pennington* applied at all, because we say the conduct

25  was to third parties, not just to Luxpro trying to stop it from

1   producing its products.

2        But they went to our suppliers, they went to our

3   distributors, they went to InterTAN, people that had products on

4   the shelves that were beyond what used to be called the Shuffle

5   product, the Super Shuffle, but they were products that were in

6   the next generations.  Those are allegations in our complaint,

7   and they had to, InterTAN was required to actually take those

8   products off the shelves and destroy them.

9        Your Honor, we don't believe that that is conduct that is

10  supporting a valid challenge, or a valid enforcement through the

11  courts of their rights, particularly when they do not identify

12  what those rights are.  They don't do it even today.

13       Your Honor, there is no patent that they have asserted in

14  any of their responses, in any of their briefing, that have been

15  presented to this court, there are no copyrights that have been

16  identified, there are no trade names that have been identified.

17  This was a virgining, it was a developing business in 2001-2005

18  time frame.  Everybody was trying to get in on that business and

19  be able to compete with Apple.  Everybody was developing it, and

20  our allegations say that our products were developed through its

21  own research and development programs and they were not just a

22  copy of the product.  But what do they do?  They call them

23  knock-offs.  That's disparaging comments about our products and

24  disparaging comments about the way Luxpro does its business that

25  occurred not only in 2005, but it continued into 2006, 2007,

**Luxpro Corporation v. Apple, Inc.**                                    **28**
**No. 08-4092**

1   2008.  This is not a continuing tort argument.  What we're

2   arguing is, in 2005 you addressed your attacks to Luxpro.  You

3   said that we ought to stop doing some things that you felt were

4   wrong.  We tried to address those issues and stopped some of

5   them.

6           **THE COURT:** What I'm saying is the letters post were

7   the interference.

8           **MR. COCKRELL:** That is what we're complaining about.

9           **THE COURT:** I think that's going to be, as I told Mr.

10  Crass, that's going to be the whole key, as I see this.

11          **MR. COCKRELL:** And Your Honor, we believe that if you

12  look at the - there are some cases that the court, as you are

13  doing your own research, needs to be aware of in looking at the

14  *Noerr-Pennington* doctrine.  And I believe we have cited some of

15  this in our brief, we may not, but the *Professional Real Estate*

16  *Investors* case, it's a U.S. Supreme Court case, 508 U.S. 49.

17          **THE COURT:** I've read that and read that and read that,

18  yes.  Go ahead.

19          **MR. COCKRELL:** Then after that, if you look at, of

20  course the *California Motor Transport* case was talking about the

21  sham exception.

22          **THE COURT:** Same case.

23          **MR. COCKRELL:** Talking about how it was supposed to

24  apply, you've read that.

25      But there are also some cases that have occurred after

**1** that, one in the Middle District of Louisiana, one that's close

**2** to this jurisdiction, the *Livingston Downs Racing Association*

**3** *and Jefferson Downs Corp*, it's 192 Fd2.

**4**         **THE COURT:** If I don't have them in your brief, please

**5** give them to me.

**6**         **MR. COCKRELL:** And we'll be happy to do it, Your Honor.

**7**     Those cases examine how the sham exception ought to operate

**8** and whether or not it is an exception to the *Noerr-Pennington*

**9** protection or immunization that Apple is trying to assert here

**10** today.  Those cases say that, all right, litigation is something

**11** we can expect if you have a legitimate right that you need to

**12** protect.  That's what the courts are for.  But when you have

**13** developed a strategy that is basically a license to hunt through

**14** the litigation process and use it to interfere with right,

**15** rightful and lawful competitors that are out in that market–

**16**         **THE COURT:** You can't do it.

**17**         **MR. COCKRELL:** --you cannot do that.  And if you have

**18** shown a pattern of litigation that just continues and continues

**19** and continues, it brings into question whether or not you can

**20** even have probable cause, that it lessens that threshold

**21** examination and the court needs to look at that.  It's not just,

**22** was I trying to enforce a right.  First thing they've got to do

**23** is define what that right is, trade dress, what is that?  What

**24** right to they have to dress their products in a way differently

**25** from other people's products?  Do they have a registered right

1  to do that?

