IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| LUXPRO CORPORATION, a Taiwanese corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No. 4:08-CV-04092-HFB |
| APPLE, INC. f/k/a Apple Computer, Inc., | ) ) ) | |
| Defendant. | ) ) ) | |

---

### PLAINTIFF'S SECOND AMENDED COMPLAINT

---

    **NOW COMES** Plaintiff Luxpro Corporation, a Taiwanese corporation, and for its Second Amended Complaint against Apple, Inc. f/k/a Apple Computer, Inc. states:

### I.      PARTIES

    1.    Luxpro Corporation ("Luxpro") is a Taiwanese corporation, with its principal place of business in Taiwan. It develops, manufactures, distributes and sells MP3 players throughout the world, including in the United States. Luxpro is a citizen of and is domiciled in Taiwan, a foreign state.

    2.    Apple, Inc. ("Apple") is a California corporation that manufactures, distributes and sells MP3 players under the brand name iPod throughout the world. Apple's principal place of business and corporate headquarters are located at 1 Infinite Loop, Cupertino, Santa Clara County, California 95014.  Apple is a citizen of and is domiciled in California.

Dockets.Justia.com

## II.    JURISDICTION AND VENUE

3.    This Court has original jurisdiction over this case under 28 U.S.C. § 1332(a)(2).  The matter in controversy exceeds the sum or value of $75,000, exclusive of costs and interest.  Luxpro is a citizen of Taiwan, a foreign state.  Apple is a citizen of California.  Therefore, the Court has subject-matter jurisdiction over this case based on diversity of citizenship.

4.    This Court has personal jurisdiction over Apple because Apple regularly conducts business in this state.  At all relevant times, Apple was engaged in the business of marketing, distributing and/or selling its consumer electronics products, including iPods, in Arkansas and throughout the United States.

5.    Venue in the Western District of Arkansas is proper for this case under 28 USC § 1391(a)(1)-(2) and (c).  Apple conducts business in this judicial district and is subject to personal jurisdiction at all times relevant herein.  Apple maintains a substantial presence in this District as it has numerous retail sales locations throughout this District.  Further, Apple promotes uses, sells, engages in marketing and/or distributes its iPods and related services throughout this District.  This Court has considered Apple's Motion to Transfer Venue, but denied said motion.  Dkt. No. 50.

## III.    FACTUAL BACKGROUND

6.    This is an unfair competition case related to the illegal efforts of Apple, an enormously successful United States Corporation, to drive a small competitor from Taiwan out of the worldwide MP3 player market and, in the process, out of business.  To accomplish its anti-competitive purpose, Apple developed an illegal scheme to discredit

and disparage Luxpro's products and to destroy the business reputation of Luxpro in the consumer electronics marketplace.

7.      This illegal scheme was premised, first, on a pattern of sham litigation to obtain injunctions against Luxpro and its products.   These lawsuits falsely accused Luxpro of violating Apple's "intellectual property" rights by selling "cheap knock-offs" or illegal copies of Apple's MP3 players.   Interestingly, however, no registered patents, copyrights or trademarks were ever asserted in the litigation filed against Luxpro. Nevertheless, Apple wrongfully obtained an *ex parte* injunction in Germany to stop Luxpro from selling a very specific prototype of MP3 player that contained the word "Shuffle" on it and was to complete with Apple's "iPod Shuffle."   Despite Luxpro's compliance with that injunction (although Luxpro did not agree with it), Apple then later parlayed that injunction on a very narrow issue related to one prototype MP3 player product into a much broader injunction in Taiwan to stop production of **all** of Luxpro's MP3players.   Apple then used the litigation against Luxpro to threaten Luxpro's commercial partners (i.e. retailers, distributors and suppliers) with similar suits that would seek civil fines, interruption to their businesses, financial losses to their businesses, litigation and even criminal penalties if they purchased, sold, or manufactured Luxpro's MP3 products that Apple continued to misrepresent as cheap knock-offs or illegal copies of the iPod MP3 player.   This scheme of disparagement and unfair trade practices ruined the reputation of Luxpro and its products and destroyed Luxpro's ability to fairly compete in the global MP3 player market.   Apple's unlawful acts resulted in the cancellation of distributorship agreements, caused customers to cancel existing orders, as well as plans for future orders for Luxpro's products.   This scheme also destroyed

Luxpro's business reputation  and goodwill, resulting in a complete loss of Luxpro's ability to raise capital for its current operations and future expansion.

 A.     **The MP3 Player Market and the Origin of Apple's Campaign to Dominate the Market.**

       8.      In 2000, music enthusiasts were very active in downloading, listening, and trading music in digital form over the internet.  At the same time, Steve Jobs was leading the efforts to forge an economic revival at Apple and was looking for ways to make more people buy Macintosh Computers and "gadgets" to use with the computers.  Since most of the music obtained over the internet was played through speakers attached to computers, Apple started looking for software to manage digital music that could be stored and marketed to the public through its own computer products.

       9.      Part of that goal was achieved when, on January 8, 2001, Apple introduced iTunes at the Macworld Expo.  iTunes is a digital media player software application that plays and organizes digital music and video files on a computer.

       10.     As they worked on and improved the iTunes digital media player *software application*, Steve Jobs and Apple were also looking for ways to enter the portable digital music *player* market; digital music players, also called MP3 players, enable consumers to download music and other media from the internet, store, and replay that music and other media.  Steve Jobs and Apple were looking to develop a proprietary digital music player that would work exclusively with iTunes.  On October 23, 2001, Apple introduced the iPod, a portable music player that interfaces with iTunes to play the stored music files.

11.     Recognizing the potential for these types of products to play a vital part in Apple's economic revival, Apple brought these two digital music products together on April 23. 2003, through the introduction of its online media store, the iTunes Store.

12.     A short time later, Apple announced that the iTunes Store had over one million songs available for download in the United States.  Through the iTunes Store, Apple gained control over 80% of the music downloaded in the United States.  However, to gain control of the consumer's use of that music, and to sell more of its related products, Apple deliberately made digital music purchased at the iTunes Store inoperable on MP3 players produced by Apple's competitors.  Thus, in order to play music from Apple's iTunes Store, the dominant online music retailer, the consumer's only option in the digital player market was Apple's higher-priced iPod product line.  To insure "customer dedication" to its other products, Apple designed the iPod in such a manner that it is unable to play music sold by rival online music stores, thus leaving iPod purchasers with no choice but to purchase music from iTunes.

13.     To "seal the deal," Apple developed software to control the manner in which its digital music is accessed. Unlike most internet sites, the iTunes Store is accessed with proprietary Apple software rather than with a web browser.  Once the consumer "entered" the iTunes Store, Apple sold individual songs that could only be played by the iPod (although in early 2009, Apple finally allowed songs purchased and downloaded from iTunes to be converted to a format that can be played on non-Apple MP3 players).  To generate more customer appeal, Apple sold its music cheaper than its competitors.  Individual songs can be downloaded from the iTunes store for $.99 (and Apple has recently introduced other pricing for the download of songs and other digital

media).  Apple was not expecting to turn a profit from the sale of songs on iTunes, because most of the funds received from iTunes purchases are paid back to the recording industry.   Instead, Apple relies on sales of its MP3 players to secure enormous profits. Because of the tremendous impact that the sale of MP3 players could have on its "bottom line," Apple's goal was to dominate the *worldwide* MP3 player market. Therefore, by February 2005, Apple had released several generations of the iPod Classic, the first generation of the iPod Mini and the iPod Shuffle.  The foregoing is merely one example of how Apple used anticompetitive and unfair practices to achieve its goal of market dominance; practices that have been the subject of enormous criticism and resulted in a multitude of antitrust lawsuits and government investigations in countries around the world.