2       Now there is no doubt that the court in Taiwan was looking

3  at whether or not there could be confusion to the public, and

4  that we do need to be able to promote competition and growth in

5  the industries and that sort of thing.  And if it looks like

6  that there is an effort to try to get somebody else's advantage,

7  then we need to look at that and we need to examine it.

8       But in this situation, it should be the proponent that has

9  to come in and define what those rights are.  Just look alike

10  and then call us knock-offs and really accuse us of trying to

11  just copy their product as the basis for our business was

12  improper, and particularly when they make those accusations to

13  our business partners, and use those as threats to make them

14  stop doing business with us.  It's not protecting the Shuffle.

15  It is eliminating competition and that is not protected by the

16  *Noerr*-Pennington doctrine.  Never was intended to do that.

17       It's very important that the court understand the

18  distinction there because it is those post activities, the post

19  injunction activities, it's not just that they were later in

20  time, although that is important.  But it how that conduct

21  shifted.  It was no longer trying to stop Luxpro and trying to

22  recognize its rights.  It was going to third parties that had no

23  dog in that hunt.  They were being threatened with boycott and

24  litigation if they did business with Luxpro.

25       That steps beyond the *Noerr-Pennington* protection, if it

1   exists and applies in this case, but also from a timing

2   standpoint, it gets us into another area and that is a separate

3   and distinct cause of action.  It is a cause of action that we

4   are alleging for interference of contractual relationships that

5   we have with third parties that is separate and distinct from

6   just writing us a demand letter and saying stop infringing on

7   our products, even though they wouldn't define what the

8   infringement really was, and what rights they were trying to

9   protect.

10        We believe that *Noerr-Pennington*, No. 1, shouldn't apply at

11   all because of the post activity conduct and who they're writing

12   the letters to.  But also that the sham exception that is really

13   related to the pattern of litigation exception.  Sometimes

14   they're called different but they–

15        **THE COURT:** I've got a little problem with that, it

16   shouldn't apply at all.  Certainly Luxpro's Shuffle is almost

17   like the Apple's Shuffle.  And so they at least had a probable

18   cause maybe to go in there to get that initial injunction in

19   Germany and possibly even going into Taiwan.  So that may well

20   have been covered.  However, it's the post letters that I'm

21   concerned about in that we begin to have problems ourselves in

22   viewing this lawsuit.

23        **MR. COCKRELL:** Well, and it's that post-litigation

24   conduct combined with the fact we exceeded to their demands.

25   Problem solved.  There were no probable cause to go beyond

1  because the problem had been fixed.

2          **THE COURT:** Right.

3          **MR. COCKRELL:** And if they're going to make contacts

4  with our distributors, with our business partners after that

5  point in time, they are not protecting their intellectual

6  property.  Now they're saying stop doing business with Luxpro

7  and that gets into the anti-competitive conduct.  It gets into

8  the tortious interference of contractual relationships.  It gets

9  into the issues that we don't believe *Noerr-Pennington* was

10 trying to protect in this context.  That's why those claims do

11 still live and should be heard by the court today.

12     Now those are very fact intensive examinations.  If there

13 was, if we are able to look into the intent and the purposes

14 that Apple had or instilling and continuing--

15         **THE COURT:** You're looking now to the second phase of

16 *Noerr-Pennington*, objective intent.

17         **MR. COCKRELL:** Your Honor, I believe that - if you

18 believe that *Noerr-Pennington* does apply in this case, then the

19 sham exception comes in where we ought to be able to explore the

20 subjective intent.  We believe that the *Noerr-Pennington*

21 doctrine shouldn't apply because of the difference in the type

22 of conduct and the approach and the purpose of it after the

23 Shuffle product had been solved.

24         **THE COURT:** At least that merits some discovery.