**B.      Apple Succeeded in Dominating the Worldwide MP3 Player Market.**

14.      With the dual rollout of its iTunes and iPod products in 2001, and by designing those products to be functional only if used together, Apple not only joined the existing MP3 market, but dominated it.  In the United States alone, Apple has obtained a staggering 90% market share of the hard drive based MP3 player market and a 70% share of the MP3 player general market.

15.      From 2004 to 2005, Apple's iPod market share increased from 21% to 26%.  Mid-range competitors such as Creative Technologies, (which created the Ltd's Zen series), Reigncom (which created the Ltd.'s Iriver series), Samsung and SanDisk watched their combined market share drop from the previous year to a combined 14% market share.   Some of that market share "drop-off" went to Apple; but some was garnered by smaller-range manufacturers, who saw their combined market share of the

digital player market increase by 8% from 2004 to 2005, which was actually higher than Apple's 5% gain over the same time period.  One of those smaller-range manufacturers experiencing significant growth in the music player market during this time frame was Luxpro.

16.     With the introduction of the iPod and iTunes music store, Apple spurred the creation of the MP3 player market and ultimately dominated it.  But Apple's market dominance did not occur overnight.   As detailed above, Apple launched the first iPod in late October 2001.  For fiscal year 2002, sales of iPods were only $143 million, and sales of related services and accessories were only $4 million.  Together, these two categories accounted for only 2.6 percent of Apple's sales, which were under $6 billion that year.[1]  Around that same time, a company called SonicBlue was the market leader for the manufacture and sale of MP3 players.

17.     However, as of fiscal year 2006, Apple's worldwide sales of iPods actually exceeded its sales of computers, which likely led the company to change its name from Apple Computer, Inc., to Apple, Inc.  In fiscal year 2006, for example, Apple posted total worldwide sales of $19.3 billion—of which desktop and laptop computers accounted for a combined total of $7.4 billion.   Apple's iPods, on the other hand, accounted for $7.7 billion, and iTunes added another $1.9 billion.  For 2006, iPod and iTunes together accounted for $9.6 billion in sales—approximately 50 percent of the total company sales.[2]   In fiscal year 2007, Apple posted total worldwide sales of $24.0 billion—of which iPods accounted for $8.3 billion, and iTunes added another $2.5

---

[1] Apple Computer Inc., Form I0·K, 2004.
[2] All financial statistics taken from Apple Computer, Inc., Form 10K FY 2006, p. 54.

billion,[3] and in fiscal year 2008, Apple posted total worldwide sales of $32.5 billion—of which iPods accounted for $9.2 billion, and iTunes added another $3.3 billion.[4]   For demonstrative purposes, these sales volumes are reflected on the following chart:



18.    Industry commentators acknowledge that today, Apple's iPods command at least 70 percent of the MP3 player market.   For example, Paul Taylor, reporting for the Financial Times, writes that Apple's "share of the hard drive player market…(is)... 82.7 percent."[5]   Consumer Reports states that Apple's iPod players still account for more than three out of four MP3 players sold.[6]   Furthermore, data from the NPD Group show that Apple's market share, in units, for portable digital players, was in the 60-70 percent range in 2004, in the 75-80 percent range in 2005 and 2006, and in the 71-72 percent range in 2007 and 2008.   Since iPods are, in general, more expensive than other MP3 players,

---

[3] All financial statistics taken from Apple Computer, Inc., Form 10K FY 2007 , p. 89.
[4] All financial statistics taken from Apple Computer, Inc., Form 10K FY 2008, p. 41.
[5] Paul Taylor, "Apple Remains Unfazed By March of Microsoft's Zune", the Financial Times, December 28, 2006, p. 10.
[6] "Buying Advice: Mp3 players", ConsumerReports.org, downloaded January 17, 2007.

Apple's share in dollar sales is even higher.  NPD data shows that Apple's dollar share was in the 75-80 percent range in 2004, about 85 percent in 2005, and in the 85-90 percent range in 2006.[7]  By the fiscal second quarter ending March 29, 2009, Apple maintained a more than 70 percent U.S. market share for digital music players.

19.   As of March 2009, Apple had sold approximately 11 billion iPods worldwide since its introduction.  Through the iTunes store, Apple has gained control over 80% of the music downloaded in the United States.

20.   As demonstrated herein, Apple dominates the worldwide markets today for both MP3 players and online music.  It is no wonder then, that once Apple realized its strongest threat in the MP3 player market included mid-range and small-range manufacturers, Apple intentionally targeted Luxpro, a small-range MP3 player manufacturer in Taiwan.  Apple sought to conquer smaller competitors like Luxpro to prevent the smaller-ranged manufacturers from acquiring an increased market share.

**C.   Apple's Road to Market Dominance Was Paved with Illegal and Anticompetitive Conduct in the MP3 Player Market.**

21.   Since the introduction of the iPod, Apple has sought to stamp out the competition using various schemes.   Notably, Luxpro is not the only small MP3 player manufacturer that Apple has targeted; Apple repeatedly has used unfair tactics against other small manufacturers.  As an example, although Creative Technology, a Singapore-based company, beat Apple to the patent punch on iPod's interface, Apple sued Creative Technology in a Wisconsin Federal District Court alleging that Creative Technologies infringed claims on four of Apple's patents.  Ultimately, the case was settled in 2006, when Apple paid out over $100 million dollars to Creative Technologies.  Ironically, the

---

[7] NPD Group, Inc., monthly data, Portable Digital Players, Retail sales, May 2004-May 2006.

settlement allowed Apple to use Creative's patent on the interfaces in Apple products—yet another one of Apple's litigation tactics designed to both "promote" Apple's market dominance and deter other smaller manufacturers' lawful efforts to compete.

22.     In addition, despite the anticompetitive technical restrictions Apple placed on its iPod, RealNetworks, a rival seller of online digital music recordings through its RealNetworks music store, discovered a way  in the summer of 2004 to provide consumers with the ability to play music that had been purchased from outlets other than iTunes on the Apple iPod..   RealNetworks independently analyzed the Apple iPod firmware and figured out how to insert software code into digital music files sold by RealNetworks that could be played on the iPod.

23.     On July 26, 2004, RealNetworks publicly announced that music files sold through its online RealNetworks music store could be played on the Apple iPod, thereby giving iPod owners a competitive outlet for purchasing online digital music files.  This announcement was significant for at least two reasons.  First, it represented the first alternative to Apple's iTunes stronghold on both the digital music download and MP3 player markets as the sole supplier of downloaded digital music files that could be played on the iPod.  Second, RealNetworks offered its digital online songs for sale at prices as low as $.49 per track, well below the $.99 per track charged by Apple's iTunes.

24.     Rather than embracing the competitive offering that enhanced the functionality of the iPod, Apple immediately threatened both RealNetworks and Apple's own iPod customers.  On Thursday, July 29, 2004, a mere four days after RealNetworks' announcement, Apple issued its own public statement, threatening RealNetworks and iPod users with an investigation into "the implications of their actions under the DMCA

[Digital Millennium Copyright Act] and other laws."   Apple also warned consumers that when Apple updated the iPod software "from time to time it is highly likely" that this new technology "will cease to work with current and future iPods." True to its threat, by December 2004, Apple updated its iPod software to  again "lock it down" to prevent songs downloaded from RealNetworks music store (or any other digital online music store) from being played on iPods.

25.     In addition to the software changes used to prevent iPod owners from listening to online digital music files purchased from competitors, Apple has changed iPod and iTunes software multiple times, under the guise of "updating" it, to add new restrictions to music files purchased from Apple.   Consumers, locked in by Apple's dominance in the digital music market, and hampered by Apple's enormous market power, are continuously subjected to such unannounced, unilateral, and one-sided changes to their rights to listen to the music which they already have purchased from Apple.