25         **MR. COCKRELL:** That's right.  That merits discovery,

1  but also, if you believe that *Noerr-Pennington* doctrine still

2  has some application to this case, that pattern of litigation,

3  that sham litigation, that we're saying occurred after the

4  Shuffle problem had been fixed, entitles us to explore their

5  subjective intent continuing that litigation, if it still

6  applies.  And that's why we believe that we do need to have

7  discovery to find out what Apple was really up to.

8      Your Honor, the Motion to Dismiss, as the court is very

9  well aware, are intended to try and short circuit litigation and

10 deny the plaintiffs their day in court.  And we need at least to

11 be able to discover and look into those issues so that they

12 could be determined later, could be summary judgment, could be

13 that there are other motions that will be available to the

14 defendants after we have conducted discovery.  But once we have

15 pled that case under Rule 8, then we're at least entitled to

16 look into them.

17     Now I understand the court's concern, limitations could

18 knock them out at the beginning, and the court needs to look at

19 those issues and we've tried to brief those for the court and

20 try to explain it, but it is not the conduct in 2005 that we're

21 complaining about and that did not give rise to the cause of

22 action for tortious interference that occurred in 2008.

23         **THE COURT:** I think the statute of limitations would

24 take care of that.

25         **MR. COCKRELL:** That's correct.

**Luxpro Corporation v. Apple, Inc.**                                    **34**
**No. 08-4092**

1      **THE COURT:** And it's only those post letters to third

2    parties that you're looking at.

3            **MR. COCKRELL:** Now that's a different protection from

4    the statute of limitations, what you're talking about there?

5            **THE COURT:** Yes, of course it is.  Those are within the

6    statute.

7            **MR. COCKRELL:** That's correct.  And you're saying that

8    post conduct should be immunized by *the Noerr-Pennington*

9    doctrine, and of course we believe that it shouldn't.

10           **THE COURT:** Here's my notes on this.  I said, So the

11   question is whether seeking the injunctions in Germany and

12   Taiwan was objectively meritless, if not, then *Noerr-Pennington*

13   applies.

14       Now, if it was objectively meritless, then determine

15   Apple's subjective modification in applying for the injunction.

16   If to interfere with Luxpro's business, then *Noerr-Pennington*

17   does not apply.  And then if *Noerr-Pennington* applies to the

18   litigation, then does it apply to the cease and desist letters

19   Apple sent to Luxpro's distributors or potential distributors.

20           **MR. COCKRELL:** Your Honor, we believe that those the

21   cease and desist letters were not just stop selling Shuffle

22   products.  Those cease and desist letters were, in fact,--

23           **THE COURT:** You're saying they gave rise to the

24   tortious interference.

25           **MR. COCKRELL:** That's correct.

1          **THE COURT:** That's what I have right here.

2          **MR. COCKRELL:** Does the court still have questions

3    about the distinctions there that we're making?

4          **THE COURT:** I really didn't need this hearing.

5          **MR. COCKRELL:** Just trying to make sure we're

6    responding to the court's inquiries.

7          Your Honor, I do want to touch on a couple other issues

8    that have been brought up.  The choice of law, we do believe the

9    choice of law is a premature analysis at this point in time.

10   We've made the allegations of the conduct that took place.  That

11   conduct took place globally and all over the United States.  And

12   in our Response to the Motion to Transfer, we pointed out how we

13   had customers, we had potential customers, we had people all

14   over the United States that were trying to get to our products

15   and showing interest in them and some of them even placing

16   orders for them.

17         Now we're going to have not only witnesses all over the

18   United States, but there is a global and national impact that

19   has taken place here.  The analysis that the court has to make

20   in trying to determine the choice of law is, which states' law

21   should be applied based upon, not the most significant context,

22   but the most significant connections to the litigation.  We

23   believe that is still up in the air right now.