26.     Apple's anticompetitive conduct is well-documented, manifesting itself in substantial litigation (and settlements by Apple) involving patent infringement, unfair competition, and antitrust claims.[8]  Indeed, in Apple's recent 10K filing with the United States Securities and Exchange Commission, Apple identifies several pieces of litigation

---

[8] *See e.g., Ines Lenzi v. Apple, Inc.*, (500-06-000296-059 Superior Court, District of Montreal; 500-09-016463-069 Quebec Court of Appeal, District of Montreal); and *Bradley Waddell v. Apple, Inc.*, (Ontario Superior Court of Justice, Court File No. 05-CV-200513CP) (Canadian Class Action Settlements with Apple related to first, second, and third generation iPod batteries) (http://www.apple.com/ca/ipod/settlement/); *Jean-François Carpentier v. Apple, Inc.*, (500-06-000315-057 Superior Court of Quebec, District of Montreal) (Canadian Class Action Settlements with Apple related to the iPod Nano); *Apple, Inc. v. Creative Technology*, (multiple patent litigation with MP3 competitor resulting in settlement payments being made by Apple of approximately one hundred million dollars) (http://www.apple.com/pr/library/2006/aug/23settlement.html); *Apple Computer Inc. v. Burst.com, Inc.*, 3:06-cv-00019-MHP, Federal District Court, Northern District of California (patent infringement litigation where Apple settled with Burst.com for ten million dollars over technology present in the Apple IPod products http://www.marketwire.com/press-release/BurstCom-Inc-795528.html); *Melanie Tucker, et. al. v. Apple, Inc.*, Case No. 5:05-cv-00037-JW ("The Apple iPod iTunes Anti-Trust Litigation"), Federal District Court, Northern District of California (pending).

filed against it related to its iPod and iTunes products, including multiple antitrust class actions, patent infringement cases, and consumer-related claims.[9]

**C.    Luxpro Developed and Manufactured Its Own Digital Music Products, Which Were More Advanced Than the iPod.**

27.    Luxpro Corporation was founded in December of 2002.  Luxpro has an outstanding research and development team that established a first-rate reputation in the worldwide electronics market and, specifically in the MP3 player market, for high quality design. Luxpro was the first in the world to offer 24 - bit digital signal processing. Luxpro owns patents in the electronics field issued in the United States, Japan, Europe, Taiwan and China.  Luxpro also has 28 Trademarks registered in the United States, Europe, Japan, Korea, Taiwan and China.  Among other electronic products, Luxpro developed and marketed a variety of cutting-edge MP3 players, such as Luxpro EZ Share MX-125D ("EZ Share"), EZ Season MX-110D ("EZ Season"), EZ Listen MX-265E ("EZ Listen"), Top Tangent MX-585D ("Top Tangent"), EZ Tangent MX-595D ("EZ Tangent") Super Tangent MX-575D/1075D ("Super Tangent"), iOta Flash IO-8XXFS ("iOta Flash"), Pico PI-9XXFS ("Pico"), and the Top Square MX-6xxFS ("Top Square") (collectively, "Luxpro's MP3 Players").

28.    Luxpro's products were progressive and unique. Luxpro invested enormous amounts of time and resources, and spent several million dollars in the research and development of those products.  Luxpro launched the EZ Share in January 2004, which boasted features the Apple products did not offer.  For example, the EZ Share entered the market with the capability to *listen* to FM radio, *record* music, and *move*, *receive* and *set up* music files.  Similarly, the EZ Season (product design launched in July

---

[9] *See* Apple 2008 10K at 25-33 attached hereto as Ex. "B."

2004), the EZ Listen (product design launched in August 2004), the Top Tangent (product design launched in April 2005), the EZ Tangent (product design launched in April 2005) and the Super Tangent (formally in volume production by May 2005) all contained these extra features.   In addition, Luxpro developed the EZ Listen, Top Tangent, and EZ Tangent with a seven language learning function and with tri-color OLED display monitors.   Moreover, the Top Tangent and EZ Tangent were the first MP3 players in the worldwide market with built–in FM Voice Positioning System (VPS). Finally, Luxpro's MP3 products were more competitively priced than many competing MP3 players, including Apple's iPod products.   For these and other reasons, Luxpro's MP3 Players posed a significant business threat to Apple.

**D.    Luxpro's MP3 Products Gain Momentum in the Global Consumer Electronics Market.**

29    The development of these advanced products led to increased industry recognition and consumer acceptance of Luxpro's products in the worldwide MP3 player market, which required Luxpro to initiate efforts to rapidly expand its business and operations.

30    The growing demand for Luxpro's MP3 players also allowed it to enter into a number of distributorship agreements that would have allowed Luxpro to compete with Apple in the global MP3 marketplace throughout Africa, Asia, Europe and the United States.   The growing list of distributorships included the following:

a.    **Tounsen Corporation ("**Tounsen") (Taiwan). By contract dated June 1, 2003, Luxpro entered into a distributorship agreement with Tounsen for the marketing and sale of all of its MP3 players throughout the country of Taiwan.   Under this distributorship agreement, Tounsen

was obligated to purchase products from Luxpro totaling Three Million Dollars ($3,000,000.00) (US) per year for five years, ending in May 2008. As Luxpro's main distributor for the country of **Taiwan**, the Tounsen contract provided access to an established commercial network for re-sale of Luxpro's MP3 players through major retailers, such as Carrefour, TKEC, ET-Mall, TV Shopping, etc.

b.      **Beijing Huaqi Informational Digital Technology Co., Ltd**. ("Beijing Huaqi") (China). By contract dated April 15, 2005, Luxpro entered into a distributorship agreement with Beijing Huaqi under which Luxpro agreed to supply Beijing Huaqi with 630,000 sets of its Super Tangent, Top Tangents, EZ Tangents and EZ Listens MP3 players.  Under this agreement, Beijing Huaqi was licensed to distribute Luxpro's MP3 players in **China**.

c.      **Beijing Qian Kun Time Digital Technology Co., Ltd**. ("Beijing Qian Kun") (China).  By contract dated April 25, 2005, Luxpro entered into a distributorship agreement with Beijing Qian Kun to supply over 215,000 sets of its Super Tangents, Top Tangents, EZ Tangents and EZ Listens MP3 players.   Under this agreement, Beijing Qian Kun was licensed to distribute Luxpro's MP3 players in **China**.

d.      **TCL Digital Electronics** (China). By contract dated June 5, 2005, Luxpro entered into a distributorship agreement to supply TCL Digital Electronics with over 450,000 sets of its Super Tangents, Top Tangents, EZ Tangents and EZ Listens MP3 players for the first year, and up to

14

600,000 sets in the second year. Under this agreement, TCL Digital Electronics was licensed to distribute Luxpro's MP3 players in **China**.

e.    **Victor Japan, Ltd.** (Japan). By contract dated June 15, 2005, Luxpro entered into a distributorship agreement to supply Victor Japan, Ltd. with over 150,000 sets of its Super Tangents, Top Tangents, EZ Tangents and EZ Listens MP3 players. Under this agreement, Victor Japan, Ltd was licensed to distribute Luxpro's MP3 players in **Japan**.

f.    **Laos Co. Ltd.** (Japan). By contract dated April 1, 2005, Luxpro entered into a distributorship agreement to supply Laos Co., Ltd. with over 350,000 sets of its Super Tangents, Top Tangents, EZ Tangents and EZ Listens MP3 players. Under this agreement, Victor Japan, Ltd was licensed to distribute Luxpro's MP3 players in **Japan**.

g.    **N.A.K.S. Asia Limited** ("N.A.K.S.) (Worldwide). By contract dated May 2, 2005, Luxpro entered into a distributorship agreement to supply N.A.K.S. with over 800,000 sets of its Super Tangents, Top Tangents, EZ Tangents and EZ Listens MP3 players. Under this agreement, N.A.K.S. was licensed to distribute Luxpro's MP3 players **worldwide**.

h.    **Funai Europe UK Representative** ("Funai") (Germany and United Kingdom). By contract dated June 13, 2005, Luxpro entered into a distributorship agreement to supply Funai with over 250,000 sets of its Super Tangents, Top Tangents, EZ Tangents and EZ Listens MP3 players.