24         There's no doubt the case has been filed in Arkansas.  We

25   have provided to the court cases that we believe support the

1  application and the conduct and the prosecution of these claims

2  in the state of Arkansas, if the court chooses to apply this

3  state's law.

4       There is no question that one of the causes of action is

5  based upon a statute in California.  This court will be asked to

6  construe California law for that particular cause of action.

7  But we believe the court is able to do that and fully capable of

8  doing it, and entitled to do it under the cases that if you have

9  other causes of action that could be controlled by the law of

10  other states, the fact that you may directed to one state, for

11  one of those causes of action doesn't limit you from the rest.

12       We believe discovery is going to be necessary to find out

13  exactly which state does have the most significant connection to

14  this litigation.

15       The largest worldwide distributor of electronic products

16  today is located right here in this state.  Wal-Mart is here.

17  Wal-Mart and this state are going to have an interest in how

18  this litigation plays out.  That is a connection to this state.

19  That doesn't mean California law has to be applied on every

20  cause of action, or should be, and that we're going to have to

21  look at that as we go down the road.

22       So the choice of law is something that we believe the court

23  should defer at this point in time until we've had an

24  opportunity to discover.  Now obviously, that presupposes, if

25  the court can get beyond the issues of *Noerr-Pennington* and the

1   statute of limitations and believe that the claims still have

2   viability, then we need to do that, need to look into them and

3   have some discovery to get there.

4       Does the court have other questions that you'd like us to

5   address?

6           THE COURT: Well, I'm going to put y'all on notice,

7   probably one of the greatest professors of law in this entire

8   world on choice of law came from the University of Arkansas,

9   Robert A. Leffler.  I made a B in his course.  So, I want to put

10  you on notice right now that I'm supposed to be - you get a B in

11  Leffler's class you did something, you really did.  So, I'm

12  kidding with you.  No, that's fine.

13          MR. COCKRELL: Your Honor, in summary, on these issues,

14  we believe that the complaint that is before the court is a well

15  pled complaint.  And that under Rule 8 it is entitled to be able

16  to go forward to let discovery be conducted and the facts to be

17  explored because the tortious interference claims, the claims

18  that we have raised that have to do with conduct that was

19  directed to our business partners post dates the injunctive

20  relief in both Germany and Taiwan and is not protected by the

21  *Noerr-Pennington* doctrine, either because the doctrine doesn't

22  apply at all, or because the exceptions we discussed, the sham

23  and the pattern litigation exceptions take it out.

24      We believe that Luxpro should be entitled the opportunity

25  to have its day in court and we look forward to the court's

1   rulings on these issues.

2          THE COURT: Rebuttal?

3      Thank you, Mr. Cockrell.

4          MR. CRASS:  Your Honor, let me start with what I

5   submit would be an effort to counter what I think is his

6   simplification of the chronology.

7      He said, and I think the court has focused on this as well,

8   that once the injunction was issued in Taiwan and this company

9   changed the name, was there really any reason for Apple to worry

10  about the protection of its intellectual property.  And a fact

11  that has not been mentioned today is that Luxpro appealed that

12  injunction, and appealed it again.  The most recent decision by

13  the Taiwan Supreme Court was July of 2009.  So during the

14  pendency of the Taiwanese action, including the exhaustion of

15  appeals, Apple is in jeopardy because we don't know what Luxpro

16  has communicated, for example, InterTAN.  Apparently InterTAN

17  had some - taking their allegations at face value, InterTAN had

18  some of their Shuffles.  InterTAN apparently made a decision

19  that if they sold them, they'd be violating Apple's intellectual

20  property.  So, I don't think it's fair under *Noerr-Pennington*,

21  that may not be the right word, I don't think it's correct under

22  *Noerr-Pennington* to say once you get an injunction you can't

23  take additional steps to protect your IP rights, particularly in

24  the face of an appeal that says we're going to try to get that

25  injunction overturned.  So they did, you know, they probably did

1    the prudent thing and said we'll change the name and argue that

2    they don't have any intellectual property rights just to cut our

3    losses, so to speak, but we're going to continue to appeal it.