Under this agreement, Funai was licensed to distribute Luxpro's MP3 players in **Germany** and the **United Kingdom**.

i.      **Keller Trading AB** (Sweden). By contract dated June 1, 2005, Luxpro entered into a distributorship agreement to supply Keller Trading AB with over 100,000 sets of its Super Tangents, Top Tangents, EZ Tangents and EZ Listens MP3 players. Under this agreement, Keller Trading AB was licensed to distribute Luxpro's MP3 players in **Sweden**.

j.      **Broadman Inc.** (India).  By contract dated April 1, 2005, Luxpro entered into a distributorship agreement to supply Broadman Inc., with over 100,000 sets of its Super Tangents, Top Tangents, EZ Tangents and EZ Listens MP3 players. Under this agreement, Broadman Inc. was licensed to distribute Luxpro's MP3 players in **India**.

k.      **Twister Sound Pty Ltd.** ("Twister") (South Africa and Singapore).  By contract dated June 27, 2005, Luxpro entered into a distributorship agreement to supply Twister with over 100,000 sets of its Super Tangents, Top Tangents, EZ Tangents and EZ Listens MP3 players. Under this agreement, Twister was licensed to distribute Luxpro's MP3 players in **South Africa** and **Singapore**.

31.     Further, in 2005, representatives of Circuit City Stores, Inc. ("Circuit City"), and of its Canadian subsidiary, InterTAN Canada, Ltd. ("InterTAN"), discovered Luxpro's MP3 Players at a consumer electronics trade show in Las Vegas, Nevada and became interested in distributing the products, both in the United States and in Canada.  Soon thereafter, officers and representatives of InterTAN traveled to

Taiwan to meet with Luxpro about selling Luxpro's MP3 Players in InterTAN's retail stores.  InterTAN is a **Canadian** consumer electronics retailer that operated under "The Source by Circuit City" banner, as a wholly owned subsidiary of Circuit City Stores, Inc.   InterTAN through its connections with Circuit City Stores, Inc., was to be Luxpro's distributor for MP3 players (among others) not only in **Canada**, but also the **United States** and throughout **North America**. InterTAN showed great interest in Luxpro's MP3 players.   InterTAN's interest in Luxpro's MP3 players was, in part, based on Luxpro's MP3 players' screens functioning as an FM radio and their ability to record sound.  InterTAN placed orders for Luxpro's Top Tangent under the brand name "Centrios."   In August 2005, Luxpro shipped over seven thousand (7,000) of its Top Tangent MP3 players under the brand name "Centrios" to InterTAN for a two-week trial in InterTAN's retail stores.   Luxpro's Top Tangents were very popular with InterTAN's customers and flew off of the retailer's shelves.   In response to this popularity, InterTAN began to actively promote the Top Tangent and was eager to purchase more of Luxpro's products.

32.     Through these distributorship agreements, by August, 2005, Luxpro had obtained orders for its MP3 players from all over the world.

33.     In addition, during the fall and winter of 2005, 2006, Luxpro also received many *direct* orders for its MP3 players from all over the world.  Specifically, Luxpro received direct orders and actually completed sales for its MP3 players with retailers, independent distributors, suppliers and consumers in the United States, and around the globe:

a.      In **Asia**, Luxpro sold its MP3 products in **Japan, China, Hong Kong, Taiwan, Singapore, Korea, Malaysia, Thailand** and **Indonesia** to over thirty retailers and independent distributors such as **Kaga Electronics, Limited, Laos Co., Limited, Seitec Corporation, Beijing Big Boss, Beijing Qian Kun Time, Longda Tech., AboCom Systems, Golden View, Co., Ltd., Orchard Co., Gajah International and DataPool Systems**.  Prior to the interference and unfair trade practices of Apple, Luxpro sold in excess of 14,150 units of its products worth NT$31,695,451.00 (US$1,056,515.05) directly to these and other Asian retailers and distributors.

b.      In **Europe**, which included the **United Kingdom, Belgium, France, Germany, Israel, Italy, Netherlands, Norway, Poland, Spain, Sweden, Switzerland**, Luxpro sold 2,930 units of its MP3 players to over 23 different retailers, distributors and companies purchasing the products for resale.  Prior to the interference and unfair trade practices of Apple, those sales totaled in excess of NT$3,704,310.00 (US$123,477.00).  Some of these European sales were actually destined for resale in the United Arab Emirates (UAE).

c.      In **North America**, including **Canada** and the **United States**, Luxpro sold over 7,000 of its MP3 products to over a dozen retailers, distributors and companies for resale, totaling NT$16,155,131.00 (US$538,504.37).

34.     Finally, because of the success of its products, Luxpro was also receiving interest from venture capital firms and outside investors from all over the world, including the United States and Japan, which would have helped provide liquidity and additional capital to Luxpro in order to expand and meet the market's growing demand for its products.

**E.     Luxpro's Evolution In The MP3 Player Market And Growing Demand For Its Products Provide Foundation For A Public Offering Of Luxpro's Stock**.

35.     This world-wide product acceptance and growth in sales prompted Luxpro, in 2005, to begin the process of preparing its stock to be publicly traded on the Gre-Tai Securities Market ("Gre-Tai"), a non-profit organization which took over the business of public stock trading from the Taipei Security Dealers Association.  This effort was not only a great business opportunity for Luxpro, but was also an economic necessity due to the world-wide demand for Luxpro's MP3 products.   A public offering of Luxpro's stock would provide needed operating capital to expand its production and manufacturing capabilities to meet this growing demand.  A listing on the Taiwanese Gre-Tai securities market would have been very advantageous to Luxpro's overall business enterprise, as well as to its shareholders and employees.  The opportunity to be traded on the Gre-Tai Stock Exchange would have facilitated long-term capital growth and would have enhanced Luxpro's already outstanding reputation in the financial and manufacturing markets, all of which was necessary to position Luxpro for future business growth.  In addition, a Gre-Tai listing would have allowed Luxpro to establish a stock option program for its employees designed to increase loyalty to the company from its manufacturing and marketing employees, as well as the people responsible for Luxpro's future research and development.

36.   With the ability to trade its stock on a public exchange, Luxpro's shareholders would have experienced greater marketability for their investments. The Gre-Tai listing would have also allowed Luxpro to use its own stock as collateral for loans from financial institutions to facilitate additional capital expansion.

**F.   Luxpro's Success Becomes a Threat to Apple's Market Dominance.**

37.   Not unlike the RealNetworks' threat, the growing market acceptance of Luxpro's MP3 player products—sold at a substantially lower cost than the iPod products—did not go unnoticed by Apple.  In February 2005, Luxpro developed a single prototype product intended to compete with Apple's recently introduced iPod Shuffle.  Luxpro called this prototype MP3 player the "Super Shuffle" because of its enhanced functionality, which included the capability to listen to FM Radio, record music and to move, receive, and organize music files.  These qualities were not provided by Apple's iPod Shuffle.  The Super Shuffle was a huge success when it was introduced at the March 2005 CeBit Trade Show in Hanover, Germany.  Upset that Luxpro's superior product gained great popularity at this trade show, Apple applied for and received *ex parte* injunctive relief against Luxpro from a German Court.  Apple asked the Court to require Luxpro to abandon the use of the word "Shuffle" in the product name.  Without Luxpro's participation in those proceedings, the injunction was granted, even though Apple had not claimed or proven that it owned a trademark or copyright registration for that name.  Nevertheless, in the face of this court challenge and other threats from Apple's legal representatives, Luxpro did not actually produce any products for resale with the "Super Shuffle" name.  Instead, Luxpro bowed to the pressure of Apple and its lawyers and renamed its MP3 player the "Super Tangent."  Luxpro also added the word "LUXPRO"

very prominently on the face of the product to eliminate any possible legal claim of product confusion.  Luxpro then began to market its MP3 player products under the "Tangent" label.