4          So I submit that *Noerr-Pennington's* umbrella reaches

5    communications as long as these people are disputing our right

6    to intellectual property.

7          Now it's interesting that on the one hand Mr. Cockrell will

8    say, we're not questioning their intellectual property, but what

9    is their intellectual property right?  What is trade dress?

10         The Supreme Court of the United States has defined what

11   trade dress is.  It's clearly a right to protect, just like

12   trade secret, just like patent.  In fact, in some ways it may be

13   more valuable than patent because the patent has an expiration

14   date.  I'm wading into water that is not my typical water, but I

15   know enough about patents to know there's an expiration date.

16   There is no such thing for trade dress.

17         The leading case on Supreme Court on trade dress had to do

18   with the motif in a Mexican restaurant.  I thought they all

19   looked alike, but the court recognized there's trade dress.

20         So here's a more serious point: they really can't come into

21   this court and collaterally attack a decision by the Taiwanese

22   court and the German court that were legitimate intellectual

23   property rights.  It would not be correct to put you in the

24   position to say well, Taiwan and Germany found intellectual

25   property rights that were protectable but, in the Western

1    District of Arkansas they don't exist.  That would be a

2    collateral attack on a binding judgment that their client was a

3    party to.  So clearly we had rights.

4         Your Honor, there's a lot of talk about letters, and I know

5    we're bound by what's alleged.  But I submit to the court that

6    there are no letters in the record.  The only references I see

7    in the First Amended Complaint to a letter is paragraph, or

8    letters, paragraph 30 says, "While the overarching injunctions

9    were on appeal, unbeknownst to Luxpro, Apple sent warning

10   letters to other companies who were doing business."  Where are

11   the letters?  What do the letters say?

12        I don't think it is fair to Apple, and that's one of our

13   arguments in the Motion to Dismiss, Your Honor, is that they've

14   not pled with specificity the acts that they claim fall outside

15   *Noerr-Pennington*.  These general allegations about letters and

16   communications and threats is not sufficient enough for the

17   court to say, those fall outside *Noerr-Pennington*.  It's their

18   burden to prove the exception exists.  I think we all recognize

19   that here.  They are seeking an exception to a general rule.

20        There is no allegation in the complaint, Your Honor, that

21   the letters or the communications were a sham.  You know what

22   they're saying to the court?  They weren't necessary because

23   there were injunctions entered.

24        They don't attack the injunctions as baseless.  They are

25   basically saying once you got the injunction the letters were

1  not necessary.  That doesn't take it outside *Noerr-Pennington*.

2  They've got to show that the letters themselves were objectively

3  meritless and the subjective intent issue.  And so, where are

4  the letters?  What do they say?

5      As Forrest Gump once said, That's all I have to say about

6  that, Judge.  Thank you.

7           **THE COURT:** Thank you.

8      Anything further?

9        **MR. COCKRELL:**  Yes, Your Honor, I would like to just

10  respond very briefly.

11     Mr. Crass has acknowledged that the court is, in this

12  analysis, required to look at the complaint itself and be bound

13  by what is there.

14     All of the evidence has not been presented to this court.

15  This is not a motion for summary judgment hearing.  This is a

16  motion to dismiss.

17     The complaint does allege that letters were sent.  It does

18  allege that threats of boycott and litigation were asserted.  We

19  have not attached all the letters to the pleading, we're not

20  required to at this point in time.  We just simply have to tell

21  the court and the defendant what the fuss is all about.  We have

22  done that.  Rule 8 says we have accomplished that and I believe

23  we've met those pleading requirements is the point I'm trying to

24  make, Your Honor.

25     We're not required to prove our case.  In fact, *Twombly*

1   says we're not required to prove our case at this point in time.