38.      In spite of these efforts by Luxpro to appease Apple and its lawyers, Apple did not give up its legal attacks and continued to send threatening letters demanding that Luxpro immediately stop marketing, manufacturing and selling  **all of its** competing MP3 products in the Tangent line - the Super Tangent, the Top Tangent *and* the EZ Tangent. In response to these demands and threats, Luxpro explained to Apple the obvious differences between the MP3 products of the two competitors and reminded Apple that it had changed the name of its prototype "Super Shuffle" product to the Super Tangent to avoid confusion and to differentiate Luxpro's products from the Apple iPod Shuffle.  It is interesting to note that Apple did not claim it had any copyright, patent or registered trademark that had been infringed by Luxpro.  Therefore, Apple had no legal right to demand that a competitor simply withdraw its independently developed products from the market.  Accordingly, Luxpro continued to manufacture, market, distribute, license, and sell its other MP3 players, none of which were in violation of the *ex parte* injunctive relief previously obtained by Apple in Germany.

**G.      Apple Continues Its Pattern of Sham Litigation to Stop Luxpro's Success.**

39.      However, Apple would not stop its illegal conduct.  Apple devised a scheme to undermine Luxpro's growing business opportunities in the market place – an elaborate plan to disparage its product line and business reputation.  Even without a patent, trademark or copyright claim, Apple again sued Luxpro, this time in Taiwan, alleging that the "appearance" of the Super Tangent, EZ Tangent **and** Top Tangent too

closely resembled the appearance of the iPod Shuffle, calling Luxpro's products cheap knock-offs or cheap copies.  Through a clearly one-sided submission by Apple to the Taiwanese District Court in this new lawsuit, Apple was able to convince the Court to enter a "provisional" (preliminary) injunction that prohibited Luxpro from manufacturing, distributing and marketing **any** of these MP3 players in the Tangent product line.

40.     Then, after Apple initiated this additional sham litigation in Taiwan, Apple also initiated a "public relations" campaign to destroy Luxpro's reputation in the MP3 market.  Apple wrote letters to Luxpro's retailers and distributors and threatened them with the same type of litigation that had been filed against Luxpro if they continued to sell Luxpro's products.   Apple also spread the word throughout the industry that Luxpro was selling cheap "knock-offs", cheap copies or illegal copies of Apple's iPod products, and that Luxpro's distributors and retailers were, therefore, subject to the same legal attack if they chose to do business with Luxpro.  Combined with these misrepresentations of Luxpro's products and threats of litigation, Apple also threatened to cut off these same distributors and retailers from access to Apple's products.

41.     Determined to protect its products and corporate reputation, as well as to try to keep its contractual promises to its distributors, retailers and customers in order to meet their growing demand for its very popular MP3 product line, Luxpro appealed the provisional injunction **and won**.  The injunction was lifted as to all of Luxpro's MP3 products, except the one product that had previously included in its name the term "Shuffle."   In fact, the Taiwanese Court, after examining all the evidence, determined that Luxpro had introduced other functionally superior products into the marketplace

*prior to* Apple's rollout of its "next generation" products with similar features. Therefore, Luxpro was not copying Apple's design or technology. Unfortunately, the time that it took to reverse that original ruling was time lost for Luxpro in its efforts to save its hard-earned position and reputation in the fast-paced and rapidly changing MP3 market. During this interim, Luxpro had been forced to stop all production, manufacturing, advertising and marketing of its popular Tangent MP3 players and, ultimately, lost its distribution agreements previously listed. Those distributors and customers, which had been so anxious to purchase Luxpro's products, cancelled those commitments under threats of litigation and boycott from Apple, directly, and through additional threats from Apple's own distributors of MP3 products. In addition, Apple's illegal acts caused prospective customers and business partners to lose interest.

42. Apple wanted to be certain that Luxpro would not be able to recover its lost business opportunities, so Apple filed its own appeal of the reversal of the injunction. Ultimately, Luxpro was able to convince the Taiwanese District Court and Supreme Court that its next-generation MP3 players were substantially different and functionally superior to the products that Apple had subsequently placed in the market and that the initial injunctive relief had been improperly requested. Nevertheless, Apple continued to file additional appeals.

43. During the time it took to overturn the injunction, and while Apple continued its appeals, Luxpro tried to preserve its agreements with the distributors and resellers of its products, and attempted to negotiate with material suppliers to terminate, postpone or hold orders of raw materials. Unfortunately, many of those raw material

orders could not be cancelled.  As a result, Luxpro's relationships with its raw material suppliers were significantly damaged and its ability to produce its products was lost.

44.     Even though Luxpro fought hard and ultimately won its legal battles with Apple, particularly with regard to its Top Tangent and EZ Tangent MP3 players, it was too late to regain the trust and acceptance of its customers and distributors.  In essence, Apple destroyed Luxpro's opportunity to compete with these products during the "golden window" of the fast-paced and rapidly developing MP3 player market.  Luxpro was forced to abandon its efforts to list its stock on the Gre-Tai Securities Market, thus destroying Luxpro's ability to raise additional capital and to market its corporation to other investors.  Apple had used the pattern of sham litigation and misrepresentations of Luxpro's products as "cheap knock-offs" and "illegal copies" to ruin the company's reputation with the public, prospective customers and business partners, and with its current customers, business contacts, and partners.

45.     Apple knew very well that Luxpro would not be able to clear its name quickly enough to compete effectively in the global and US markets until the litigation had concluded.  Even though the Taiwanese Courts revoked the improperly requested provisional injunction against the Top Tangent and EZ Tangent MP3 players, Apple would not stop its sham litigation tactics and other unfair trade practices until Luxpro's destruction was complete.

**H.     Apple Also Files A Complaint With The Fair Trade Commission in Furtherance of Its Pattern of Sham Litigation.**

46.     In addition to seeking the injunctive relief from the Taiwanese Courts, Apple also filed a complaint with the Taiwanese Trade Commission alleging that Luxpro violated Taiwan's Fair Trade Act by selling products that were confusingly similar to

Apple's products.  The Fair Trade Commission ruled against Apple and issued a letter opinion stating that Luxpro's Tangent product line was not in violation of the Fair Trade Act.  True to its plan, Apple appealed that ruling, too.

**I.      The Pattern of Sham Litigation and Appeals Contribute to Apple's Scheme to Intimidate and Threaten Luxpro's Business Partners.**

47.      Apple used the pendency of the lawsuit in the Taiwan District Court and the challenge before the Taiwanese Fair Trade Commission as the bases for its threatening letters to Luxpro's business partners (distributors, retailers, re-sellers and customers) and threatened to file the same type of litigation against them, for selling what Apple called cheap knockoffs and illegal copies of the iPod, if they continued to do business with Luxpro.  These threats, misrepresentations, and the delays caused by Apple's sham litigation strategy caused Luxpro to lose valuable market opportunities and an enormous amount of product orders that would have flowed to Luxpro naturally from its established market acceptance and the product demand that  Luxpro's products had generated in the past.