2   All we have to do is get a cause of action pled that goes beyond

3   speculation.  We're not speculating this.  They don't deny that

4   letters were sent.  They just want to read them.  They will get

5   an opportunity to do that in discovery.

6       Now when we're talking about the application of the *Noerr-*

7   *Pennington* doctrine, we don't believe it is our burden to prove

8   that *Noerr-Pennington* applies or doesn't apply to these cases,

9   to this case.  I believe it is the defendant's, if they're going

10  to use that as a defense to our claims, it is their burden to

11  prove *Noerr-Pennington* does apply to this case.

12      We've explained to the court why we don't believe it does

13  and we've also explained to the court why we believe, if it does

14  apply, why the exception should come into play, but it's not our

15  burden to do that.

16      I want to really emphasize to the court that if they had,

17  if Apple had a right to protect the look of its product, this

18  trade dress that they're arguing about here today, the issue

19  that was presented to both the German court, excuse me,

20  particularly the Taiwanese court is whether or not the public is

21  going to be confused by those products, not that they had the

22  right to make their products look better or look different from

23  our products, all the way through.  It was only on the Shuffle

24  product and the name was involved there and there was confusion

25  that was the issue.

1      The issues that came before the Trade Commission was public

2   confusion.  Is that going to be a confusing aspect.  That's what

3   really was being looked at in the Taiwanese court.  It was not

4   whether or not they had an intellectual property right or a

5   trade right or a copyright, a trade name or a copyright to

6   protect.  They're asserting that what they were trying to do was

7   an intellectual property right, but I don't believe it has

8   actually yet been defined in this court.  And that is not our

9   obligation and we're not acknowledging that they have IP rights.

10   We're saying if they had one, they have a right to go to the

11   court and have access to the court like everybody else, but

12   that's not what they were doing here.  They were just concerned

13   that our products looked like theirs.  Trade confusion, public

14   confusion was the issue, not property rights.

15      That's why we believe that the court needs to look very

16   carefully at these issues that are being raised.  They don't get

17   to rewrite the pleading by adding facts that are not yet into

18   evidence, is the point we're trying to make.  That's what is

19   really being accomplished here today.

20      We stand on our pleadings and Rule 8, and believe we should

21   be entitled to go forward.  Thank you, Your Honor.

22          **THE COURT:** Anything else?

23          **MR. CRASS:**  Not on the Motion to Dismiss, Your Honor.

24          **THE COURT:** All right, good.

25          **MR. CRASS:**  Do you want to hear anything on our Motion

**Luxpro Corporation v. Apple, Inc.** 44
No. 08-4092

1  to Transfer?  I'm prepared--

2         THE COURT: Let's just withhold that.  I'm going to

3  deal with this motion, I think.

4         MR. CRASS:  Thank you, Your Honor.

5         THE COURT: And then if you wish to come back once I

6  handle this, we'll listen to that.

7      Is your Motion to Transfer - where did the power points

8  come in?

9         MR. McGAHA: We had a power point on both of them, Your

10  Honor, but that's fine.

11         THE COURT: I was kind of looking forward to the power

12  points.

13         MR. McGAHA:  We'll give them to you.

14         THE COURT: My ex-law clerk wanted to do power points,

15  I was going to let him do it.

16      Thank y'all very much.  Appreciate y'all being here.  It's

17  a pleasure being with you.

18      Court is adjourned.

19                    [Adjourned at 10:50 a.m.]

20

21

22

23

24

25

Luxpro Corporation v. Apple, Inc.                                      **45**
No. 08-4092

1                             **C E R T I F I C A T E**

2

3         I, Donna S. McKinney, CCR-CVR, certify the foregoing is a

4   correct transcript from the record of the proceedings in the

5   above-entitled matter.

6         DATED this 28th day of October, 2009.

7

8                               /s/ *Donna S. McKinney*
                                Donna S. McKinney, CCR-CVR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25