48.      Apple's abusive litigation tactics and misrepresentations to Luxpro's business partners kept Luxpro from recovering even after the favorable rulings had been obtained from the Taiwanese Civil Court and the Taiwanese Fair Trade Commission. While Apple was appealing those favorable rulings, Apple and its marketing representatives continued to threaten Luxpro's distributors and retailers to the point where they could not afford to do business with Luxpro any longer.  For example, Luxpro placed significant pressure on InterTAN, a subsidiary of the U.S. based consumer electronics giant, Circuit City, to drop Luxpro's MP3 players from its retail shelves. InterTAN yanked and destroyed 4500 Luxpro MP3 players, which drastic action was

toxic to Luxpro's ability to recover and restore its reputation.  Despite the popularity of the Luxpro MP3 players in its retail stores, in April 2006, InterTAN decided to stop placing orders with Luxpro.  News of the incident spread throughout the MP3 player market. Apple sent letters to Luxpro's business partners threatening the same type of litigation against them if they purchased and resold Luxpro's products.  Apple also used its own distributors to spread false statements throughout the MP3 industry that Luxpro's products were cheap "knock-offs," or cheap copies or illegal copies of Apple's iPod products.

**J.     Apple's Pattern of Sham Litigation and Misrepresentations of Luxpro's Products Destroy Luxpro's Business.**

49.     All of Luxpro's distribution agreements detailed in paragraph thirty (30) were terminated during the latter part of 2005 and early 2006; terminations that are directly attributable to Apple's illegal conduct.  In addition, because of Apple's disparaging statements about Luxpro's products and its business operations, as well as Apple's threats of litigation and boycott, the dozens of customers, retailers and re-sellers that had already purchased thousands of units of Luxpro's MP3 products stopped doing business with Luxpro and even cancelled some existing orders.  In addition, Luxpro's business relationship with its suppliers of parts and components for its MP3 product market was destroyed, causing Luxpro to lose its ability to manufacture those products.[10]

50.     These devastating results continued throughout 2006 as Apple persisted in its appeals of Luxpro's favorable rulings in the Taiwanese Civil Courts and Taiwan Fair Trade Commission.  In September 2006, Apple increased its pressure on Luxpro's

---

[10] Luxpro has specifically listed numerous examples of Apple's misconduct herein as it relates to Luxpro business partners, suppliers, customers, and distributers.  This should not be considered an exhaustive list.  In addition, because a great deal of the specific information (*e.g.*, threats, misrepresentations, etc.) is in the possession of third parties, as well as Apple, discovery is needed to expose the specific communications between Apple and Luxpro's business partners.

business partners and, based on the pendency of the sham litigation, continued to make threats of similar lawsuits and disparaging remarks about Luxpro and its products.

51.     During that same time frame, a number of specific examples of Apple's illegal conduct (also noted elsewhere in this Second Amended Complaint) provide a glimpse into Apple's scheme to destroy Luxpro, not based on fair competition, but rather, premised on an illicit campaign of fraud, misrepresentation, and thuggish intimidation tactics intended to gut the MP3 player market of lower-cost competitors.  In fact, Apple issued threats to Luxpro's suppliers, business partners, and retailers that they would receive the same treatment if they continued to do business with Luxpro.  It goes without saying that the conduct described herein only represents a sample of the illegal conduct of which Luxpro is aware.  Only thorough discovery into Apple's tactics will reveal the full scope of Apple's plan, which Luxpro reasonably believes is likely much broader than detailed here.

52.     For example, Apple threatened Orchard Company ("Orchard"), a Singapore Company, and Kaga Electronics Company Ltd., ("Kaga", a major Japanese distributor, that had purchased large quantities of Luxpro's MP3 products) and demanded they cease all business relations with Luxpro or face the same type of lawsuits Apple had filed against Luxpro – again, based upon misrepresentations that Luxpro's products were cheap knock-offs or illegal copies of the Apple iPod.  Those companies, along with WebWorker (a German purchaser of Luxpro's MP3 Players), ended all of their business relationships with Luxpro - based upon these litigation threats and misrepresentations.  Notably, Apple asserted to WebWorker, among other things, that Luxpro was violating European copyrights by selling its MP3 products, but never specified what copyright it

owned that Luxpro was allegedly violating.  Indeed, no claim of copyright infringement has ever been formally levied against Luxpro by Apple, nor has Apple ever identified any patent, copyright, or trademark, registered in *any* country, that Luxpro even arguably has violated.  The threats levied by Apple against Luxpro's business partners and customers were baseless.

53.    Another company, Elecom, Co. Ltd., informed Luxpro, after the August 2005 lawsuit and after expressing interest in purchasing several thousand Luxpro MP3 players, that because of the lawsuit with Apple, they could not do business with Luxpro; if they did, Apple would stop doing business with them.

54.    In addition to the distribution agreements, direct product sales, and other interest from current and prospective business partners described above, Luxpro also received requests for samples from over 1,000 other companies in Asia, Europe and in the United States (such as Best Buy, RadioShack, and Wal-Mart), and was also receiving interest from global retailers of other products that wanted to joint venture with Luxpro in the digital music industry.  For example, Starbucks Corporation had agreed to a trial marketing campaign that would place Luxpro's MP3 players in Starbucks' Japanese stores.  These MP3 players were specially designed for Starbucks' customers and included pre-selected music.  Luxpro prepared samples, as requested by Starbucks. and was on the verge of implementation of this joint venture prior to the interference and unfair trade practices of Apple.

55.    A similar incident occurred with Japan Airlines.  Interest was expressed by Japan Airlines in Luxpro's products, samples were made and delivered to the prospective

customer, but the deal was cancelled due to Apple's illegal conduct and pattern of sham litigation.

56.     Also, a number of retailers and distributers (*e.g.*, Fatech Co., Carrefour, Dai-ichi Denki, TKEC 3C, ET-Mall TV Shopping) that were interested in and/or actually selling Luxpro's products were threatened by Apple to immediately stop selling Luxpro's products (or cease discussions with Luxpro) because Luxpro had illegally copied Apple's products.  If they did not agree, Apple would seek to interrupt, disrupt, or impede their ability to do business, as well as file lawsuits against them.

57.     Other companies dealing with Luxpro's MP3 products detailed similar stories, including Bruder Products, Ltd., a major exporter, who was intimidated and threatened by Apple because it was doing business with Luxpro.  Also, Carrefour retail stores displayed Luxpro's MP3 products (through Hi-Im Intertrade Co. and others) right next to Apple's iPod products in 2005.  Upon discovering the display, Apple demanded that Luxpro's display be taken down, that Carrefour stop selling Luxpro's products as displayed, and that Carrefour agree not to sell any of Luxpro's future products.  Because of Apple's threats and intimidation, Carrefour cancelled the orders and distribution shipments with Luxpro.

58.     Finally, because of the success of its products, Luxpro was also receiving interest from venture capital firms and outside investors, which would have helped provide liquidity and additional capital to Luxpro in order to expand and meet the market's growing demand for its products.  For example, Nikko VC was very interested in investing in Luxpro and meetings were held between the parties in 2005.  Due to

Apple's pattern of sham litigation and other illegal tactics, however, Nikko VC decided later to not invest with Luxpro.

59.     In addition, Apple threatened Luxpro itself, claiming, without specificity, that Luxpro was violating Apple trademarks, copyrights, and unregistered design rights. Moreover, Apple threatened Luxpro by noting that its commercial partners were also at risk of incurring civil fines, having their property confiscated, and even being punished criminally.  Indeed, Apple threatened to have Luxpro sued in every country in which Luxpro was doing business.

60.     As discussed above, in addition to Apple's direct contacts with Luxpro's distributors, retailers and customers, Apple used its own suppliers, such as ASUS Tek Computer Co. ("ASUS") and Synnex Technology International Corp. ("Synnex") to spread the disparaging comments about Luxpro and its products, and the threats of similar litigation and boycott against anyone who cooperated with Luxpro, throughout the MP3 player market.

61.     These misrepresentations, abusive litigation and unfair trade practices were used by Apple consistently  in late 2005, and throughout 2006, and 2007, even though Apple claimed no infringed copyrights, patents, or trademarks in the litigation against Luxpro, and even though the Taiwanese Courts ultimately ruled that the Luxpro MP3 products (the EZ Tangent and Top Tangent products, in particular) did not violate the Taiwanese Fair Trade Laws as confusingly similar in dress or design.  In fact, Apple could not make those claims because Apple later admitted that the iPod technology and design was actually the idea or invention of Kane Kramer, an English businessman. Kane Kramer had patented much of the technology used in the digital music players and

had copyrighted his own drawings of a digital music player very similar to the iPod back in 1979. When Mr. Kramer's patent expired in 1988, that technology became public property, not the intellectual property of Apple.

62.     By the time Luxpro had successfully defeated Apple's abusive litigation strategy in the Taiwanese District Court and before the Taiwan Trade Commission, it was too late to get back into the global MP3 market, and too late to penetrate Apple's vise-grip on the United States MP3 market.   Moreover, Luxpro's reputation had been significantly damaged.   Apple knew very well that its misrepresentations concerning Luxpro and its products were untrue.   Rather than selling "cheap knock-offs" or "illegal copies" of Apples MP3 products, Apple was, itself, copying the design and technology that had been developed by others and had been in the public domain for two decades. Nevertheless, Apple's efforts to ruin Luxpro as a viable competitor and to unfairly disparage Luxpro's products throughout the global MP3 market, caused irreparable damage to Luxpro's business reputation and to the marketability of its products.

63.     The damages caused to Luxpro included the loss of valuable distributorship agreements, existing and prospective future sales and profits of its MP3 products, a greater market share in the burgeoning MP3 player market, as well as the loss of its access to the materials necessary to manufacture Luxpro's MP3 products.   Luxpro's loss of goodwill associated with its products and business reputation in general was caused by Apple's conduct in approaching others in the MP3 player market.   The destruction of Luxpro's business reputation also resulted in the loss of working capital and investors that would have been available to Luxpro from venture capitalists and from the public listing of its stock on the Gre-Tei Stock Exchange.   Apple's persistence in

pursuing this sham litigation strategy and the spread of false representations concerning Luxpro's commercial development of its own line of MP3 players caused Luxpro to lose its place in the "golden window" of the development and marketing of its products in the world-wide MP3 market.  In addition, Luxpro had a vested interest in a greater market share on the MP3 player market, as well as in the revenues and profits from substantial numbers of its MP3 players that Apple directly caused to be destroyed, returned, or became the result of cancelled orders and interest.  Apple's false and disparaging statements about Luxpro and its products were for the intended purpose of damaging Luxpro and its products. At the same time, those actions gave Apple an unfair and unlawful opportunity for the commercial promotion of its own MP3 products. All of these actions destroyed Luxpro's ability to fairly compete in the same market.

## IV.   CAUSES OF ACTION

### A.   Tortious Interference with Contractual/Prospective Advantage

64.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

65.    As explained in the complaint, Luxpro had achieved remarkable success in the development and marketing of it own line of MP3 products. Luxpro had entered into written distribution agreements with companies to retail its MP3 products throughout Asia, Europe, India, South Africa and the worldwide market. In addition, Luxpro had actually sold thousands of its products to dozens of re-sellers all over the world, including the United States.  Through its sham litigation campaign and false statements that Luxpro was manufacturing and selling cheap knock offs and illegal copies of the iPod Players, together with threats to sue Luxpro's business partners, too, if they purchased and resold

Luxpro's products, Apple was able to intimidate the distributors into cancellation of those agreements.  Those same litigation threats, combined with threats of boycott, based on false statements about Luxpro's products throughout the worldwide MP3 market caused the cancellation of existing purchases orders and promises of future orders from independent retailers with whom Luxpro was doing business.  Apple's disparagement of Luxpro and its products destroyed its reputation in the MP3 market and with its suppliers and interested investors.

66.     Due to the early success of Luxpro and the existing contracts that were canceled only due to Apple's untrue disparaging misrepresentations, and threats of similar lawsuits and boycott, Luxpro had a reasonable expectation of economic advantage or benefit from its MP3 products.  As set forth above, Luxpro has been in the MP3 players business since 2002 and had a number of business partners with whom it had entered into contracts.   Those contracts and purchase orders called for Luxpro's MP3 players to be distributed, marketed and sold throughout the world in well known stores such as The Source by Circuit City, Carrefour, Kaga Electronics and many more that are named in this Complaint.  Luxpro's MP3 players were unique and were designed with features that not all MP3 players had, such as a FM radio tuner, and the ability to record, organize and play music other than the songs sold by Apple.

67.     The threats to Luxpro's distributors, retailers and suppliers show that Apple had knowledge of Luxpro's expectation of economic advantage or benefit.  In fact, without Luxpro's knowledge or consent, Apple sought out information about Luxpro's relationships with its business partners and made direct contact with them to disparage Luxpro and its products.  Apple implemented a concerted plan to discredit  and disparage

Luxpro  and its MP3 products and even persuaded other business entities to exert pressure on Luxpro's business partners to stop selling Luxpro's products by telling them they could be subject to civil fines and criminal liability. These threats were based on the false premise that Luxpro was making cheap knockoffs or illegal copies of Apple's iPod.

68.     Apple wrongfully, and without justification, interfered with Luxpro's reasonable expectation of an economic advantage or benefit.  No legally sufficient justification for Apple's efforts to destroy Luxpro exists.  Apple's actions can only be explained by its thirst for complete global dominance in the worldwide MP3 player market.

69.     In the absence of the wrongful acts of Apple outlined in detail in this Complaint, it is reasonably probable that Luxpro would have realized its expected economic advantage or benefit.  Luxpro was already a successful company in the worldwide MP3 player market.  A reasonable probability certainly exists that Luxpro would have realized a significant economic advantage or benefit that it missed out on due to Apple's scheme to quash it.

70.     Luxpro did in fact sustain damages as a result of this wrongful interference by Apple.  Luxpro sustained damage as a result of Apple's wrongful interference because its true market share in the worldwide MP3 player market was never realized,  and existing commitments and requests for future sales were lost.  Supply lines were cut and funds for capital expansion were ruined by Apple's unfair trade practices, causing loss of goodwill, revenues, profits and investment capital.

**B.     Tortious Interference with a Contract**

**7**1.     Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

72.     Valid contractual relationships existed between Luxpro and its distributors and independent retailers, as well as its suppliers and other business partners. As set forth above, Luxpro has been in the MP3 players business since 2002 and had a number of business partners with whom it had entered into contracts, many of which are outlined in this Complaint.  Those contracts called for Luxpro's MP3 players to be distributed, marketed and sold throughout the world in well known stores, many of which are also listed in this Complaint.

73.     The sham litigation campaign filed against Luxpro and direct threats to those business partners of similar treatment show that Apple had knowledge of the relationships between Luxpro and Luxpro's retailers, distributors and business partners.

74.     Apple intentionally and improperly interfered with the relationships between Luxpro and its distributors and retailers which induced or caused a breach or termination of said relationships.  Apple forced entities like Tounsen and  InterTAN to drop existing contracts with Luxpro or be subject to legal recourse (lawsuits) and also be shut off from access to Apple products (boycott).  Such unfair trade practices and conduct was intentional and improper.  Apple's market share of the worldwide MP3 player market at that time was so great, InterTAN had no real choice but to bow to Apple's threats and terminate their relationships with Luxpro.

75.     As a result of Apple's intentional and improper interference, Luxpro experienced significant economic loss, including loss of revenues, profits and other consequential damages.  Luxpro expended substantial sums in developing its MP3 player

products prior to Apple's intentional and improper interference.   Luxpro sustained enormous damages as a result of Apple's wrongful interference because the termination of these agreements caused Luxpro to lose existing and future purchase orders, its business was destroyed and its true potential or available market share in the worldwide MP3 player market was never realized.

**C.      Violation of Section 43(a) of the Lanham Act,  15 USCA §1125(a).**

76.     Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

77.     The false statements that Luxpro was selling cheap knockoffs or illegal copies of Apple's MP3 players, as alleged in this Complaint, constitutes false descriptions and unfair competition under the Lanham Act because the Defendant, Apple, (1) made material misrepresentations and false disparaging statements about the nature or characteristics of the Plaintiff, its business practices and its products; (2) those false and misleading misrepresentations were made in commerce because they were spread and repeated directly to Luxpro's distributors and retailers and throughout the worldwide MP3 market; (3) were made in the context of commercial advertising or commercial promotion; and (4) caused extensive  compensatory and consequential damages to the Plaintiff and to the Plaintiff's products.

78.     Accordingly, Apple has violated §43a of the Lanham Act by knowingly engaging in false representations in its commercial activities which disparaged both the commercial business and operations of Luxpro and its products and, therefore, constituted unfair business practices.

79.     Apple knew the misrepresentations and other statements that it made were false, or were at least misleading to the public, and were intended to be acted upon or to have an effect on Luxpro's business partners (distributors, retailers, resellers, and suppliers and other business relationships).

80.     Apple's unfair trade practices caused extensive damage to Luxpro's business reputation and caused Luxpro economic losses and pecuniary damages, together with special damages in the loss of its goodwill and its ability to raise capital through the listing of its stock on the Gre-Tai Stock Exchange, as well as the loss of working capital through investments from venture capitalists.  These actions were taken by Apple with the knowledge of Luxpro's business relationships, both existing and prospective, and with the intent to cause economic harm to Luxpro. Therefore, Plaintiff is entitled to recover compensatory damages as well as special damages and punitive damages. Luxpro is also entitled to seek disgorgement of profits that Apple took from Luxpro unlawfully as a result of its unfair trade practices.

**F.     Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.***

81.     Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

82.     The conduct alleged in this complaint, including its violation of the Lanham Act and its disparagement of Luxpro and its products constitutes unfair competition and unlawful, unfair, and fraudulent business acts and practices within the meaning of the California Unfair Competition Law, § 17200, *et seq.* of the California Business and Professions Code.  Luxpro has suffered injury in fact and lost money and/or property as a result of Apple's violations of law and wrongful conduct.

83.     Apple's actions are unlawful and unfair because, in an attempt to dominate the worldwide MP3 player market, it has attempted to squash a smaller competitor, Luxpro through false and misleading statements about Luxpro and its products to Luxpro's business partners and the worldwide MP3 market.   Apple has interfered with Luxpro's business, economic advantages and contracts and has unlawfully disparaged Luxpro's name in the worldwide MP3 player market in violation of the Lanham Act and the common law.

84.     Accordingly, Apple has violated the Unfair Competition law proscription against engaging in unlawful, unfair, and fraudulent business practices.   Luxpro is entitled to injunctive relief from the Court to stop Apple from continuing these unfair trade practices.

85.     In addition, as a result of Apple's unlawful, unfair and fraudulent conduct, Apple has been unjustly enriched at the expense of Luxpro.   Luxpro is, therefore, entitled to seek restitution in the form of the disgorgement of profits that Apple received and in which Luxpro had a vested interest as a result of its existing distribution agreements and market acceptance that Luxpro's products had already achieved.

## G.     Commercial Disparagement

86.     Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

87.     Apple published false statements concerning Luxpro's business, its practices and products.   Apple spread false rumors that Luxpro was manufacturing and selling cheap copies and illegal copies of Apple's MP3 players.   Apple threatened

Luxpro's business partners with lawsuits similar to those Apple had filed against Luxpro (and lost) if they continued to do business with Luxpro.

88.     Apple intended the publication of its false statements to cause a pecuniary loss to Luxpro or Apple should have reasonably known that the publication of its false statements would result in a pecuniary loss to Luxpro's business and products.

89.     Apple knew the statements it made were false or Apple acted in reckless disregard of the statements' truth or falsity.

90.     Apple's disparagement caused harm to Luxpro's reputation, loss of valuable goodwill and caused Luxpro economic losses and special damages in the form of lost business profits (past, present and future), loss of working capital and the ability to secure additional capital through the listing on the Gre-Tai Stock Exchange and through investments from Venture Capitalists.

## DAMAGES

91.     As a direct and proximate result of Defendant's unlawful actions, and unfair business practices described in this Complaint, Plaintiff has been damaged in an amount to be determined by a jury at a trial of this matter, and Plaintiff will seek an award of costs and attorney's fees.

92. Plaintiff's damages, general and special, include: lost profits (past, present and future) caused by Apple's conduct; loss of market share by Luxpro in the electronics product market, and the MP3 Player market in particular; loss of goodwill as to both Luxpro's business reputation and as to the type and quality of Luxpro's products; loss of capital for future operations through private investments and through the listing of Luxpro's stock on the Gre-Tai Stock Exchange, all of which losses occurred, as described

in the complaint, as a direct and proximate result of Defendant's unlawful actions and unfair business practices.  In addition to the aforementioned damages and as a result of the  willful conduct on the part of the Defendant, punitive damages should be imposed to punish the conduct of the Defendant and to deter others from similar conduct.

93. Finally, Luxpro also seeks restitution, because it had a vested interest in profits that would have been  received through the contracts and business arrangements that were cancelled due to the intentional and wrongful conduct of Apple.  That conduct also caused a loss of Luxpro's growing share of the MP3 and electronic products market, together with loss of revenue, profits and goodwill, as detailed in the complaint, and injunctive relief from the Court, to preclude Apple from continuing its illicit and illegal conduct. Plaintiff also seeks to recover any and all further relief it is entitled to receive under the applicable law or in equity.

## JURY DEMAND

94.  The Plaintiff demands a jury trial on all issues of this complaint.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff prays for judgment against the Defendant and respectfully requests that this Court enter its Order granting judgment against Defendant for actual and consequential damages, costs, attorney fees, punitive damages and for all other relief which Plaintiff is entitled.

Respectfully Submitted,


/s/ Phillip N. Cockrell
Richard A. Adams
Ark. Bar No.  97036
Phillip N. Cockrell
Ark. Bar No.  79154
Leisa B. Pearlman
Ark. Bar No. 92070
Corey D. McGaha
Ark. Bar No.  2003047
Reid D. Miller
Ark. Bar No. 2008264

**PATTON ROBERTS PLLC**
2900 St. Michael Drive, Suite 400
Texarkana, Texas 75505-6128
Phone:  (903) 334-7000
Fax:  (903) 334-7007

Jeremy Y. Hutchinson
Ark. Bar No.  2006145
**PATTON ROBERTS PLLC**
111 Center St., Suite 1315
Little Rock, AR 72201
Telephone: (501) 372-3480
Facsimile: (501) 372-3488

Patrick J. Conroy
*Pro Hac Vice*
Glenn E. Janik
*Pro Hac Vice*
**SHORE CHAN BRAGALONE LLP**
Bank of America Plaza
901 Main Street, Suite 3300
Dallas, Texas 75202
Telephone:  (214) 593-9110
Facsimile:  (214) 593-9111

**ATTORNEYS FOR PLAINTIFF
LUXPR0 CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule, this <u>29</u><sup>th</sup>   day of December, 2009

 <u>/s/ Phillip N. Cockrell</u>